UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | : Chapter 11 |
| BARNET LOUIS LIBERMAN, | Case No. 8-21-70611-reg |
| Debtor. | : |

**NOTICE OF TELPEPHONIC HEARING TO CONSIDER THE DEBTOR'S MOTION FOR ORDER APPROVING SETTLEMENT**

**PLEASE TAKE NOTICE** that on the date hereof, Barnet Louis Liberman, the above-referenced debtor and debtor-in-possession (the "Debtor") filed the annexed *Motion for Order Approving Settlement* (the "Motion"). The undersigned proposed counsel will present the Motion to the Honorable Robert E. Grossman, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of New York (the "Court"), at a telephonic hearing to be held on **May 10, 2021 at 10:00 a.m. (ET)** (the "Telephonic Hearing").

**PLEASE TAKE FURTHER NOTICE,** that objections to the relief requested in the Motion, if any, must be in writing, conform with Title 11 of the United States Code and Bankruptcy Rules, state with particularity the grounds therefor, and be filed with the Court, with a courtesy copy to the Chambers of the Honorable Robert E. Grossman, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of New York, if required, and served upon, so as to be received by: (i) Rosen & Associates, P.C., *proposed counsel to the Debtor*, 747 Third Avenue, New York, New York 10017-2803, Attn.: Sanford P. Rosen, Esq. (srosen@rosenpc,.com); (ii) Office of the United States Trustee for the Eastern District of New York, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, New York 11722, Attn.: Christine H. Black, Esq., Assistant United States Trustee; and (iii) Rosenberg & Estis, P.C., *counsel to 305-421 LLC*, 733 Third Avenue, New York, New York 10017, Attn.: John Giampolo, Esq. (jgiampolo@rosenbergestis.com), no later than May 3, 2021 at 4:00 p.m. (the "Objection Deadline"), as follows: (a) (i) through the Court's electronic filing system, in accordance with General Order M-242, which may by assessed through the internet at the Bankruptcy Court's website at www.nyeb.uscourts.gov by registered users; and (ii) in portable document format ("PDF") using Adobe Exchange Software for conversion; or (b) if by a party that is unable to file electronically, such party shall submit the objection in PDF format on portable media in an envelope with the case name, case number, type and title of document, document number to which the objection refers and the file name on the outside of the envelope.

PLEASE TAKE FURTHER NOTICE, that in order to attend the Telephonic Hearing, in accordance with the Court's rules and procedures, all parties must email the Courtroom Deputy at: reg_hearings@nyeb.uscourts.gov at least 24 hours in advance of the scheduled hearing to identify the parties that will appear. All attorneys must also identify the party that the attorney represents. The Court's relevant rules and procedures for attending the Telephonic Hearing are set forth more fully at https://www.nyeb.uscourts.gov/content/judge-robert-e-grossman.

PLEASE TAKE FURTHER NOTICE, that a copy of the Motion may be obtained by either: (i) accessing the Court's website at www.nyeb.uscourts.gov, (ii) contacting proposed counsel to the Debtor, or (iii) contacting the Office of the Clerk of the Court at Central Islip, New York. Note that a PACER password is needed to access documents on the Court's website.

DATED: New York, New York
      April 15, 2021

BARNET LOUIS LIBERMAN
  *Debtor and Debtor in Possession*
By his Proposed Counsel

ROSEN & ASSOCIATES, P.C.

By: /s/ Sanford P. Rosen
      Sanford P. Rosen
747 Third Avenue
New York, New York 10017-2803
(212) 223-1100

ROSEN & ASSOCIATES, P.C.
Proposed Attorneys for the Debtor
and Debtor in Possession
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Sanford P. Rosen
Paris Gyparakis

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

In re: Chapter 11

BARNET LOUIS LIBERMAN, Case No. 8-21-70611-reg

Debtor.

