UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                            :
In re:                                      : Chapter 11
                                            :
BARNET LOUIS LIBERMAN,                        Case No. 8-21-70611-reg
                                            :
                    Debtor.                 :
                                            :
-------------------------------------------------------------x
```

**NOTICE OF TELPEPHONIC HEARING TO CONSIDER THE DEBTOR'S
MOTION FOR ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN
POSTPETITION FINANCING (II) GRANTING SECURITY INTERESTS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III)
MODIFYING THE AUTOMATIC STAY; AND (IV) AUTHORIZING
THE DEBTOR TO ENTER INTO AGREEMENTS WITH 305-421 LLC**

**PLEASE TAKE NOTICE** that on the date hereof, Barnet Louis Liberman, the

above-referenced debtor and debtor-in-possession (the "Debtor") filed the annexed *Motion for*

*Order (I) Authorizing the Debtor to Obtain Postpetition Financing (II) Granting Security*

*Interests and Superpriority Administrative Expense Status; (III)Modifying the Automatic Stay;*

*and (IV) Authorizing the Debtor to Enter into Agreements with 305-421 LLC* (the "Motion").

The undersigned proposed counsel will present the Motion to the Honorable Robert E.

Grossman, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern

District of New York (the "Court"), at a telephonic hearing to be held on **May 10, 2021 at 10:00**

**a.m. (ET)** (the "Telephonic Hearing").

**PLEASE TAKE FURTHER NOTICE,** that objections to the relief requested in

the Motion, if any, must be in writing, conform with Title 11 of the United States Code and

Bankruptcy Rules, state with particularity the grounds therefor, and be filed with the Court, with

a courtesy copy to the Chambers of the Honorable Robert E. Grossman, United States

Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of New York, if required, and served upon, so as to be received by: (i) Rosen & Associates, P.C., *proposed counsel to the Debtor*, 747 Third Avenue, New York, New York 10017-2803, Attn.: Sanford P. Rosen, Esq. (srosen@rosenpc,.com); (ii) Office of the United States Trustee for the Eastern District of New York, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, New York 11722, Attn.: Christine H. Black, Esq., Assistant United States Trustee; and (iii) Rosenberg & Estis, P.C., *counsel to 305-421 LLC*, 733 Third Avenue, New York, New York 10017, Attn:. John Giampolo, Esq. (jgiampolo@rosenbergestis.com), no later than May 3, 2021 at 4:00 p.m. (the "Objection Deadline"), as follows: (a) (i) through the Court's electronic filing system, in accordance with General Order M-242, which may by assessed through the internet at the Bankruptcy Court's website at www.nyeb.uscourts.gov by registered users; and (ii) in portable document format ("PDF") using Adobe Exchange Software for conversion; or (b) if by a party that is unable to file electronically, such party shall submit the objection in PDF format on portable media in an envelope with the case name, case number, type and title of document, document number to which the objection refers and the file name on the outside of the envelope.

PLEASE TAKE FURTHER NOTICE, that in order to attend the Telephonic Hearing, in accordance with the Court's rules and procedures, all parties must email the Courtroom Deputy at: reg_hearings@nyeb.uscourts.gov at least 24 hours in advance of the scheduled hearing to identify the parties that will appear. All attorneys must also identify the party that the attorney represents. The Court's relevant rules and procedures for attending the Telephonic Hearing are set forth more fully at https://www.nyeb.uscourts.gov/content/judge-robert-e-grossman.

PLEASE TAKE FURTHER NOTICE, that a copy of the Motion may be obtained by either: (i) accessing the Court's website at www.nyeb.uscourts.gov, (ii) contacting proposed counsel to the Debtor, or (iii) contacting the Office of the Clerk of the Court at Central Islip, New York. Note that a PACER password is needed to access documents on the Court's website.

DATED: New York, New York
      April 8, 2021

                                       BARNET LOUIS LIBERMAN
                                         *Debtor and Debtor in Possession*
                                       By his Proposed Counsel

                                       ROSEN & ASSOCIATES, P.C.

