| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>EASTERN DISTRICT OF NEW YORK<br>---------------------------------------------------------x | **Hearing Date and Time:**<br>**May 10, 2021 at 10 a.m.** |
| In re<br>　　　Barnet Louis Liberman,<br>　　　　　　　　　　　Debtor.<br>---------------------------------------------------------x | Chapter 11<br>Case No. 21-70611-reg |

**TO:　THE HONORABLE ROBERT E. GROSSMAN;**
**　　　UNITED STATES BANKRUPTCY JUDGE:**

### UNITED STATES TRUSTEE'S OBJECTION
### TO MOTION UNDER BANKRUPTCY RULE 9019

　　　　**WILLIAM K. HARRINGTON**, the United States Trustee for Region 2 (the "United States Trustee"), in furtherance of his duties under 28 U.S.C. section 586, by his counsel, submits the within objection ("Objection") to the motion of Barnet Louis Liberman (the "Debtor"), under rule 9019 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bank. P.") seeking entry of an order approving a settlement agreement (the "Motion"). In support of his Objection, the United States Trustee represents and alleges as follows:

### PREMILIMINARY STATEMENT

　　　　The Motion is nominally brought under Fed. R. Bank. P. 9019 but does not resolve any particular lawsuit. Substantively, the Motion appears to seek approval of a private sale to the Acquirer of all of the Debtor's interests in certain general and limited partnerships for no immediate consideration but in exchange for the promise of a future payment under a related document identified as the "Profit Participation Agreement."

1

Case 8-21-70611-reg    Doc 41    Filed 05/03/21    Entered 05/03/21 11:49:17

The requested relief appears to be broader than what is appropriate either as settlement or a sale, and more properly pursued in accordance with the notice and voting requirements applicable to a plan of reorganization.  Because the Settlement is not in accord with the applicable law for approval of a settlement, and the Motion fails satisfy the Bankruptcy Code's provisions governing the sale of the Debtor's assets outside the ordinary course, the Motion to approve the Settlement should be denied in its entirety.

## **FACTS**

1.  On April 1, 2021, Barnet Louis Liberman (the "Debtor") filed a voluntary chapter 11 petition under title 11 of the United States Code (the "Bankruptcy Code"), and under sections 1107 and 1108 of the Bankruptcy Code has remained in possession of his assets as a debtor in possession (See ECF Docket No. 1).

2.  The Debtor is represented by Rosen & Associates, P.C., Sandford P. Rosen, Esq., of counsel ("Counsel").

3.  On April 16, 2021, the Debtor filed two motions, both returnable on May 10, 2021. The first motion under rule 9019 of the Fed. R. Bank. P., seeks entry of an order approving a settlement with 305-421 LCC, defined in the Settlement as the "Acquirer" (ECF Docket No. 22).  The second motion under section 364 of the Bankruptcy Code seeks approval of financing from an entity related to the Acquirer (ECF Docket No. 23).

4.  On April 23, 2021, the United States Trustee appointed a three-member Official Committee of Unsecured Creditors (the "Committee").  On April 28, 2021, one of the three members resigned from the Committee.  Upon information and belief, the Committee will be retaining The Kantrow Law Group, PLLC, Fred Kantrow, Esq., as counsel.

5.      The Settlement is supported by a number of ancillary documents including a Stipulation of Settlement, (the "Stipulation"), the Profit Participation Agreement, which to date has yet to be signed, and the Assignment of Equity Interests, which was apparently executed by both the Debtor and the Acquirer on October 22, 2020.

*The Petition*

6.      According to the Petition, the Debtor resides at 10 Palomino Court, East Hampton, New York (the "Residence"). The Debtor scheduled real estate assets valued at $400,000 and personal assets valued at approximately $5.4 million. The Debtor scheduled approximately $25.6 million in secured debt, and $97 million in unsecured debt. The Debtor's schedule I reports income of less than $6,000 per month, derived from the income of the Debtor's non-filing spouse, and the Debtor's unemployment and social security payments. In contrast, the Debtor's schedule J reports monthly expenses exceeding $60,000, $47,000 of which represents payments due on a lease agreement with 421 Hudson Street (See ECF Docket No. 1).