---------------------------------------------------------x

**MOTION OF BARNET LOUIS LIBERMAN FOR THE ENTRY OF ORDER APPROVING SETTLEMENT**

TO THE HONORABLE ROBERT E. GROSSMAN, ,
UNITED STATES BANKRUPTCY JUDGE:

Barnet Louis Liberman, the above-captioned debtor and debtor in possession (the "**Debtor**"), by his proposed attorneys, Rosen & Associates, P.C., respectfully represents:

**PROCEDURAL BACKGROUND**

1. On April 1, 2021 (the "**Petition Date**"), the Debtor commenced in this Court a voluntary case under chapter 11 of the Bankruptcy Code.

2. The Debtor is continuing to operate his businesses and manage his properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. To date, an official committee of unsecured creditors has not been appointed by the Office of the United States Trustee.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N). Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**THE DEBTOR'S BUSINESSES**

5. The Debtor is a real estate developer, having many years of experience in the residential rental and condominium sector.

6. Among the Debtor's projects are the condominium located at 305 Second Avenue, known as Rutherford Place Condominium, and the condominium located at 421 Hudson Street a/k/a 29 Clarkson Street, New York, NY 10014, known as Printing House Condominium. For many years, the Debtor's partner has been Winthrop Chamberlin ("**Chamberlin**").

7. The building located at 305 Second Avenue was originally the New York Lying-In Hospital, which provided maternity services to the women of New York City. The building was built by JP Morgan, with a design by architect Robert Henderson Robertson. Robertson is known for his designs of the American Tract Society Building, the New York Savings Bank Building, and Park Row Building. Construction on the hospital began in 1899 and was completed in 1902. The building was operated as a hospital for over 80 years.

8. In 1984, the building began its conversion into condominium residences with a design by Beyer Blinder Belle sponsored by 305 Second Avenue Associates, L.P. of which the Debtor and Chamberlin were general partners. This conversion was completed with the original offering plan filed in 1986.

9.      Rutherford Place Condominium is currently listed on the National Register of Historic Places. Rutherford Place Condominium had been realigned to form 127 unique, multi-level homes featuring fully-renovated, elite finishes, double-glazed mahogany windows, 10 feet high illuminate ultra-high ceilings reaching 17 feet.  Residents enjoy services including a 24-hr doorman, and available valet and maid service.

10.      Printing House Condominium, capped with a dramatic green cornice, located in the West Village was built in 1911 as an industrial printing building. When converted to rental apartments in 1979, 421 Hudson Street was in the vanguard of the luxury loft era that still defines downtown Manhattan living. Within Printing House Condominium are 184 units, all with high ceilings and massive windows overlooking James Walker Park and the 19th Century townhouses that line St. Lukes Place. Inside, the lofts have carefully-considered finishes in open layouts. Two 4,200-square-foot townhomes offer private elevators, rooftop terraces, floor-to-ceiling windows, and gas-burning fireplaces.  A notable feature is its Mews, a 200-foot-long gated and landscaped lane stretching from Leroy to Clarkson Street designed by Gunn Landscape Architecture.

11.      Despite a long history of success, the Debtor has recently experienced severe financial distress due to several factors, including irreconcilable differences with Chamberlin, construction issues relating to the renovation of unsold condominium units and the disruption caused by the Coronavirus pandemic ("**COVID-19**"), which has contributed to a recession in the New York City residential real estate market.

12.      On March 11, 2020, the World Health Organization officially declared COVID-19 a pandemic.  In response, national, state, and local governments in the United States,

and around the world, imposed shelter-in-place and stay at home orders, as well as social distancing protocols.

13.     Before the pandemic and the downturn in the residential real estate market, the Debtor had a substantial liquidity cushion, was improving operations, and was proactively engaging with creditors to deleverage his capital structure and extend debt maturities to build a healthier balance sheet. Unfortunately, that progress was extinguished with the onset of COVID-19. Moreover, the Debtor's affiliates, many of whose loan obligations have been guaranteed by the Debtor, are unable to pay the upcoming debt service on their over-burdened capital structure.