                                       By: /s/ Sanford P. Rosen
                                           Sanford P. Rosen
                                       747 Third Avenue
                                       New York, New York 10017-2803
                                       (212) 223-1100

**ROSEN & ASSOCIATES, P.C.**
*Proposed Counsel to the Debtor*
  *and Debtor-in-Possession*
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Sanford P. Rosen
Paris Gyparakis

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BARNET LOUIS LIBERMAN,<br><br>                              Debtor. | Chapter 11<br><br>Case No. 8-21-70611-reg |

**DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING THE
DEBTOR TO OBTAIN POSTPETITION FINANCING; (II) GRANTING
SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS; (III) MODIFYING THE AUTOMATIC STAY; AND (IV)
AUTHORIZING THE DEBTOR TO ENTER INTO AGREEMENTS WITH 305-421 LLC**

TO THE HONORABLE ROBERT E. GROSSMAN,
UNITED STATES BANKRUPTCY JUDGE:

Barnet Louis Liberman, the above-referenced debtor and debtor-in-possession (the

"**Debtor**"), by and through his undersigned proposed counsel, hereby moves this Court

("**Motion**") for the entry of an order, substantially in the form attached hereto as *Exhibit A* (the

"**Financing Order**"), pursuant to 11 U.S.C. §§ 105, 362, 364 and 507, Rules 2002, 4001 and 9014

of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-5 of the

Local Bankruptcy Rules for the Eastern District of New York (the "**Local Rules**"): (i) authorizing

the Debtor to obtain postpetition financing; (ii) granting security interests and superpriority

administrative expense status; (iii) modifying the automatic stay; and (iv) authorizing the Debtor to enter into agreements with 305-421 LLC, and respectfully represents as follows:

## JURISDICTION, VENUE AND STATUTORY PREDICATES

1.      This Court has jurisdiction to consider this core proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these proceedings is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105, 362, 364, and 507(b), as supplemented by Bankruptcy Rules 2002, 4001, 9013 and 9014 and Local Rule 4001-5.

## BACKGROUND

3.      The Debtor is a real estate developer and syndicator with over fifty years of experience in the Manhattan residential rental and condominium sector.

4.      The Debtor's primary assets consist of ownership interests in various entities which own and/or operate condominium developments in New York City.

5.      Among of the Debtor's better-known projects are the condominiums located at 305 Second Avenue (also known as "**Rutherford Place**") and 421 Hudson Street (also known as "**Printing House**"). For many years, the Debtor's partner has been Winthrop D. Chamberlin ("**Chamberlin**").

### A.      Rutherford Place

6.      Located in the heart of Manhattan's Gramercy Park lies Rutherford Place, built by J.P. Morgan and designed by Robert Henderson Robertson in 1902, this beautiful 10-story building, now known for its 127 unique luxury apartments and classic Beaux Arts facade, operated as a maternity ward—once the New York Society of the Lying-In Hospital—for over eighty years.

7.      In 1984, the Debtor partnered with Chamberlin and converted Rutherford Place into a luxury apartment complex. Its conversion was praised for maintaining many of the building's historically significant detailing and ornamentation.

8.      Currently listed on the National Register of Historic Places, Rutherford Place was realigned and converted to condominiums in 2006 to form 127 unique, multi-level homes featuring fully renovated, elite finishes, double-glazed mahogany windows, and ultra-high ceilings reaching seventeen feet.

9.      Now one of the most expensive addresses in its area, residents of Rutherford Place enjoy the prestige of living in a land-marked building coupled with all of the conveniences of modern luxury residences.

**B.      Printing House**

10.     Capped with a dramatic green cornice in Manhattan's West Village, Printing House, built in 1911 as an industrial printing building, was converted by the Debtor and Chamberlin into luxury lofts in 1979 and was in the vanguard of the luxury loft era that still defines downtown Manhattan living. Printing House now offers 184 units, all with high ceilings and massive windows overlooking James Walker Park and the 19th Century townhouses that line St. Lukes Place. Inside, the lofts have carefully considered finishes in open layouts. Two 4,200-square-foot townhomes offer private elevators, rooftop terraces, floor-to-ceiling windows, and gas-burning fireplaces. A notable feature is its Mews, a 200-foot-long gated and landscaped lane stretching from Leroy to Clarkson Street designed by Gunn Landscape Architecture.

**C.      Events Precipitating the Bankruptcy Filing**

11.     Despite a long history of success, the value of the Debtor's interests has been significantly impacted by the Coronavirus pandemic ("**COVID-19**"), which has contributed

to a recession in the New York City residential real estate market, as well as construction issues relating to the renovation of unsold condominium units.

12.     Before the pandemic and the downturn in the residential real estate market, the Debtor had a substantial liquidity cushion and was proactively engaging with creditors to deleverage his capital structure and extend debt maturities to build a healthier balance sheet. Unfortunately, that progress was extinguished with the onset of COVID-19. Moreover, the Debtor's affiliates, many of whose loan obligations have been guaranteed by the Debtor, are unable to pay the upcoming debt service on their over-burdened capital structure.