7.      The Debtor apparently owns the Residence jointly, but there is no disclosure as to identity of the other owner or owners. The Debtor's schedule D shows that numerous parties, including the Internal Revenue Service and New York State Department of Taxation and Finance, have filed liens against the Residence, as well as a number of judgment creditors, and unpaid common charges which comprise the $25.6 million in secured debt. (See ECF Docket No. 1).

8.      In addition to two vehicles, the Debtor's assets consist of membership and limited partnership interests, having a total scheduled value of $437,500. The Debtor's most significant asset is a $5 million quiet enjoyment claim against the Board of Director of the

Printing House Condominium. The Debtor scheduled and exempted cash and cash equivalents are valued at slightly more than $10,000. (See ECF Docket No. 1).

9. The Debtor's $97 million of scheduled unsecured debt consists of guarantee obligations, unpaid lease obligations, promissory notes, claims for services rendered, legal expenses and judgments (See ECF Docket No. 1).

10. The Debtor's 341 First Meeting of Creditors is scheduled for May 7, 2021.

*The Settlement:*

11. On April 16, 2021 the Debtor filed a Motion Seeking to Approve a Settlement (the "Motion") (ECF Docket No. 22).

12. According to the Application in Support of the Settlement (the "Application"), for approximately 40 years, the Debtor was a real estate developer. For most of his career, his partner was Winthrop Chamberlin ("Chamberlin"). But recently, the relationship between the Debtor and Chamberlin had soured, and the parties were involved in various disputes, which the Debtor characterized as "irreconcilable." These issues coupled with construction issues and the COVID-19 pandemic had negatively impacted the value of the Debtor's assets, and in August 2020, the Debtor faced defaulting on his guaranties (See Application in Support at ¶s 11-15).

13. As explained in the Application, because the Debtor lacked working capital to resolve his financial issues he entered into negotiations with the Acquirer. The negotiations culminated in the Settlement, which is supported by a related agreement identified as the "Profit Participation Agreement." According to the Application, the Profit Participation Agreement will result in some value for the Debtor and his estate and underwrite distributions under the plan of reorganization (See Application in Support at ¶18).

14.     The Application contains a detailed explanation of the Debtor's various entities (See Application at ¶s 19-29).  The Application explains that the Acquirer proposes to provide the Debtor and Chamberlin with equal amounts that will compensate them for the transfer of their interests, allow each of them to be relieved of their guarantee obligations, settle costly disputes and avoid "almost certain liquidation of the Debtor's assets over the prior twelve months" (See Application in Support at ¶ 39).

15.     To effectuate the Settlement, in March 2021, the Debtor resigned from his partnerships, while retaining his economic interests.  Previously, on October 22, 2020, the Debtor had entered into an agreement with Acquirer for the "Assignment of Equity Interests," wherein the Debtor agreed to sell, assign and transfer his interests in 305 Second Avenue Associates, L.P. and Mountbatten Equities, L.P., together with the related sub-entities, to the Acquirer (See Application in Support at ¶s 37-38).

16.     The Application assigns no value to the entities to be transferred, but according to the Debtor's schedule A/B, 305 Second Avenue Associates, L.P., is valued at $65,000 and Mountbatten Equities, L.P., is valued at $110,000.

17.     Under the Assignment of Equity Interests, the Acquirer will not make any immediate payment to the Estate.  The consideration for the interests is set forth in the Profit Participation Agreement which provides that the Debtor will receive 25 percent of excess net cash flow, after the Acquirer is repaid its pre-petition loans to the Debtor and repaid the "Priority Payment" of $2.5 million (See proposed Profit Participation Agreement (ECF Docket No. 22-4 at clause 2 "Waterfall of Distributed Funds")).