14.     Due to the pandemic, the value of the Debtor's Interests, as hereinafter defined, has been significantly impacted.  The severe decrease in apartment unit sales, residential and commercial rent revenue loss, and negative pressure on property values resulting from crucial but economically painful public safety measures, coupled with disputes with Chamberlin, necessitated this chapter 11 case. This proceeding will allow the Debtor to successfully navigate this uncertain period and emerge from this bankruptcy (and this pandemic) stronger than ever with an appropriately sized balance sheet.

15.     Beleaguered by the pandemic with ever declining sources of revenue, depleted reserves of cash and overburdened by a host of guaranties, the Debtor found himself facing imminent events of default under loan agreements under which he is a guarantor in the summer of 2020.  The Acquirer, as defined below, has been in negotiations with a number of lenders and has enabled a number of borrowers to make certain payments to lenders.  In addition, the Acquirer has engaged in ongoing negotiations in an effort to obtain the time necessary to allow the assets to recover the value lost in the recent past.

16.     In addition, several judgments have been entered against the Debtor.  These judgments, along with the Chamberlin disputes, plus inadequate working capital have precluded the Debtor from restructuring the debt of his affiliates that is associated with the unsold condominium units.  Thus, the assets of certain entities in which the Debtor has an equity interest are at risk of imminent foreclosure.  This is particularly so with respect to the Debtor's interest in 305 Second Avenue Associates, L.P., the original sponsor of the Rutherford Place Condominium, and parent entity of several limited liability companies that still hold unsold condominium units.  In many instances, the Debtor has provided guaranties of payment and/or performance obligations, such as the completion of construction that the loans financed.

17.     Unfortunately, however, the Debtor does not have access to working capital or other resources necessary to restructure the obligations of his affiliated entities.  In light of these challenges, the Debtor began to consider and pursue strategic alternatives.

18.     The Debtor has succeeded in finding an entity which has the wherewithal to achieve a restructuring, reconcile management, governance, and funding issues with Chamberlin, and thus hopefully not only preserve but maximize the value of such interests.  Pursuant to the terms of a Profit Participation Agreement to be entered into with such entity, discussed below, some of such value will be available for the Debtor and his estate and provide the funding to underwrite distributions under a plan of reorganization.  Moreover, absent entering into the Profit Participation Agreement, it is likely that the Debtor would lose the Interests and creditors would realize no value.

## THE DEBTOR'S INTERESTS

19. Among the Debtor's property are his interests (the "**Interests**") in 305 Second Avenue Associates, L.P. and Mountbatten Equities L.P. (collectively, the "**Entities**").[1]

20. 305 Second Avenue Associates, L.P. is a holding company that owns directly the interests in (i) 305 Second Avenue LLC, which directly owns the interests in Rutherford Palace LLC; (ii) Remnant 305 LLC, (iii) Super 714 LLC; (iv) 305 Commercial LLC; and (v) 305 Las Vegas LLC. The Debtor and Chamberlin each were general partners and each own approximately 33.48% of 305 Second Avenue Associates, L.P., which was the original sponsor of the Rutherford Place Condominium, located at 305 Second Avenue, New York, New York. Its subsidiaries, with the exception of 305 Las Vegas LLC, own residential and commercial units in Rutherford Place Condominium and have substantial obligations related thereto.

21. Rutherford Palace LLC owns ten remaining residential units in Rutherford Place Condominium. 305 Second Avenue LLC is the borrower under a mezzanine construction loan, the proceeds of which were used to renovate the residential units owned by Rutherford Palace LLC. 305 Second Avenue LLC is the borrower under a $7,000,000 mezzanine mortgage loan that is currently in default and Rutherford Palace LLC is the borrower under a $8,000,000 mortgage loan that is currently in default. The Debtor guaranteed the completion of the construction and the cost of carrying the units. The liability under the completion and carry guarantee is projected to be approximately $3,500,000. This liability would extinguish any remaining equity that the Debtor might have in the remaining 305 Second Avenue Associates, L.P. subsidiaries.

[1] The Debtor owns interests in certain other properties. These interests are not the subject of this transaction.

22.     Remnant 305 LLC owns three remaining residential units in Rutherford Place Condominium and has no debt.  However, the value of these units has suffered from remaining vacant for the majority of 2020, a lack of capital, complications in the form of a lapsed filing with the New York State Attorney General, arrearages on common charges and taxes.