13.     Beleaguered by the severe decrease in apartment unit sales, residential and commercial rent revenue loss, and negative pressure on property values resulting from crucial but economically painful public safety measures, the Debtor faced imminent events of default under guaranteed loan agreements in the summer of 2020 without access to working capital.

14.     This inadequate working capital precluded the Debtor from restructuring the debt of his affiliates that is associated with the unsold condominium units that are now at risk of imminent foreclosure. This is particularly so with respect to the Debtor's interest in 305 Second Avenue Associates, L.P., the original sponsor of Rutherford Place, and parent entity of several limited liability companies that still hold unsold condominium units.

15.     Confronted with these financial constraints, on April 1, 2021 (the "**Petition Date**"), the Debtor petitioned this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**").

16.     The Debtor is hopeful that this proceeding will allow him to maximize the value of his assets for the benefit of all creditors and parties-in-interest and emerge from this bankruptcy (and this pandemic) with an appropriately sized balance sheet.

17.     Prior to the Petition Date, the Debtor negotiated a transaction which, through a settlement with Chamberlin, will provide the wherewithal to achieve a restructuring, reconcile management, governance, and funding issues, and thus hopefully not only preserve but maximize the value of such interests.

18.     Simultaneously herewith, the Debtor is filing a motion seeking the approval of such transaction. Among the conditions precedent to the prospective lender's obligation to make the proposed DIP Financing available to the Debtor are (i) the Stipulation incorporating such transaction is approved by a final non-appealable order entered by the Bankruptcy Court after a hearing having been held on proper notice; and (ii) the transaction shall have closed.

19.     Prior to the Petition Date, 3-4 Lender LLC ("**Prior Lender**") made loans aggregating $80,000 to the Debtor pursuant to (a) the terms and conditions set forth in that certain Promissory Note, dated as of November 12, 2020 (as amended, supplemented or otherwise modified from time to time through the Petition Date, the "**Prepetition Credit Agreement**"); and (b) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of Prior Lender, including, without limitation, the Pledge and Security Agreement dated as of November 12, 2020  (collectively, the "**Prepetition Loan Documents**").  The Prior Lender is an affiliate of 305-421 LLC, the proposed lender to the Debtor.

20.     As of the Petition Date, the Debtor was indebted to the Prior Lender under the Prepetition Loan Documents in an aggregate outstanding principal amount of not less than $80,000.00 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto, plus those other obligations that constitute obligations under the Prepetition Credit Agreement (collectively, the "**Prepetition  Secured Obligations**").

21.    Under the proposed Financing Order, described below, the Debtor will acknowledge that the Prepetition Secured Obligations constitute legal, valid, binding, enforceable and non-avoidable obligations of the Debtor and are deemed to be allowed claims against the Debtor, which claims the Debtor agrees are oversecured, and are not subject to any offset, recoupment, challenge, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtor does not possess, shall not assert, forever releases, and is forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition Secured Obligations.    The acknowledgement will be binding on all parties including a subsequent trustee and creditors.

22.    As of the Petition Date, the Prepetition Secured Obligations were secured pursuant to the Prepetition Loan Documents by valid, binding, perfected, enforceable and non-avoidable security interests and liens (the "**Prepetition Liens**") granted by the Debtor to Prior Lender under the Prepetition Loan Documents, in the Debtor's partnership interests in 305 Second Avenue Associates, L.P. as more fully set forth in the Prepetition Loan Documents (the "**Prepetition Collateral**"), and such security interest is perfected.

23.    Under the proposed Financing Order, the Debtor will acknowledge that he does not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of Prior Lender's liens, claims or security in the Prepetition Collateral.  This acknowledgement will be binding on all parties including a subsequent trustee and creditors.

24. With this background, the Debtor now seeks approval of $ 86,098 in DIP Financing to finance and complete the Chapter 11 Case. The Court's approval of the DIP Financing will preserve the value of the Debtor's interests for all the stakeholders of the Debtor.