18.      According to the Stipulation, which is annexed as Exhibit A to the Application, the Acquirer is an entity under the control of Gary and Adam Rosenberg.  The

Acquirer previously lent the Debtor $4.5 million in two transactions, the first in the amount of $3.5 million and secured by the Debtor's equity in 305 Second Avenue Associates, L.P., and $1 million secured by the assets of Hudson Leroy LLC, and its subsidiary, 421 Commercial Fitness, LLC.  Another entity, 3-4 LLC, defined as the Lender, and also under the control of Gary and Adam Rosenberg, lent the Debtor up to $80,000, some or all of which was apparently the source of the retainer paid to Counsel (See Stipulation at Recitals).[1]

19.     The Stipulation provides that the Debtor is released from any and all liabilities under the Guaranties (See Stipulation at ¶ 4).

20.      According to the Stipulation, the Debtor is precluded from litigating the validity of the Acquirer's security interests, and " . . . no other party in interest shall be permitted to challenge the validity, priority and the extent of the Acquirer's interest in the Collateral."  (See Stipulation at ¶ 10).

21.     Although the Application indicates that there is no exchange of releases, the Stipulation at paragraph 10, also provides that

> [U]pon entry of this Stipulation and Order, the Debtor, its estate, any trustee appointed for the Debtor's estate, or appointed or elected in a Chapter 7 case, if this case is converted to Chapter 7, the Debtor's successors or assigns, and all creditors and parties in interest hereby <u>unconditionally and</u> <u>irrevocably release and forever discharge the Acquirer from any and all claims, counterclaims, demands, defenses, offset, debts, accounts, contacts, liabilities, actions and causes of action, of any kind or nature whatsoever, arising out of or relating to the Collateral Agreement, the Guaranty, or the Acquirer's security interest in the Collateral</u>.

---

[1] According to Counsel's 2016(b) Statement, Counsel received an $80,000 retainer, $50,000 was paid by the Debtor and $30,000 was paid by the Lender.  The Lender is also providing the Debtor's post-petition financing which is the subject of the separate motion see ECF Docket No. 23.

(Emphasis added).

22.     The Stipulation also contains a finding that the Acquirer's offer is the highest and best offer, and that the transaction does not violate various fraudulent conveyance statutes (See Stipulation at ¶18).

23.     Paragraph 35 of the Stipulation also provides that any payments due from the Debtor under the Transaction Documents shall be an allowed administration expense, payable without further order of the Bankruptcy Court.

24.     At Paragraph 45 of the Stipulation provides that any plan of reorganization cannot alter or conflict with the Stipulation, which shall be the controlling document.

## APPLICABLE LAW

**The Proposed Settlement Does Not Comply
With the Requirements of 9019**

*The "Settlement" Does Not Settle Any Identifiable Litigation*

25.     Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bank. P. 9019(a).

26.      In considering whether to approve of a settlement under Fed. R. Bank P. 9019, a bankruptcy court must make an

> educated estimate of the complexity, expense and likely duration
> of litigation, the possible difficulties of collecting on any judgment
> which might be obtained, and all other factors relevant to a full and
> fair assessment of the wisdom of the proposed compromise. Basic
> to this process, in every instance, of course, is the need to compare
> the terms of the compromise with the likely rewards of litigation.

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

27. While the decision whether to approve a settlement rests in the Court's sound discretion, *In re Arrow Air, Inc*., 85 B.R. 886, 891 (Bankr.S.D.Fla.1988), the debtor's business judgment should not be ignored. *Depo v. Chase Lincoln First Bank, N.A. (In re Depo)*, 77 B.R. 381, 384 (N.D.N.Y.1987), aff'd, 863 F.2d 45 (2d Cir.1988).