23.     Super 714 LLC is the leaseholder of one unit in Rutherford Place Condominium and the owner of one residential unit in Rutherford Place Condominium that is leased to the building's superintendent, which unit is subject to a mortgage loan.  The value of this asset has suffered from the leasehold unit remaining vacant for the majority of 2020 and the rent on the owned unit is insufficient to satisfy the remaining expenses and debt service.

24.     305 Commercial LLC owns various ground floor and concourse level commercial units in Rutherford Place Condominium.  305 Commercial LLC is the borrower under a $9,000,000 mortgage loan that becomes due in October 2021.  The largest tenant, representing 55% of the space, has only renewed for a 3 year term.    Since becoming involved the Acquirer has spearheaded negotiations to keep that tenant in the building.  The second largest tenant has already vacated the building and this commercial unit remains vacant.   As a result, there will be challenges in obtaining new financing to replace the existing $9,000,000 mortgage when it becomes due in October 2021.  Moreover, retail rents are continuing to drop in New York as a result of the ongoing commercial rent recession.

25.     Finally, 305 Las Vegas LLC owns three properties known as 300, 320, and 330, East Charleston Boulevard, in Las Vegas, Nevada.  These properties consist of two and three stories of commercial and retail space.  During the last two years, the property has become 80% vacant and has a negative cash flow in excess of $200,000 per year.  However, this property has approvals in place that would permit the construction of a substantially larger building on the

site, but the Debtor does not have the financial resources to take advantage of this opportunity. The properties are subject to a $2,000,000 first mortgage and a $1,000,000 second mortgage in favor of BFN Ventures, LLC, an affiliate of Chamberlin.  Both are guaranteed by the Debtor and Chamberlin. The senior debt came due on December 13, 2020 and the Acquirer is in the process of extending such mortgage for 6 months.  The mortgagee requires that all interest be paid to date plus the 6 months interest must be paid in advance into a reserve.  Only with the Acquirer's resources can the property be prevented from going into foreclosure.  In addition, 305 Las Vegas LLC is listed as a defendant in a number of lawsuits.

26.      Mountbatten Equities L.P. was the original sponsor of Printing House Condominium.  It owns eleven commercial units located in Printing House Condominium.  For many years, the Debtor and Chamberlin each owned a 40% general partnership interest and a 3.3335% limited partnership interest in the sponsor.  On or about March 10, 2021, the Debtor resigned as a general partner of Mountbatten Equities L.P., retaining all of his economic interests. As of April 6, 2021, Chamberlin transferred his entire general partnership interest and all but 1% percent of his limited partnership interest in Mountbatten Equities L.P. to 421 HL Fitness LLC (a wholly owned subsidiary of Acquirer).  As of the April 6, 2021, the Debtor still holds a 43% limited partnership interest, and Chamberlin and the remainder of the limited partners hold a combined 15%  limited partnership interest in Mountbatten Equities, L.P.  The Acquirer, through 421 HL Fitness LLC, is now the sole general partner, holding 42% partnership interest in Mountbatten Equities L.P. The transfer from Chamberlin to Acquirer (through its subsidiary) was pursuant to Chamberlin's agreement with Acquirer, which is substantially similar to the Assignment.

27.      Mountbatten Equities L.P. is the lessor on a ground lease to Hudson Leroy

LLC, which in turn subleased certain space to Equinox Hudson Street Inc. ("**Equinox**"), an unrelated luxury gym. Prior to April 6, 2021, Hudson Leroy LLC was owned by Chamberlin (50%) and The Liberman Group (50%), a non-revocable trust under which the Debtor was the settlor. Hudson Leroy LLC assigned its interest in the sublease to 421 Commercial Fitness LLC, an affiliated entity.[2] As of April 6, 2021, Chamberlin transferred forty-nine (49%) of his membership interest in Hudson Leroy LLC to 421 HL Fitness LLC, the subsidiary of Acquirer. The transfer from Chamberlin to Acquirer (through its subsidiary) was pursuant to Chamberlin's assignment agreement with Acquirer.