## RELIEF REQUESTED

25. By this Motion, the Debtor requests entry of the Financing Order, described below, granting, among other things, the following relief:

- authority for the Debtor to obtain senior, non-priming, secured postpetition financing (the "**DIP Facility**") in an aggregate principal amount of $86,098 (the "**Commitment**") (all of which, upon entry of the Financing Order and satisfaction or waiver of the borrowing conditions set forth in the DIP Loan Documents (as defined below) shall be made available to the Debtor and may be drawn in a single draw);

- authority (a) for the Debtor to enter into that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, between the Debtor, as Borrower, and 305-421 LLC, as Lender (the "**DIP Lender**"), in substantially the same form as filed herewith as *Exhibit 1* to the Financing Order (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreemen**t" and, together with any ancillary, collateral or related documents and agreements, the "**DIP Loan Documents**");

- authority for the Debtor to use the DIP Facility and the proceeds thereof in accordance with the DIP Loan Documents to fund the postpetition working capital needs of the Debtor during the pendency of the chapter 11 case, solely in accordance with the DIP Loan Documents, the DIP Budget, which is attached hereto as *Exhibit 2* to the Financing Order and the Financing Order;

- authority for the Debtor to grant to the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out (as defined below) and pre-petition liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code in the Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code ("**Cash**

**Collateral**"), to secure all DIP Obligations (as defined below), as more fully set forth in the Financing Order;

- waiver by the Debtor of all rights to surcharge against the collateral of the DIP Lender and the Prior Lender, defined below, pursuant to section 506(c) of the Bankruptcy Code;

- waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender and the Prior Lender;

- ratification of the validity, enforceability and non-avoidability of Prior Lender's liens, claims or security in the Prepetition Collateral; and

- modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h).

## SUMMARY OF THE DIP FACILITY[1]

26.     Pursuant to Bankruptcy Rule 4001(b), (c) and (d), the following is a concise statement and summary of the proposed material terms of the DIP Facility, as specified in the Loan Documents:

| Overview of the Postpetition Financing | |
| --- | --- |
| DIP Agreement Parties | **Borrower**: the Debtor <br><br>**Lender**: 305-421 LLC, a New York limited liability company <br><br>**DIP Agreement, introduction** |
| Maturity <br><br>*Bankruptcy Rule 4001(b)(1)(B)(iii)* | The full outstanding principal amount, together with all accrued and unpaid interest and fees, are due and payable on the Maturity Date, which is defined as the earliest of (i) the Stated Maturity Date ([]); (ii) the effective date of a plan of reorganization; (iii) entry of |

---

[1] The terms and conditions set forth herein are qualified in their entirety by reference to the provisions of the DIP Loan Documents. In the event of any inconsistency between the description of the terms of the DIP Loan Documents contained in this Motion and the actual DIP Loan Documents, the terms of the DIP Loan Documents shall govern. Capitalized terms not defined in this summary shall have the meaning ascribed to them in the DIP Loan Documents.

| | |
|---|---|
| | an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Case; (iv) the closing of a sale of all, or substantially all, the assets of Borrower; and (v) the acceleration of the outstanding Obligations or termination of the Commitment as a result of the occurrence and continuation of an Event of Default.<br><br>**Financing Order, ¶9.**<br>**DIP Agreement, p. 8.** |
| Purpose<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* | **DIP Facility**: The Debtor shall use advances of credit under the DIP Facility (the "**DIP Facility Loans**") only for the express purposes specifically set forth in the Financing Order and the DIP Loan Documents. The Debtor is authorized to use the proceeds of the DIP Facility Loans to fund the postpetition working capital needs of the Debtor during the pendency of the Chapter 11 Case solely in accordance with the DIP Loan Documents (including, but not limited to, the Budget) and the Financing Order. Notwithstanding anything herein, the extensions of credit under the DIP Facility shall not constitute Cash Collateral of the Prior Lender.<br><br>**Financing Order, ¶4.**<br>**DIP Agreement, ¶6.11.** |
| Interest Rate<br><br><br><br><br><br><br>*Bankruptcy Rule* | **Interest Rate:** All Advances shall bear interest on the Daily Balance thereof at a rate equal to fifteen percent (15%) per annum. For the avoidance of doubt, for the purpose of calculating interest the Daily Balance shall exclude accrued but unpaid interest due or owing. Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to five percentage points (5%) above the per annum rate otherwise applicable upon notice from the DIP Lender of its election to impose interest at the default rate. Any |

| | |
|---|---|
| | such notice may impose interest at the default rate retroactively to the date of the occurrence of the related Event of Default.<br><br>**DIP Agreement, ¶2.4(a).** |
| DIP Commitment<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ii)* | Total aggregate term loan commitment of $86,098 to be disbursed upon entry of Financing Oder and subject to the terms and conditions of the DIP Loan Documents.<br><br>**Financing Order, ¶3.**<br>**DIP Agreement, ¶2.1(a).** |