28. Courts in the Second Circuit, also consider the following factors, known as the *Iridium* Factors, when determining whether to approve a settlement:

> (i) the balance between the litigation's possibility of success and the settlement's future benefits;
> (ii) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;
> (iii) the paramount interest of the creditors, including each affected class' relative benefits, and the degree to which creditors do not object to or affirmatively support the proposed settlement;
> (iv) whether other parties in interest support the settlement;
> (v) the competence and experience of counsel supporting the settlement; and
> (vi) the extent to which the settlement is the product of arm's length bargaining.

*In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir.2007).

29. Nevertheless, a court is not required to conduct a mini-trial to "decide the numerous questions of law and fact raised ... but rather to canvass the issues" raised by the parties, *Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir.), cert. denied, 464

U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983), and decide whether a proposed settlement falls "below the lowest point in the range of reasonableness." *In re Teltronics Services, Inc*., 762 F.2d 185, 189 (2d Cir.1985).

30. The instant case creates a certain dilemma. While the Motion is ostensibly brought under Fed. R. Bank. P. 9019, the substance of the Motion appears to be a sale, which should be initiated under Bankruptcy Code section 363.

31. Moreover, if we review the Motion under the case law in connection with the approval of a settlement it is apparent that while there is appears to be a long-standing series of disputes between the Debtor and his partner, Chamberlin, the settlement does not involve a resolution of their differences. Rather, the Motion concerns the transfer of the Debtor's, and apparently that of Chamberlin's interests, to the Acquirer. There is no specific litigation that is being resolved. Hence, it is submitted that the analysis set forth by the Supreme Court in *TMT*, is inapplicable to the instant case.

32. A similar conclusion results with respect to the first *Iridium* factor. There is simply no litigation being settled. However, the Settlement, also fails to satisfy the other *Iridium* factors.

*The Settlement Does Not Satisfy the Iridium Factors*

33. A review of the Settlement demonstrates that there no information that addresses the interests of the creditors, or how the Settlement will affect each creditor class relative benefits alleged to be received if the Settlement was approved.

34. Any proposed financial benefit derived from the Settlement is dependent upon the information disclosed in the Profit Participation Agreement. From a review of the Profit Participation Agreement, it appears, that it is only after the Acquirer is re-paid its pre-

9

petition loans, which totaled $4.5 million, (but which appeared to be repayable under the Stipulation by a $4 million payment, and the $2.5 million Priority Payment), that the estate would be entitled to receive 25 percent of the net cash flow.  Yet, there is no information as to how the amounts are to be calculated. Consequently, there is no reason to believe that there will be any funds available, and therefore no reason to conclude that the Profit Participation Agreement benefits the Debtor's creditors.

35. The Motion was made 16 days after the case was filed.  The First Meeting of Creditors will be conducted after the expiration of the objection period.  Once again, there is no reason to conclude that any of the parties in interest, other than perhaps the Debtor and the Acquirer, support the relief sought in the Motion.

36. There is no information to doubt the competence and experience of counsel.  But, there are reasons to question whether the alleged Settlement is the product of an arms-length negotiation.  Specifically, it appears that an entity related to the Acquirer paid at least some portion of Counsel's retainer.  Additionally, an entity related to the Acquirer, is the proposed DIP funder, and according to the DIP Funding Motion, at paragraph 43, Rosenberg & Estis, P.C., represents Mountbatten Equities, L.P. in an action against the Print House Condominium.  Finally, the Settlement appears to favor the Acquirer in terms of a repayment of its pre-petition loans.   Based upon the inter-connecting relationships, it is difficult to conclude the Settlement resulted from an arms-length negotiation.

37. After reviewing the Settlement in conjunction, with the applicable case law, it is submitted that the Motion is improperly brought under Fed. R. Bank P. 9019. Moreover, even if the Motion was proper under Fed. R. Bank. P. 9019, the relief sought in the Motion fails to rise to the lowest level of reasonableness and should not be approved.