28. As a result of restrictions in place due to the COVID-19 pandemic, Equinox was not operating for an extended period of time and it is in substantial default of the payment obligations under its lease with Hudson Leroy LLC. The payment default has impaired the ability of 421 Commercial Fitness LLC to timely satisfy its rent obligations to Hudson Leroy LLC, which has not satisfied its own rent obligations to Mountbatten Equities L.P., thus impairing the latter's cash flow. Equinox is in default under its lease, owing several months in rent and additional rent totaling over $1,500,000. In addition, the building contains certain other commercial space which is also suffering during this economic downturn and with the early surrender of previously rented space. 421 Commercial Fitness LLC is the borrower on a $19,000,000 loan which is in default of payment and has matured. Neither borrower nor the principals have any resources and could not defend any foreclosure.

29. Mountbatten Equities L.P. is also obligated in respect of unpaid legal fees for services rendered, unpaid real estate taxes, unpaid common charges, and unpaid assessments

[2] The Acquirer intends to acquire The Liberman Group's interest in Hudson Leroy LLC as part of the series of transactions contemplated with this restructuring.

and penalties assessed by the Board of Managers of Printing House Condominium. Mountbatten Equities L.P. does not have access to working capital to satisfy its obligations as they mature.

**THE SETTLEMENT**

30. The relationship between the Debtor and Chamberlin has deteriorated into a number of disputes including: (a) the renovations of twelve units which were in the process of being altered, reconfigured and consolidated to form five larger units[3] at 305 Second Ave. For example, (a) in 2019, when a loan on the units needed to be refinanced, the Debtor had exhausted his financial resources on other business ventures and was unable to assist, forcing Chamberlin to unilaterally support the venture; (b) the Debtor and Chamberlin could not agree upon details for the renovation and as a result never agreed to sign off on "construction drawings," which resulted in the renovation being stalled; and (c) Chamberlin, who had been funding the project due to the Debtor's lack of liquidity, himself became unable to provide further liquidity to the project. Further, three units in Rutherford Place Condominium, controlled by 305 Second Avenue L.P. were held vacant due to ongoing disputes between the Debtor and Chamberlin. Moreover, as of December 1, 2020 the commercial unit and other residential units located in Rutherford Place Condominium, controlled by 305 Second Avenue Associates L.P., were in arrears for real estate taxes totaling $284,684.93 and common charges totaling $184,389.90 and continue to be at risk of losing these units to the lenders or the condominium based upon defaults in payments. The Acquirer has loaned money to 305 Second Avenue Associates L.P. to pay for a portion of the outstanding arrears. Other disputes have festered and continue to cause friction that have resulted

[3] Chamberlin and Liberman had owned the units since 1985, when they had renovated the building and converted the building to condominiums. A portion of the units which had not been sold were rented to third parties or remained vacant. In 2015, Chamberlin and Liberman decided to merge the 12 remaining units into 5 units and sell them.

in a situation where the Debtor and Chamberlin can no longer work together in a collaborative or productive manner and neither the Debtor nor Chamberlin has sufficient capital or resources to support the capital requirements of the Entities or any future projects or developments.

31.    The Debtor and Chamberlin have had disagreements regarding: (a) financing arrangements; (b) the amount and timing of distributions; (c) the retention of funds; (d) the required amounts and use of working capital; (e) the sales of assets; and (f) the management of relationships with the condominium associations.

32.    In light of the disputes between the Debtor and Chamberlin, the dissipation of their financial resources, the ongoing financial distress brought on the Entities by COVID-19, the Debtor and Chamberlin, have agreed to terminate their business association and ongoing relationship pursuant to the terms of the attached Stipulation and Order (the "**Approval Order**") attached hereto as Exhibit "A", and through their respective transfers of their respective interests to 305-421 LLC (the "**Acquirer**").