| Fees | Commitment Fee 3% and Exit Fee 3%<br><br>The Debtor is authorized and directed to pay on the Maturity Date, all other fees, costs, expenses and other amounts payable under the terms of the Financing Order and the DIP Loan Documents and all other fees and out-of-pocket costs and expenses of the DIP Lender in accordance with the terms of the Financing Order and the DIP Loan Documents (including, without limitation, the documented postpetition fees and out-of-pocket costs and expenses of counsel to the DIP Lender), subject to receiving a written invoice therefor.<br><br>**Financing Order, ¶6.**<br>**DIP Agreement, ¶2.8.** |
| Liens and Priorities of DIP Obligations | Effective immediately as of the entry of the Financing Order, as security for the DIP Obligations, the DIP Lender is granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens collectively, the "**DIP Liens**") on all DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the Stated Maturity Date (i.e. [], 2021), by acceleration, or otherwise) of the DIP Obligations.<br><br>The term "DIP Collateral" means collectively all prepetition and postpetition real property and all |

| | prepetition and postpetition tangible and intangible personal property of the Debtor wherever located and whether now owned or hereafter acquired, including, but not limited to, all accounts, contracts rights, chattel paper, cash, general intangibles, intellectual property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, rents, insurance proceeds (as each such term above is defined in the UCC, to the extent applicable).<br><br>**Financing Order, ¶9.**<br>**DIP Agreement, ¶9.2.**<br><br>**Priority of DIP Liens.** To secure the DIP Obligations, immediately upon and effective as of entry of the Financing Order, the DIP Lender is hereby granted on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected first priority DIP Liens in the DIP Collateral as follows, in each case subject to the Carve-Out:<br><br>(i)  Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to any valid, enforceable, and non- avoidable liens on and security interests in the DIP Collateral that (A) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), (B) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and<br><br>(ii) Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (ii)) subordinate only to the Permitted Prior Liens. Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claims shall not be made junior to or pari passu with |
|---|---|

|  | (1) any lien, security interest or claim heretofore or hereinafter granted in the Chapter 11 Case or any successor case, and shall be valid and enforceable against the Debtor, his estate, any trustee or any other estate representative appointed or elected in the Chapter 11 Case or any successor case and/or upon the dismissal or conversion of the Chapter 11 Case or any successor case, (2) any lien that is avoided and preserved for the benefit of the Debtor and his estate under section 551 of the Bankruptcy Code or otherwise, and (3) any liens arising after the Petition Date excluding any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, or board for any liability of the Debtor. |
|  | **Financing Order, ¶10.**<br>**DIP Agreement, ¶9.2.** |
|  | **Superpriority Claims:** In accordance with section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute an allowed senior administrative expense claim against the Debtor and his estate (the "**DIP Superpriority Claims**") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to and subordinate to only the Carve-Out; provided, further that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtor and the estate and all DIP Collateral and all proceeds thereof. |

| | |
|---|---|
| | **Financing Order, ¶8.**<br>**DIP Agreement, ¶9.1.** |
| Carv- Out<br><br>*Bankruptcy Rule 4001(b)(1)(B)(iii)* | **Carve-Out**: The term "Carve-Out" means, the sum of all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) and section 31 U.S.C. § 3717.  The Carve-Out will be funded out of proceeds of DIP Liens in the DIP Collateral.<br><br>**Financing Order, ¶[].**<br><br>**DIP Agreement, ¶9.1.** |
| Events of Default, Termination Events | The DIP Agreement contains certain customary Events of Default, including the following:<br><br>• The Borrower shall fail to pay any Obligation to the DIP Lender when due, including, but not limited to, the payment of principal, interest or any Fees or costs due to the DIP Lender under the DIP Loan Documents;<br><br>• The Borrower shall fail to comply with his obligations under Sections 5.1, 5.2, 5.3, 5.4, 5.8, 5.11, 5.12, Section 6 and/or Section 9 of the DIP Loan Documents;<br><br>• Any representation or warranty made by the Debtor in the DIP Loan Documents or in any agreement, certificate, instrument or financial statement or other statement delivered to the Lender pursuant to or in connection with same which shall prove to have been incorrect in any material respect when made or deemed made, which failure or breach shall continue for ten (10) Business Days after the date upon which such default is known or reasonably should have become known to the Borrower or he has received a written notice of such failure or breach from the DIP Lender;<br><br>• The Debtor shall file a motion with the Bankruptcy Court or any other court with |

|  | jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Order or any of the DIP Loan Documents; |
|  | • The Debtor shall file or obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization that does not propose to pay in full in cash all Obligations on the effective date of said plan; |
|  | • The Debtor shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the DIP Lender under the Financing Order, or with respect to the DIP Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Order. |
|  | • The Financing Order shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court; |