**The Transaction Appears to a Sale But**
**Does Comply with Bankruptcy Code Section 363**

38.     The substance of the Motion seeks entry of an order approving the "Assignment of the Equity Interests."  The description of the transaction uses such terms such as "sell," "assign" and "transfer" of estate assets.  The Acquirer's offer is described as the "highest and best."

39.     Because the tenor of the Motion is one of a sale, it is submitted that the Settlement must comply with the Bankruptcy Code section 363 applicable to a sale of assets outside the ordinary course.  Unfortunately, the Motion does not.

40.     The Second Circuit in *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir.1983), articulated a standard for determining when to authorize a section 363(b) sale "prior to acceptance and outside of any plan of reorganization" which strikes a balance between a debtor's ability to sell its assets and the right of a creditor to an informed vote on a plan of reorganization.

41.     The *Lionel* Court concluded that there has to be some articulated business justification, other than appeasement of a particular creditor, for the use, sale or lease of a debtor's property outside of the ordinary course of business.  *Id*. at 1070.

42.     The Court then set forth a nonexclusive list of factors (the "*Lionel* Factors") to guide a court in its consideration of the issue, which are the following:

> (i) the proportionate value of the asset to the estate as a whole,
> (ii) the amount of elapsed time since the filing,
> (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future,

>> (iv) the effect of the proposed disposition on future plans of reorganization,
>> (v) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property,
>> (vi) which of the alternatives of use, sale or lease the proposal envisions, and
>> (vii) whether the asset is increasing or decreasing in value.

*Id.*

43. The Second Circuit re-articulated the "good business reason" standard in *In re Chateaugay Corp. (LTV Corporation),* 973 F.2d 141, 143 (2d Cir.1992), when it affirmed sale of substantially all assets of a debtor where the debtor articulated risk of loss of value of the assets.

44. In the instant the case, the Debtor did not address the *Lionel* Factors, probably because the Motion was brought as under Fed. R. Bank. P. 9019. But, it is submitted that if the Motion were brought under Bankruptcy Code section 363, the Motion would be denied. Not only does the proposal fail to satisfy the *Lionel* standards, but it fails to comport with the requirements for a sale under Bankruptcy Code section 363.

45. The Settlement would transfer what appears to be a substantial portion of the Debtor's assets to the Acquirer, for consideration in an unarticulated amount, at some future date. The Debtor may respond that the equity interests do not constitute the majority of the estate assets and that the Debtor is not transferring all of his equity interests, or the largest estate asset, the Debtor's interest in the alleged $5 million claim for quiet enjoyment against the Print House.

46. However, the value of a quiet enjoyment claim is quite speculative. Additionally, while the Debtor is retaining some equity interests, other than the Debtor's

schedules, neither the Application nor any of the supporting documents provide any information as to the value of the assets being transferred and those assets that are not the subject of the Motion.

47. With respect to the other *Lionel* Factors, the Motion also falls short. Within two weeks of filing his bankruptcy petition, the Debtor made the Motion. The Official Committee was just recently appointed, and the First Meeting of Creditors has not been conducted and will not take place until after the expiration of the objection period. There does not appear to be a good business reason for a sale at this time, and it is submitted that the Motion is merely to complete a transaction for the benefit of one pre-petition creditor.

48. The Debtor may argue that the assets are depreciating in value and the Debtor cannot afford the delay inherent in the plan confirmation process. However, other than some generalized information that the assets are declining in value there is no independent support for that position. Moreover, because the Stipulation provides that it is the controlling document, approval of the Stipulation would pre-ordain certain plan provisions such as releases and the discharge of certain obligations. While some of these provisions could make their way into a plan of reorganization, provisions, such as releases, are considered to be extraordinary, requiring full disclosure and possibly consent of the affected parties. When such extraordinary relief is sought, the creditors should not be denied the protections provided to them under the Bankruptcy Code's plan process.