33.    The Acquirer has (a) agreed to provide the Debtor and Chamberlin with consideration in substantially equal amounts that will compensate them for their respective transferred interests, (b) allowed each of them to be relieved from substantial liability under their guaranties, (c) settled a number of time consuming and potentially costly disputes without the need for costly litigation, and (d) avoided an almost certain liquidation of all of the Debtor's holdings over the prior twelve months.

34.    The Debtor resigned (the "**Resignation**") as a general partner of each of the Entities, but retained all of his economic interests in each of them.  The Resignations were undertaken to facilitate the transactions contemplated by the settlement.

35.    Had the Resignation not occurred, the Acquirer would not have entered

into the settlement. The Debtor's bankruptcy filing would have triggered additional default provisions under the loans, further deteriorating asset value.

36.    A requisite number of Limited Partners of each of the Entities has approved of the Resignation, withdrawal and admission of a new general partner to each of the Entities as required in order to consummate the transactions contemplated by the settlement.  Moreover, a requisite number of lenders to the Entities has approved of the Resignation and the concept of the Acquirer serving as a new general partner to each of the Entities as required in order to consummate the transactions contemplated by the settlement.

37.    In connection with his efforts to wind down his business, the Debtor entered into an Agreement for Assignment of Equity Interests  (as amended, the "**Assignment**") with the Acquirer, dated October 22, 2020, that the Debtor believes to be in the best interests of his estate.

38.    Pursuant to the Assignment, the Debtor has agreed to sell, assign, and transfer his Interests in the Entities to the Acquirer.  A copy of the Assignment is attached to the Approval Order as Exhibit "B."

39.    The Acquirer will make no immediate payment to the estate. The consideration for the Interests is a Profit Participation Agreement, under which the Debtor shall receive 25% of excess net cash flow, if any, once the Acquirer receives a preferred return of $2,500,000[4], as set forth in greater detail in the Profit Participation Agreement.  A copy of the Profit Participation Agreement is attached as Exhibit "A" to the Approval Order.

40.    The Acquirer has made a substantially identical agreement with Chamberlin, in respect of his interests in the Entities.  The Acquirer intends to operate and manage

---

[4] In addition to the preferred return, the Acquirer is entitled to recover certain transaction and advanced operating expenses, prior to the Debtor receiving any distributions.

the Entities, provide necessary working capital, and hopefully restructure their businesses for the benefit of itself, the Debtor and Chamberlin and the other parties in interest. As discussed, for the Debtor's part, he lacks the financial wherewithal and resources to restructure the businesses for his own account and has no alternative but to look to a third party to do so on his behalf.

41. The Acquirer's principals have extensive experience in real estate restructuring and assets which will allow the Acquirer to negotiate with each of the Lenders. As part of the acquisition, the Acquirer will obtain in its negotiations with the Lenders a release of liability for certain of the guarantees of the principals as set forth in the Settlement as well as restructuring and extending the mortgages.

42. If the Acquirer's agreement with the Debtor are approved by the Court, the Debtor will be relieved of substantial guarantee liabilities and will be able to share in the improved values as the Acquirer turns around these properties and the economy improves. If these properties are liquidated in the current market (which will happen without the Acquirer's resources and abilities) the Debtor will be left with only claims for his guarantees and no possible positive recovery.

43. Property excluded from the Assignment includes all property of the Debtor's estate other than the Interests.

**RELIEF REQUESTED**

44. The Debtor seeks the entry of an order, substantially in the form of Exhibit "A" annexed hereto, approving the proposed settlement (the "Settlement") and approving the assignment and transfer of the Interests to the Acquirer pursuant the terms and conditions of the Assignment, free and clear of all liens, claims, and encumbrances, interests and other restrictions on transfer pursuant to Bankruptcy Rule 9019(a), section 363 of the Bankruptcy Code and

Bankruptcy Rules 2002 and 6004, and such other and further relief as this Court deems just and proper.

45. Under all the circumstances, the Debtor has concluded that the proposed settlement represents a sound exercise of his business judgment and is in the best interest of the Debtor's estate and creditors.