|  | • The occurrence of any default or event of default under the Financing Order and the continuance thereof after any grace or cure period provided in such order or granted by order of the Bankruptcy Court in the Bankruptcy Case; |
|  | • The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the DIP Lender (other than any creditor having a Lien on specific equipment that is senior to the Lender), to realize upon, or to exercise any right or remedy with respect to, the Collateral; |

| | |
|---|---|
| | • Conversion of the Chapter 11 Case to a chapter 7 case under the Bankruptcy Code, or dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily and the Obligations are not simultaneously indefeasibly paid in full;<br><br>• The Financing Order is modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of the DIP Lender (and no such consent shall be implied from any other authorization or acquiescence by the DIP Lender);<br><br>• A trustee or an examiner with special powers is appointed pursuant to Section 1104 of the Bankruptcy Code;<br><br>• A chapter 11 plan is confirmed that does not provide for the payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnifications for the DIP Lender;<br><br>• The occurrence of a Change of Control<br><br>**DIP Agreement, ¶8.1.** |
| Modification of the Automatic Stay Bankruptcy<br><br>*Bankruptcy Rule 4001(b)(1)(B)(iii)* | The automatic stay imposed under section 362(a) of the Bankruptcy Code will be modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of the Financing Order, and the DIP Loan Documents including without limitation, to permit the DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents and take any and all actions provided therein, in each case, without further notice, application to, order of or hearing before the Bankruptcy Court.<br><br>**Financing Order, ¶24.** |

| Bankruptcy Code Sections 506(c) and 552(b) Waivers | Without limiting the Carve-Out, the Debtor irrevocably waives and shall be prohibited from asserting (i) any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral and no costs or expenses of administration that have been or may be incurred in the Chapter 11 Case at any time shall be charged against the DIP Lender or its respective claims or liens (including any claims or liens granted pursuant to the Financing Order), and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Facility and the use of Cash Collateral.<br><br>**Financing Order, ¶15.** |
|---|---|
| Ratification of Prior Lender's Secured Claims | Debtor ratifies the validity, enforceability and non-avoidability of Prior Lender's liens, claims or security in the Prepetition Collateral.<br><br>**Financing Order, ¶12.**<br>**DIP Agreement, ¶.** |

## THE DEBTOR'S NEED FOR DIP FINANCING AND EFFORTS TO OBTAIN DIP FINANCING

27.     The Debtor, with the assistance of his advisors, analyzed his cash needs in order to determine the liquidity levels necessary to maintain the Debtor's operations and pay administrative costs during the Chapter 11 Case to conclusion. The Debtor needs access to liquidity through DIP Financing in on order to continue operating in the ordinary course and to effectuate an efficient and expeditious restructuring.

28.     Without access to the proposed DIP Facility, the Debtor would have insufficient liquidity to continue to maintain and preserve his property and pay restructuring costs

associated with the Chapter 11 Case. Approval of the DIP Facility is thus necessary to ensure the Debtor has sufficient working capital and liquidity and thus preserve and maintain the going concern value of his assets.

29.    The Debtor's DIP Budget reflects the Debtor's reasonable judgment and conservative projections as to his cash needs to see the Chapter 11 Case to conclusion. In advance of reaching out to potential financing providers, the Debtor undertook an analysis of how much postpetition financing would be required during the Chapter 11 process. Based on this analysis, the Debtor determined that he would require liquidity of approximately $85,000 to remain adequately capitalized. The Debtor promptly began contacting parties that were most likely to fund a DIP financing facility.

30.    Given the circumstances, the Debtor provided diligence and engaged in various conversations and negotiations with potential third-party lenders to achieve the best possible terms for a DIP term loan facility. Unfortunately, the Debtor received no proposals. None of the potential third-party lenders would provide the Debtor with executable postpetition financing on an unsecured, junior-lien basis. After extensive, arm's-length negotiations, the Debtor was able to secure the proposed DIP Facility from the DIP Lender. Under the circumstances, no other lender was willing to provide debtor-in-possession financing on better or more favorable terms to the Debtor than the DIP Facility. The DIP Facility will provide a speedy path to emergence and maximize value for all stakeholders.

## BASIS FOR RELIEF

A.    **The DIP Financing Should be Approved Pursuant to Section 364(c) of the Bankruptcy Code.**

31.     The Debtor proposes to obtain financing under the proposed DIP Facility by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp. Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

32.     Courts generally have set forth a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code. Specifically, courts consider whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by allowing a lender only an administrative claim);

    b.    the credit transaction is necessary to preserve estate assets; and

    c.    the terms of the transaction are fair, reasonable, and adequate under the circumstances of the debtor-borrower and the proposed lender.