49. As set forth herein, the proposed Profit Participation Agreement, provides that only after the Acquirer is re-paid its loan, and paid its Priority Payment, does the estate receive a payment of 25 percent of the net cash flow. Not only does this mean that the Acquirer will have been paid $6.5 million, but there is no information on the expected cash flow, and

operating expenses. Basically, there is no information on how cash flow or net cash flow would be calculated. Consequently, there is no reliable information supporting the conclusion that the transfer of the Debtor's equity interest would produce a benefit for the estate and a distribution to the $97 million of unsecured creditors.

50. The Motion does not provide any information concerning the value of the equity interests being transferred, or whether there are any alternative uses of those assets. Moreover, despite the Application's recitation of the disputes among the parties, cash flow problems, and the problems related to the COVID-19 pandemic, there is no indication that the Debtor is suffering an immediate cash crisis. A substantial portion of the Debtor's expenses appears to be lease payments in the amount of $47,500. While the Debtor's net cash flow is negative, absent the lease payment, the Debtor's cash flow is not so substantially negative such that the assets are in danger of losing all value. Additionally, the Debtor's proposed DIP Budget does not provide for the lease payments.

51. With respect to the requirements of Bankruptcy Code section 363, there is no indication that the assets were marketed or exposed to the marketplace in any manner. There is no reason to find the at the sale was subject to "higher and better" offers, or that the Acquirer is entitled to any of the relief, such as a good faith finding.

## **CONCLUSION**

52. The Debtor has failed to satisfy any of the legal requirements necessary to grant the requested relief. The Motion does not settle any specific litigation. The benefits allegedly flowing to the estate from the Settlement lack factual support. In contrast, the Settlement provides for payments and benefits to the Acquirer while foreclosing the statutory

protections available to creditors under the plan process.  The Settlement also fails to pass muster as a sale, because there is no information concerning the value of the assets or whether those assets were exposed to the marketplace. The Motion should be denied in its entirety.

**WHEREFORE,** the United States Trustee respectfully requests that its objection be sustained and the Court deny the Motion in its entirely and grant such other and further relief as may be just and proper.

DATED:   Central Islip, New York             WILLIAM K. HARRINGTON
           May 3, 2021                             UNITED STATE TRUSTEE REGION 2
                                                                       560 Federal Plaza
                                                                       Central Islip, New York 11722
                                                                       Telephone  (631) 715-7800


                                                                       By: ***/s/ Christine H. Black***
                                                                             Christine H. Black
                                                                             Assistant United States Trustee

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>EASTERN DISTRICT OF NEW YORK<br>---------------------------------------------------------x | **Hearing Date and Time:**<br>**May 10, 2021 at 10 a.m.** |
| In re | Chapter 11<br>Case No. 21-70611-reg |
| Barnet Louis Liberman,<br><br>                          Debtor.<br>---------------------------------------------------------x | |

## CERTIFICATION OF SERVICE OF THE
## UNITED STATES TRUSTEE'S OBJECTION
## TO MOTION UNDER BANKRUPTCY RULE 9019

      I,   Joann C. Lomangino, am employed at the Office of the United States Trustee for the Eastern District of New York, hereby certify that I caused a copy of the annexed United States Trustee's Objection To Motion Under Bankruptcy Rule 9019, to be served by electronic mail upon the persons listed below by emailing the same to their email addresses provided.

      James E. & Bernice Bookhamer
      jbookie@verizon.net

      Jacob M. Toledano
      Medival5@verizon.net

      Fred S Kantrow
      The Kantrow Law Group, PLLC
      Email: fkantrow@thekantrowlawgroup.com

      **Paris Gyparakis**
      Rosen & Associates, P.C.
      Email: pgyparakis@rosenpc.com

      **Sanford P Rosen**
      Email: srosen@rosenpc.com

      John Giampolo, Esq.,
      Counsel for the Lender/Acquirer 3-4 Lender LLC
      jgiampolo@rosenbergestis.com

Dated: Central Islip, New York
       May 3, 2021

                                    */s/ Joann C. Lomangino*
                                    Joann C. Lomangino
                                    Paralegal Specialist