**DISCUSSION**

***A. The Court Should Approve the Settlement***

44. Bankruptcy Rule 9019(a) provides, in relevant part, that "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." F. R. BANKR. P. 9019(a). Fed, R. Bank. P. 9019(a).

45. As a general matter, "settlements and compromises are favored in bankruptcy, as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641–642 (Bankr. S.D.N.Y. 2012); *see also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452, 455 (2d Cir. 2007) (settlements "help clear a path for the efficient administration of the bankrupt estate").

46. "Although courts have discretion to approve settlements, the business judgment of the [trustee] in recommending the settlement should be factored into the court's analysis." *In re MF Global Inc.*, No. 11-2790 MG, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012).

47. In ruling on a motion pursuant to Bankruptcy Rule 9019(a), the court must find that the proposed settlement is fair and equitable and is in the best interests of the estate. *See Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S.

414 (1968) (hereinafter "TMT Trailer"); *Air Line Pilots Ass'n v. Am. Nat'l Bank and Trust Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). The court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

48. In *In re Iridium Operating LLC*, the Second Circuit Court of Appeals directs courts to consider the following factors (the "***Iridium* Factors**") in determining whether to approve a settlement:

> (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation, 'with its attendant expense, inconvenience, and delay,' including the difficulty in collecting on the judgment; (iii) 'the paramount interests of the creditors,' including each affected class's relative benefits 'and the degree to which creditors either do not object to or affirmatively support the proposed settlement'; (iv) whether other parties in interest support the settlement; (v) the 'competency and experience of counsel' supporting, and '[t]he experience and knowledge of the bankruptcy court judge' reviewing, the settlement; (vi) 'the nature and breadth of releases to be obtained by officers and directors'; and (vii) 'the extent to which the settlement is the product of arm's length bargaining.

*In re Iridium Operating LLC,* 478 F.3d 452, 462 (2d Cir. 2007) (internal citation omitted).

49. While a court must evaluate "all . . . factors relevant to a full and fair assessment of the wisdom of the proposed compromise," (*TMT Trailer*, 390 U.S. at 424) there is no requirement for the court to conduct a "mini-trial" of the claims being settled or a full independent investigation. *Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983).

50. Rather, a court should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness." *Id.; accord In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 505 (Bankr. S.D.N.Y. 1991).

51. Here, a review of the relevant *Iridium* Factors strongly supports approval of the Stipulation.

*Likelihood of Success on the Merits*

52. The first of the *Iridium* Factors reflects the Supreme Court's view that a court should form an "intelligent and objective opinion" of the probability of success in the underlying litigation. *TMT Trailer,* 390 U.S. at 424.

53. As the court stated in *In re Adelphia*, "[T]here is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *See In re Adelphia Commc'n Corp.,* 327 B.R. 143, 159 (Bankr. S.D.N.Y 2005) (quoting *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir. 1972)).

54. Here, the Debtor faces foreclosure or worse possible litigation that the Debtor has no resources to defend. Thus, the Debtor would lose the Interests and have no prospect to see any recovery. Moreover, absent this settlement, the Debtor could not fund this case as the Acquirer has agreed to provide debtor in possession financing if this motion is granted. Thus, this settlement is the corner stone of the Debtor's restructuring.

55. The Debtor submits that this first *Iridium* Factor clearly weighs in favor of approving the settlement. *See In re Adelphia,* 368 B.R. at 226 ("'In administering [liquidation] proceedings in an economical and practical manner it will often be wise to arrange the settlement

of claims as to which there are substantial and reasonable doubts."') (quoting *TMT Trailer,* 390 U.S. at 424).

*Likelihood of Complex, Costly and Protracted Litigation*

56. In evaluating the reasonableness of a settlement, a court should "form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *TMT Trailer,* 390 U.S. at 424.

57. As noted above, the factors clearly weigh in favor of the settlement as any litigation would be overwhelmingly likely to come out against the Debtor as absent the transaction described above and the settlement set forth herein and in the Stipulation, the Debtor would have no possibility of restructuring or avoiding losing the Interests.

58. Consequently, the Debtor submits that approval of the settlement is clearly supported by the first and second *Iridium* Factors.