*See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990); *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse*, 71 B.R. at 549.

33.     As described in greater detail below, the Debtor sought and marketed alternative sources of postpetition financing to determine whether he could obtain debtor-in-possession financing as an administrative expense. No parties were willing to provide postpetition financing solely on an unsecured, administrative priority basis. Furthermore, the Debtor does not believe he can adequately protect, preserve, and maximize the value of his estate without access

to postpetition financing. Given the Debtor's circumstances, the Debtor believes that the terms of the DIP Facility are fair, reasonable, and adequate.

34.    Where, as here, a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]." 11 U.S.C. § 364(c)(1). As described above, the Debtor is unable to obtain unsecured credit. Therefore, approving the superpriority claims in favor of the DIP Lender is appropriate under the circumstances.

B.    **The Debtor is Unable to Obtain Unsecured Credit**

35.    To show that credit is not obtainable on an unsecured basis, the Debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by subsections 364(c) or (d) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Anchor Savings*, 99 B.R. at 120 n.4 (noting that the debtor satisfied the requirement of section 364(d) by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); *Ames*, 115 B.R. at 37–40 (holding that the debtor must show  that it made a reasonable effort to seek other sources of financing under subsections 364(a) and (b) of the Bankruptcy Code).Moreover, the Bankruptcy Code and courts do not require a debtor to "seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (finding that "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some financial stress and has little or no unencumbered property"), *aff'd sub nom. Anchor Savings*, 99 B.R. at 117; *In re Reading Tube*

*Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."); *but see Crouse Grp.*, 71 B.R. at 550 (noting the "relative ease" of establishing the unavailability of unsecured credit, but denying the motion where the debtor only approached one potential lender, and did not contact two large prepetition lenders).

36.     As noted above, after a marketing process for postpetition financing, the Debtor believes that there are no alternative sources of financing reasonably available, and no alternative sources of financing available on better terms than those being provided by the DIP Facility. No party with whom the Debtor communicated as part of the marketing process, and no other party that the Debtor was aware of, was interested in providing, or willing to provide, postpetition financing on an unsecured basis. No party was willing to provide postpetition financing on anything other than a secured basis with respect to substantially all of the Debtor's assets. Thus, providing the DIP Lender with a super-priority administrative claim and liens is reasonable and appropriate here as it will allow the Debtor to obtain critical DIP financing he needs and appropriately administer the Chapter 11 Case to conclusion. Therefore, the Debtor submits that it satisfies the requirements of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtor.

C.     **The Scope of the Carve-Out Is Appropriate.**

37.     The Carve-Out does not directly or indirectly deprive the Debtor' estate or other parties in interest of possible rights and powers. Additionally, the Carve-Out protects against administrative insolvency during the course of this chapter 11 case by ensuring that assets remain for the payment of the Clerk of the Court and U.S. Trustee fees.

**D.**   **The Debtor Should be Authorized to Pay the Fees Required by the DIP Lender Under the DIP Loan Documents**

38.    In connection with negotiating the DIP Facility, the Debtor agreed, subject to Court approval, to pay certain fees, expenses and other payments arising under the DIP Loan Documents (the "**DIP Payments**"). Specifically, the Debtor will pay a 3% Commitment Fee for funding of the DIP Facility and a 3% Exit Fee. The Debtor has also agreed to pay the fees and expenses of the lender's counsel as provided for in the DIP Loan Documents.

39.    These fees are reasonable in the context of and the nature and extent of the credit provided under the Debtor's circumstances. The DIP Facility represents the most favorable terms to the Debtor on which the DIP Lender would agree to make the DIP Facility available. The Debtor considered the DIP Payments above when determining in his sound business judgment that the DIP Facility constituted the best terms on which he could obtain the postpetition financing necessary to continue his operations and prosecute this Chapter 11 Case to conclusion. Courts routinely authorize a Debtor to pay amounts similar to those the Debtor proposes to pay, where the associated financing is, in the debtor's business judgment, beneficial to the Debtor's estate. *See, e.g.*, *In re Sungard Availability Serv's Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May 1, 2019) (approving upfront and commitment fees of 3% of the committed DIP amount and 2.5% of the average daily unused delayed draw, respectively); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. April 4, 2018) (approving an upfront fee of 7.75% of the aggregate commitments and an exit fee of 2.50% of the aggregate commitments); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 28, 2017) (approving 3.5% DIP closing fee).