*The Paramount Interest of Creditors*

59. The "paramount interest of creditors" generally reflects not only the desire to recover the greatest amount upon the creditors' allowed claims, but also their competing desire that recovery should occur in the least amount of time possible. *See In re Marples*, 266 B.R. 202 (Bankr. D. Idaho 2001).

60. The Debtor submits that, in light of the foregoing, the proposed settlement furthers the interests of all creditors and parties-in-interest to the estate by affording the Debtor an opportunity to survive as a debtor in possession and hopefully confirm a plan under which all

parties in interest may see a recovery – a result that would be in the paramount best interest of all creditors.

*Competency of Counsel*

61. The Debtor submits that throughout this case, the Debtor, the Acquirer and all other parties in interest have been represented by skilled and experienced bankruptcy counsel, knowledgeable about the types of issues that would arise in any litigation of the settled claims. Courts have given this factor considerable weight. *See In re Chemtura Corp.,* 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (holding that settlement easily satisfied the Iridium requirements, in part because "[n]o argument has been made, nor could any argument be made, that counsel who put the Settlement together were anything less than highly skilled in their craft, and knowledgeable in the considerations underlying a settlement of this character").

*Nature and Breadth of Releases to be Obtained*

62. The settlement does not provide for any releases to be exchanged.

*Extent to Which the Proposed Settlement is the Product of Arm's-Length Negotiations*

63. Finally, the terms and conditions of the settlement are the product of arms-length negotiations, proposed and entered in the utmost good faith. *See In re Charter Communc'ns,* 419 B.R. at 257 ("The Court is satisfied that the [settlement] represents the considered judgment of economically motivated parties who were negotiating at arm's-length to reach the best settlement that could be achieved under the circumstances.")

64. Accordingly, the Debtor submits that the proposed settlement amply satisfies this final *Iridium* Factor as well as every other Iridium Factor, and that therefore, the settlement should be approved.

**CONCLUSION**

65. In light of the foregoing, the Debtor submits that the proposed settlement is fair, equitable and in the best interests of the estate and should be approved, and that the actions required pursuant to the settlement should be authorized.

**OBJECTIONS**

66. The Debtor proposes that objections, if any, to the relief requested herein, shall be in writing and filed with this Court and served, so as to be received no later than 4:00 p.m. prevailing Eastern Time on May 3, 2021 (the "**Objection Deadline**"), upon: (i) Rosen & Associates, P.C., proposed attorneys for the Debtor, 747 Third Avenue, New York, New York 10017-2803, Attention: Sanford P. Rosen, Esq.; (ii) Rosenberg & Estis, P.C., counsel to the Acquirer, 733 Third Avenue, New York, New York 10017, Attention: John Giampolo, Esq.; (iii) the Office of the United States Trustee for the Eastern District of New York, New York; and (iv) all other parties who have requested service in this case pursuant to Bankruptcy Rule 2002. Only timely filed and served responses, objections, and other pleadings will be considered by this Court at the hearing on this Motion.

**NO PRIOR REQUEST**

67. No prior request for the relief sought in this Motion has been made to this or any other Court.

**NOTICE**

68. The Debtor shall give notice of this Motion by serving by first class mail a copy of this Motion (together with the exhibits annexed hereto) and the prefixed notice of hearing upon: (a) the Office of the United States Trustee; (b) counsel to the Acquirer; (c) all of the Debtor's secured creditors; (d) the parties in interest who have requested notice pursuant to Bankruptcy

Rule 2002; and (e) all other creditors of the Debtor who are lis1ted on the schedules filed by the

Debtor or who have filed proofs of claim against the Debtor's estate.

             WHEREFORE, the Debtor respectfully requests (i) the entry of the Approval

Order, and (iii) such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        April 15, 2021

                    ROSEN & ASSOCIATES, P.C.
                    Proposed Attorneys for the Debtor and
                      Debtor in Possession

                    By: /s/Sanford P. Rosen
                        Sanford P. Rosen

                    747 Third Avenue
                    New York, NY 10017-2803
                    (212) 223-1100