**E.**   **Good Faith under Section 364(e) of the Bankruptcy Code**

40.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

41.     The DIP Facility is the result of (a) the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable (and only) terms on which postpetition financing was available for this chapter 11 case, and (b) extended arm's-length, good faith negotiations between the Debtor and the DIP Lender.

42.     The Debtor submits that the terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Loans will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by section 364(e) of the Bankruptcy Code.

43.     The Debtor notes that the DIP Lender is represented by the firm of Rosenberg & Estis, P.C.  Rosenberg & Estis, P.C. is representing Mountbatten Equities, L.P., as

one of the plaintiffs in an action against the Residential Committee of the Board of Managers of Printing House Condominium, AKAM Associates, Inc., and Douglas Elliman, LLC.

44.     The plaintiffs include owners, lessors and sublessors of a commercial unit in Printing House Condominium, which also includes residential units. The action re-asserts claims against the condominium's Residential Committee and management companies for improperly and wrongfully charging the commercial unit for expenses and improvements that were unauthorized and solely benefit residential units, and for improperly occupying or restricting plaintiffs' access to certain spaces in the building. The claims were initially asserted as counterclaims that were discontinued without prejudice in a prior litigation.

45.     The Board of Managers of Printing House Condominium recently filed a complaint against Mountbatten Equities, L.P., and the Debtor to foreclose upon liens for unpaid common charges, alleging that the Debtor resides at and is a tenant in possession of property subject to foreclosure. Rosenberg & Estis, P.C. also is representing Mountbatten Equities, L.P., as defendant in that action.

## MODIFICATION OF THE AUTOMATIC STAY

46.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed Financing Order contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to (i) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens and (ii) implement the terms of the Financing Order.

47.     Prior to payment in full of the DIP Obligations, upon the occurrence of an Event of Default, the DIP Lender may file a notice for relief from the automatic stay and, provided

that no party in interest files an objection to the notice within the five (5) day period on the basis that no Event of Default has occurred and is continuing, then after expiration of five (5) days from the notice, the DIP Lender may exercise all default-related rights and remedies against the DIP Collateral without order of or application or motion to the Court and without restriction or restraint by any stay under sections 362 and 105 of the Bankruptcy Code or otherwise, <u>provided</u>, <u>however</u>, the only issue that may be raised by any party in opposition to such five (5) day notice for relief from the automatic stay shall be whether in fact, an Event of Default has occurred and is continuing; provided further that, if an Event of Default occurs as a result of the Debtor' failure to indefeasibly satisfy the DIP Obligations by the Stated Maturity Date (as defined in the DIP Loan Documents), the Debtor and all other interested parties shall not have any challenge rights. In the event a party in interest files an appropriate objection to a five (5) day notice for relief from the automatic stay within the five (5) day period, the DIP Lender will take no action until a hearing disposing of the objection (unless the objection is withdrawn or resolved prior to the hearing) provided the hearing occurs within ten (10) days of the notice; otherwise, upon the expiration of such ten (10) day period, the DIP Lender can, at its sole discretion, exercise all default-related rights and remedies against the DIP Collateral without order of or application or motion to the Court and without restriction or restraint by any stay under sections 362 and 105 of the Bankruptcy Code or otherwise, in accordance with the foregoing provisions of this paragraph.

48.     Stay modification provisions of this kind are ordinary and standard features of post-petition debtor-in-possession financing orders, and are, in the Debtor's business judgment, reasonable under the circumstances. Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Financing Order.

## **WAIVER OF BANKRUPTCY RULE 6004(h)**

49.     To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a), to the extent applicable, and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **MOTION PRACTICE**

50.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to the Motion. Accordingly, the Debtor submits that this Motion satisfies Local Bankruptcy Rule 9013-1(a).

## **NOTICE**

51.     Notice of this Motion has been provided either by facsimile, electronic transmission, overnight delivery, or hand delivery to: (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) counsel for the DIP Lender (e) the U.S. Attorney for the Eastern District of New York; (f) all secured creditors; and (g) any other party entitled to notice pursuant to Rule 9013-1(d) of the Local Rules.

## **CONCLUSION**

**WHEREFORE**, the Debtor respectfully requests that the Court grant the relief requested in this Motion and such other and further relief as may be just and proper, for all of which no prior request has been made to this or any other court.

Dated: New York, New York
    April 15, 2021

**ROSEN & ASSOCIATES, P.C.**
*Proposed Counsel to the Debtor*
  *and Debtor-in-Possession*

By: <u>Sanford P. Rosen             </u>

747 Third Avenue
New York, NY 10017-2803
(212) 223-1100