Page 1

1

2  UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

3  ------------------------------------------X

In re                Case No. 8-21-70611-REG

4

BARNET LOUIS LIBERMAN, Chapter 11

5

Debtor.

6  ------------------------------------------X

7

8                DATE: May 14, 2021

9                TIME: 1:17 P.M.

10

11

12          VIRTUAL DEPOSITION of the

13  Debtor, BARNET LOUIS LIBERMAN, taken by the

14  Respective Parties, pursuant to a Notice

15  and to the Federal Rules of Civil

16  Procedure, before Natalie Lynch, a Notary

17  Public of the State of New York.

18

19

20

21

22

23

24

25

```
 1
 2   A P P E A R A N C E S:
 3
 4   SCHWARTZER & MCPHERSON LAW FIRM
         (Co-Counsel to Russell Nype and
 5       Revenue Plus LLC, Judgement Creditors)
         2850 South Jones Boulevard, Suite 1
 6       Las Vegas, Nevada 89146-5308
         BY: LENARD E. SCHWARTZER, ESQ.
 7
 8
     RIVKIN RADLER, LLP
 9       (Co-Counsel to Russell Nype and
         Revenue Plus LLC, Judgement Creditors)
10       926 RXR PLAZA
         Uniondale, New York 11556-0926
11       BY: STUART GORDON, ESQ.
         FILE #: 7801-1
12
13
     WILLIAM J. CANDEE IV
14       (Co-Counsel to Russell Nype and
         Revenue Plus LLC, Judgement Creditors)
15       445 Park Avenue, 9th Floor
         New York, New York 10022
16       BY: WILLIAM J. CANDEE, ESQ.
17
18   ROSEN & ASSOCIATES, PC
         (Proposed Counsel to Barnet Louis
19       Liberman, Debtor and Debtor in
         Possession)
20       747 Third Avenue
         New York, New York 10017-2803
21       BY: SANFORD P. ROSEN, ESQ.
22
23
24       (Appearances continued on next page.)
25
```

```
 1
 2   A P P E A R A N C E S:
 3
 4   ROSENBERG & ESTIS, PC
        (Attorneys for 305-421 LLC and
 5      3-4 Lender LLC)
        733 Third Avenue
 6      New York, New York 10017
        BY: JOHN D. GIAMPOLO, ESQ.
 7
 8
     THE KANTROW LAW GROUP, PLLC
 9      (Attorney for the Official Committee of
        Creditors of the Estate of Barnet
10      Louis Liberman)
        6901 Jericho Turnpike, Suite 230
11      Syosset, New York 11791
        BY: FRED KANTROW, ESQ.
12
13
     UNITED STATES TRUSTEE OFFICE
14      560 Federal Plaza
        Central Islip, New York 11722
15      BY: CHRISTINE BLACK, ESQ.
16
17   ROBERT COHEN, ESQ.
        Pro Se
18      (Creditor of the Bankruptcy Estate)
        P.O. Box 323
19      Beckett, Massachusetts 01223
        BY: ROBERT COHEN, ESQ.
20
21
     ALSO PRESENT:  RUSSELL NYPE, Creditor
22                  BEN PELTA-HELLER,
                    Concierge Tech, Novak Trial
23                  Services, LLC
24
25            *         *         *
```

Page 4

1

2      F E D E R A L    S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10  may be signed and sworn to by the witness

11  before anyone authorized to administer an

12  oath, with the same effect as if signed

13  before a Judge of the Court; that an

14  unsigned copy of the deposition may be used

15  with the same force and effect as if signed

16  by the witness, 30 days after service of

17  the original & 1 copy of same upon counsel

18  for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21  all objections except as to form, are

22  reserved to the time of trial.

23

24              *     *     *     *

25

1          B. Liberman

2     B A R N E T    L O U I S    L I B E R M A N,

3     called as a witness, having been first duly

4     sworn by a Notary Public of the State of

5     New York, was examined and testified as

6     follows:

7

8          MR. SCHWARTZER:  Mr. Lieberman,

9          my name is Lenard Schwartzer.  I'm

10         the attorney who will be representing

11         Russell Nype and Revenue Plus at this

12         deposition.

13              Your deposition was noticed for

14         1 p.m. on Friday the 14th.  I believe

15         that time was an agreement.  That

16         time would set and agreed to by you

17         and your counsel.

18              For some reason, that we're not

19         aware of, your counsel is not on the

20         phone, and we have a relatively short

21         time in order to take this deposition

22         because there is a hearing on May

23         24th.

24              Do you want to go forward with

25         the deposition without your attorney?

Page 6

1                    B. Liberman

2              THE WITNESS:  No.

3              MR. SCHWARTZER:  Okay.  We'll

4         wait another -- another 13 minutes,

5         until 1:30, to see if Mr. Rosen or

6         one of his associates is on the

7         deposition.

8              (Whereupon, a recess was

9         taken.)

10             MR. SCHWARTZER:  It is now, as

11        I understand it, 1:37 p.m.  This

12        deposition was set to begin at 1

13        p.m., New York time, and due to Mr.

14        Rosen's inability to get in on the

15        video conference, he is on now via

16        telephone.

17   EXAMINATION BY

18   MR. SCHWARTZER:

19        Q.    Please state your name for the

20   record.

21        A.    Barnet Louis Liberman.

22        Q.    Please state your address for

23   the record.

24        A.    10 Palomino Court, East

25   Hampton, New York 11937.

1                    B. Liberman

2        Q.    Mr. Liberman, this deposition

3    is being taken in a contested matter in the

4    bankruptcy court involving your bankruptcy

5    case.

6             It is really -- it is --

7    pursuant to the rules it's related to the

8    two motions that are pending in the

9    bankruptcy court.  And it is not a general

10   2004 exam relating to other matters, but

11   just to these two motions.

12             And I'm going to be seeking

13   information that relates to these motions

14   or may lead to evidence relating to these

15   motions.

16             To begin with, are you able to

17   answer questions today?

18        A.    I believe so.

19        Q.    Is there any medical condition

20   that will prevent you from answering

21   questions to the best of your ability

22   today?

23        A.    Well, I'm somewhat compromised

24   by Lasix, so, I'll be leaving the table a

25   few times during this period.

1                   B. Liberman

2        Q.    If you need -- you know, you

3    and I are not far in difference in age, so,

4    if you need to get up, let me know.

5        A.    Okay.

6        Q.    And that will be fine.  I have

7    no problem giving you the opportunity to

8    relieve yourself, or get a drink, or

9    whatever you need to do.

10            However, I would like to get as

11   many questions in in the period of time

12   that we have left.

13            MR. ROSEN:  It's Sandy.  Can

14        you hear me?

15            MR. SCHWARTZER:  I can hear you

16        now, Sandy.

17            MR. ROSEN:  Okay.  Could I just

18        trouble you?  I don't know who is on

19        the phone, but John Giampolo is

20        trying to get the link to the

21        deposition.

22            MR. GIAMPOLO:  I'm here, Sandy.

23        Sandy, I dialed in.

24            MR. ROSEN:  All right.  Very

25        good.  Thank you.  Sorry.

1                    B. Liberman

2              MR. SCHWARTZER:  Okay.

3         Q.    To begin with, Mr. Liberman, do

4    you know Gary M. Rosenberg?

5         A.    Yes.

6         Q.    How long have you known him?

7         A.    Since 1985 or '84.

8         Q.    And how did you -- how do you

9    know him?

10        A.    Uh, he represented me before

11   the -- his firm represented me before the

12   rent stabilization board in New York.

13        Q.    And has he or his law firm

14   represented you in other matters since

15   then?

16        A.    Represented me?  Yes, his firm

17   represented me.  I'm not certain.  It

18   was 2017 in, uh, a mortgage closing, uh,

19   with a bridge lender.

20        Q.    For what property?

21              MR. GIAMPOLO:  I'm just going

22        to object to form.  Specify.  Are you

23        asking if he was representing him

24        individually, Barnet Liberman or

25        entities that he owned?

                    B. Liberman

1                   MR. SCHWARTZER:  You can -- Mr.

2          -- Mr. Giampolo, you're not a party

3          to this contested matter, and you

4          don't represent a party in this

5          contested matter.

6                You need to file the motion,

7          anything in support of the motion,

8          and you didn't file anything in

9          opposition to the motion.

10               So, you're not allowed to

11         object during this deposition.  If

12         you want to object to the form of

13         questions and things like that, you

14         can do that at the time we introduce

15         the transcript to the court.

16    A.    Well, take a hint from what the

17   counsel just said that in the first

18   instance, he represented -- the firm of

19   Rosenberg & Estis represented Mountbatten

20   -- Mountbatten Equities.

21               And in a second instance what I

22   just spoke about, his firm represented

23   Ossining Land Holdings.

24    Q.    Okay.

```
 1                  B. Liberman
 2           With regard to Mountbatten,
 3   what was your position in Mountbatten?
 4       A.     Mountbatten?
 5           MR. ROSEN:  Objection.
 6           You can answer that.
 7           THE WITNESS:  I can?
 8           MR. SCHWARTZER:  Who's
 9       objecting?
10           MR. ROSEN:  The only one who
11       can is me.  It's Sandy.
12           MR. SCHWARTZER:  Okay.  Why?
13       You're objecting to him telling me
14       what position he held in Mountbatten?
15           MR. ROSEN:  I'm objecting to
16       the form of your question.  He can
17       answer it if he understands it.
18       A.     What position?  I was at that
19   time a general partner in that partnership.
20       Q.     And in the Ossining entity that
21   was involved in the later representation,
22   what was your position in that company?
23       A.     I think they call it member.
24       Q.     Were you the managing member?
25       A.     No.  I'm not certain.
```

```
1                    B. Liberman
2       Q.     Were you the person who made
3  decisions for that company?
4       A.     I was one, yes.
5       Q.     Who was the other?
6       A.     Stefan Melter.
7       Q.     Do you have any family
8  connection to Mr. Gary M. Rosenberg?
9       A.     No.
10      Q.     Uh, in the past Mr. Rosenberg
11 has loaned you, according to the promissory
12 notes, about $2,000,000; is that correct?
13      A.     That's an approximation.
14      Q.     And I believe the first note
15 you gave him was dated some time in 2009;
16 is that correct?
17      A.     I'm not certain.
18      Q.     About when did you get your
19 first loan from Mr. Rosenberg, to the best
20 of your knowledge?
21      A.     I can't hear you clearly.  Can
22 you get closer?
23      Q.     To the best of your knowledge,
24 when did you get your first loan from
25 Mr. Gary M. Rosenberg?
```

```
 1                    B. Liberman
 2            MR. ROSEN:  Objection.
 3            You can answer that, Barnet.
 4       A.   I think --
 5            MR. ROSEN:  Lenard --
 6       A.   It was in connection with a
 7  project I was doing in some time around
 8  2000.
 9       Q.   Okay.
10            Was that loan repaid?
11       A.   Yes.
12       Q.   Do you recall providing
13  Mr. Nype's counsel, John Mooshie, with a
14  series of 11 promissory notes from you and
15  Phyllis Liberman to Mr. Rosenberg?
16       A.   I'm sorry, can you repeat the
17  question?
18       Q.   Do you remember providing
19  copies of a 11 promissory notes to Mr.
20  Rosenberg executed by you and Phyllis
21  Liberman?
22       A.   I don't recall any specific
23  number.
24       Q.   Do you recall giving a number
25  of promissory notes to Mr. Mooshie?
```

1                       B. Liberman

2          A.    I didn't hear that, the last

3    part.

4          Q.    Did you remember giving a group

5    of promissory notes to Mr. John Mooshie,

6    Mr. Nype's state court counsel in

7    discovery?

8          A.    Yes.

9          Q.    Okay.

10               Do you recall being questioned

11   about any of those notes?

12         A.    Not specifically.

13         Q.    Were the copies of the

14   promissory notes that you provided to

15   Mr. Mooshie true copies of what you

16   actually signed and executed?

17         A.    I'm not sure I understand what

18   you mean by true copy.

19         Q.    Well, I assume that you -- you

20   and your attorney provided copies of

21   documents to Mr. Mooshie.

22               Would those have been copies of

23   actual documents that you had in your

24   records?

25         A.    Yes, but they were copies.  The

1                    B. Liberman

2  note -- I am pretty sure Mr. Rosenberg has

3  the note.

4       Q.    I would assume that the payee

5  has the original notes as well.

6       A.    Okay.  They were copies, yes.

7       Q.    Yeah.

8             And the copies you have that

9  you provided show that the interest rate on

10  these promissory notes was 14 percent per

11  annum.

12             Do you recall that?

13       A.    I don't recall each and every

14  note, but 14 percent I'm sure was on some

15  of them.

16       Q.    Have you paid interest on these

17  promissory notes?

18       A.    Not that I recall.

19       Q.    So, to the best of your

20  recollection you don't recall ever paying

21  interest on any of the promissory notes

22  that you provided to Mr. Mooshie?  And

23  these are the ones that are dated from 2009

24  through 2019.

25       A.    I would have to check, uh, with

1                      B. Liberman

2    my bookkeeper.

3         Q.    I understand that.  But to the

4    best of your recollection can you tell me,

5    have you been paying the 14 percent

6    interest on these notes, or any interest on

7    these notes?

8         A.    Not that I recall.

9         Q.    Have you paid off any of these

10   notes?

11        A.    I don't have the notes nor

12   those records in front of me, so, I can't

13   give you a definitive answer.  I don't know

14   which notes you have.

15        Q.    Well, I'm asking, to the best

16   of your recollection, promissory notes that

17   you provided in discovery in the state

18   court case.

19             They add up to about

20   $2,000,000, and they date back from 2009 to

21   2019.  Do you recall paying off any of

22   those notes?

23        A.    Do I recall?  No.

24        Q.    Okay.

25             In December of 2019 you

1                     B. Liberman

2    executed -- well, I should not say you

3    executed.  Let me check.

4              You executed a mortgage

5    document for the benefit of Gary M.

6    Rosenberg encumbering the apartment 805,

7    uh, at 421, uh, Hudson Street.

8              Do you recall doing that?

9        A.    I know I did.  I just -- I'm

10   trying to -- a specific recollection I

11   don't have.  But I did execute that.

12       Q.    So this -- and I was provided,

13   and I believe I -- it came from

14   Mr. Mooshie, I don't know whether you

15   provided it, a copy of a mortgage recorded

16   on December 17, 2019 in New York County,

17   and it appears to have your signature on

18   the mortgage.

19              Would that be the document you

20   executed?

21              MR. ROSEN:  Objection.

22              Barnet, you can answer that.

23       A.    Without -- you're asking me to

24   make assumptions.  Without looking at it it

25   is hard to say.

1                    B. Liberman

2              If you're confirming that I

3    provided it or my attorney provided it,

4    then, uh, you can rely on that.  I --

5         Q.    I'm just -- I'm asking your

6    recollection.  I'm just wondering if you

7    remember executing a mortgage on the

8    apartment at 805 -- apartment 805 for the

9    benefit of Mr. Rosenberg in December of

10   2019?

11        A.    I'm sure I did.  I just don't

12   recollect exactly who was sitting where.  I

13   don't recollect the exact circumstances,

14   but I'm sure I did sign.

15        Q.    Well, that's what I'm going to

16   be asking you about.  How come after ten

17   years of unsecured promissory notes you

18   provided a mortgage to Mr. Rosenberg?

19              MR. ROSEN:  Objection.

20              You can answer that, Barnet.

21        A.    The consideration for giving

22   the mortgage was for him giving me

23   additional funds, which I sorely needed at

24   the time.

25        Q.    Have you made any payments on

1                    B. Liberman

2    the mortgage since it was executed?

3         A.    No.

4         Q.    Has any -- do you know if any

5    of the entities that I -- well, let me ask.

6              Do you know if Hudson 805 LLC

7    has made any mortgage payments to Mr.

8    Rosenberg?

9         A.    No, I don't know.

10        Q.    Do you know what Hudson 805 LLC

11   is?

12        A.    Yes.

13        Q.    Well, what is it?

14        A.    It's an LLC that owns apartment

15   805 at 421 Hudson Street.

16        Q.    And who are the managing

17   members of that company?

18        A.    My wife Phyllis.

19        Q.    And do you know if your wife

20   has arranged for any payments on that

21   mortgage since it was made?

22        A.    I don't know.

23        Q.    Do you know what the payment

24   would be on the mortgage --

25        A.    No.

```
 1                    B. Liberman
 2       Q.    -- that you signed?
 3       A.    No.
 4       Q.    Would they -- okay.
 5             Do you know what the entity TLG
 6  Hudson LLC is?
 7       A.    Not really.
 8       Q.    Do you know who the managers of
 9  TLG Hudson LLC are?
10       A.    Probably my wife and myself.  I
11  just can't remember where it fits in.
12       Q.    Is T -- do you recall if TLG
13  Hudson LLC is the managing member of Hudson
14  805 LLC?
15       A.    I don't recall that.  That
16  might be what happened.  I'm not sure.
17       Q.    Did you arrange for an attorney
18  or someone else to organize TLG Hudson LLC
19  for you in May of 2019?
20       A.    Yes.
21       Q.    And who was the person who
22  arranged for the formation of that company?
23       A.    Neil Parsoff.
24       Q.    And what was the purpose of
25  forming that company?
```

```
 1                    B. Liberman
 2        A.     I don't recall.
 3        Q.     How would you go about finding
 4   out what the reason was?  If you were
 5   trying to find out, how would you do it?
 6        A.     I would ask Neil.
 7        Q.     And Neil Parsoff is an
 8   attorney; is that correct?
 9        A.     Yes.
10        Q.     And who does he represent?
11        A.     He represents -- he represents
12   myself.  And he represents the trusts for
13   my children.  And he represents -- I think
14   that's it.
15        Q.     Does he represent your wife as
16   well?
17        A.     Yes.  Yes.  I'm sorry.  Yes.
18        Q.     Okay.
19               So, at this point in time you
20   can't tell me the reason why TLG Hudson LLC
21   was formed?
22        A.     No.
23        Q.     And could you tell me, who were
24   the managers of Hudson 805 LLC before TLG
25   Hudson was formed?
```

1                    B. Liberman

2        A.    Oh, that would have been my

3    wife and perhaps myself as well.

4        Q.    Okay.

5              You arranged, it appears that

6    you arranged that for Hudson TLG to become

7    the controlling entity for Hudson 805,

8    which -- apartment 805.

9              Do you recall why that was

10   done?

11             MR. ROSEN:  Objection.

12             You can answer that, Barnet.

13       A.    No.  That's just what I told

14   you a few moments ago.  You asked that

15   question.

16       Q.    Did you have any discussions

17   with Mr. Rosenberg about the re -- the

18   mortgage on apartment 805?

19       A.    You have to be more specific.

20       Q.    Well, at one point he didn't

21   have a mortgage, and at another point he

22   did have a mortgage.

23       A.    Oh, yeah.

24       Q.    How did that come about?

25       A.    I thought I explained that a

```
 1                    B. Liberman
 2   moment ago.
 3                (Whereupon, the Reporter asked
 4          for a clarification because of
 5          technical difficulties.)
 6                MR. ROSEN:  Objection.
 7                Go ahead, Barnet.
 8                THE WITNESS:  Sorry?
 9                MR. ROSEN:  I said go ahead.
10                THE WITNESS:  Oh.
11        A.    At the time I required
12   additional money, and Mr. Rosenberg said
13   that he had out a lot of money.  If he was
14   going to put out any additional money, he
15   wanted to be secured by a mortgage.
16                And then from then on I dealt
17   with someone else in his office
18   exclusively.
19        Q.    Who did you deal with at his
20   office?
21                MR. ROSEN:  Can I -- hold it.
22          Hold it a minute.
23                I got a problem.
24                MR. SCHWARTZER:  I can't tell
25          who's speaking.
```

1              B. Liberman

2          MR. ROSEN:  It's Sandy.

3          (Whereupon, the Reporter asked

4      for a clarification because of

5      technical difficulties.)

6          MR. ROSEN:  All I said was, I

7      have a problem getting into

8      attorney/client work product or the

9      attorney/client privilege.

10     Q.     Was the person you spoke to at

11 the firm of Rosenberg & Estis?

12     A.     You're not asking me -- are you

13 asking me who it was?

14     Q.     I'm asking you if they were

15 with the firm of Rosenberg & Estis.

16     A.     Yes.

17     Q.     Were they representing you?

18     A.     In that transaction, no.

19     Q.     And who was the person you were

20 talking to at Rosenberg & Estis with regard

21 to this mortgage transaction?

22     A.     Let me correct myself.  I was

23 talking with Neil Parsoff.  And we were

24 together on the phone with a fella named

25 Freeze.  David Freeze.  He just had a baby.

1                    B. Liberman

2        Q.     Now, I'm not going to ask you

3    anything about what Mr. Parsoff said, but

4    with regard to Mr. Freeze, did he explain

5    to you what the purpose of the mortgage

6    was?

7                MR. ROSEN:  I'm going to

8         object.  Why are you asking him about

9         what Mr. Freeze said?

10                MR. SCHWARTZER:  Fine.  You're

11        -- are you instructing him not to

12        answer?

13                MR. ROSEN:  Well, if you're

14        asking --

15                MR. SCHWARTZER:  Either

16        instruct him not to answer or --

17        that's fine.  Your objection is on

18        the record.

19                We have nobody to decide on the

20        outcome of objections, so, you made

21        your objection.

22                MR. ROSEN:  Can you relax?

23                MR. SCHWARTZER:  Could you stop

24        interrupting?

25                MR. ROSEN:  No.  Not if you are

1              B.  Liberman

2      going to ask inappropriate questions

3      that breach the attorney/client

4      privilege.

5            MR. SCHWARTZER:  You're telling

6      me that asking about the other side

7      -- what the other side attorney said

8      to Mr. Liberman is covered by

9      attorney/client privilege?

10           MR. ROSEN:  You have not

11     established who this person is.

12           MR. SCHWARTZER:  I understand.

13     That's what I'm asking the questions.

14           MR. ROSEN:  So why don't you

15     ask who he is?

16           MR. SCHWARTZER:  Mr. Rosen, you

17     are just interrupting for the purpose

18     of delaying.  That's getting to be

19     very apparent.

20           MR. ROSEN:  You're wrong.  I'm

21     interrupting because your questions

22     are terrible.  Your questions are not

23     good questions.  Why don't you ask

24     clear questions?

25           MR. SCHWARTZER:  You -- fine.

```
 1              B. Liberman
 2         Your client, if he does not
 3         understand a question, he can say he
 4         does not understand.
 5              In depositions in Federal Court
 6         all the objections are reserved.  So,
 7         you don't have to make any objections
 8         on the record.
 9         Q.   Mr. Liberman, to the best of
10    your recollection, what's the name of the
11    attorney who was on the phone with you and
12    Mr. Parsoff?
13         A.   David Freeze.
14         Q.   What did Mr. Freeze say to you
15    about this mortgage?
16              MR. ROSEN:  Lenard, do me a
17         favor.  Could you tell me who
18         Mr. Freeze was at the time?
19              MR. SCHWARTZER:  No.  I'm
20         asking the witness.
21              MR. ROSEN:  Lenard, please ask
22         the witness.
23              (Whereupon, the Reporter asked
24         for a clarification because of
25         technical difficulties.)
```

1              B. Liberman

2         MR. SCHWARTZER:  Miss Court

3    Reporter, are you able to keep your

4    statements on the record as well?

5    Because I want the record to clearly

6    reflect that you were unable to hear

7    Mr. Rosen.

8         (Whereupon, the Reporter asked

9    to go off the record.)

10         MR. SCHWARTZER:  For the

11    record, I am pointing out that the

12    court reporter had to state several

13    times that she could not hear Mr.

14    Rosen, and that when he talks on the

15    phone in this deposition, we are only

16    hearing every other word.

17         THE WITNESS:  Sandy, there is

18    like a red line through the speaker

19    on your -- I don't know what that

20    means.  I think it might mean you're

21    muted, Sandy.

22         MR. ROSEN:  Can you hear me,

23    Barnet?

24         THE WITNESS:  Yes.  Now I can

25    hear you.

```
 1                    B. Liberman
 2        Q.    Mr. Liberman, in your
 3   conversation with Mr. Freeze, did you
 4   understand who Mr. Freeze was representing?
 5        A.    Yes, certainly.
 6        Q.    And who was he representing?
 7        A.    Gary Rosenberg.
 8        Q.    Okay.
 9              And did he discuss with you the
10   terms of the mortgage?
11        A.    Not that I recall.
12        Q.    So, what was the contents of
13   that conversation?
14        A.    I don't remember.  I remember I
15   was on the phone.  I was in Mr. Parsoff's
16   office, and we were on the phone with
17   Mr. Freeze.  I don't remember any other
18   details at the moment.
19        Q.    How did the terms of the
20   mortgage come about?
21        A.    They were what was presented.
22   They were presented that way in writing.
23        Q.    Who presented them to you?
24        A.    The law firm.  I guess office
25   of Freeze.  I'm not certain which
```

1                        B. Liberman

2    personality, but...

3         Q.    Was there any point in time

4    when they asked you how much interest you

5    were willing to pay?

6         A.    No, not that I recall.

7         Q.    Did there come a time when they

8    ever asked you when the note -- when the

9    debt would mature?

10         A.    Did they ask me?

11         Q.    Yes.

12         A.    Not that I recall.  It was all

13    in writing on the documents.

14         Q.    And did you discuss the terms

15    of the mortgage with anybody?

16         A.    With, uh, Neil Parsoff.

17         Q.    Mr. Liberman, let's go on to --

18    I have to get one final question about that

19    mortgage.

20              To the best of your knowledge,

21    has anyone made any payments on the

22    mortgage since it was made in December of

23    2019?

24         A.    I can't confirm either way.

25         Q.    What is the -- what is the

```
 1                    B. Liberman
 2   value of the apartment, 805?
 3        A.    Hard to tell.  This is a
 4   difficult market.
 5        Q.    Are there any other similar
 6   apartments listed for sale at that
 7   location?
 8        A.    No.
 9        Q.    Are you sure that apartment 820
10   is not listed for sale?
11        A.    It may be.  It is not similar.
12        Q.    In what way is it not similar?
13        A.    Half the size.
14        Q.    Which one is half the size?
15        A.    820.
16        Q.    820 is half the size of
17   apartment 805?
18        A.    Approximately, yes.
19        Q.    Okay.
20              And is that because apartment
21   805 is actually consisting of two units,
22   805 and 806?
23        A.    It is a totally different
24   layout.
25        Q.    Okay.
```

1                    B. Liberman

2              But it is twice the size?

3       A.    Yes.

4       Q.    When is the last time you had

5    apartment 805 appraised?

6       A.    I think more than four years

7    ago.

8       Q.    Do you recall what the

9    appraisal was four years ago?

10      A.    The value?

11      Q.    The appraised value.

12      A.    About $12,000,000.

13      Q.    Have there been any substantial

14   physical changes to the unit since that

15   appraisal was done?

16      A.    Yes.

17      Q.    And what were they?

18      A.    Two stainless steel and glass

19   spiral staircases connecting the terraces

20   of the apartment were removed.

21      Q.    Any other major changes?

22      A.    No.

23      Q.    Are you still one of the

24   managing members of TLG Hudson LLC?

25      A.    I'm not certain.

1            B. Liberman

2      Q.    When you signed the mortgage as

3  the manager, the mortgage to Mr. Rosenberg,

4  you signed it as a manager of TLG Hudson

5  LLC.

6            Were you the manager at that

7  time?

8      A.    The best I could tell from what

9  you're saying.

10      Q.    And do you recall if you

11  resigned as the manager since then?

12      A.    I don't recall resigning.

13      Q.    Other than owning an interest

14  -- other than being the manager of Hudson

15  805 LLC, what other purpose does TLG Hudson

16  LLC perform?

17      A.    None that I know of.

18      Q.    Does TLG Hudson LLC own any

19  assets other than an interest in Hudson 805

20  LLC?

21      A.    Not that I'm aware of.

22            THE WITNESS:  I'm going to

23        exercise my old man privilege now.

24            MR. SCHWARTZER:  That is

25        perfectly fine.  Please go ahead.

1              B. Liberman

2          We'll take a couple of minute break

3          and wait for you to come back.

4              THE WITNESS:   Thank you.

5              (Whereupon, a short recess was

6          taken.)

7          Q.    Mr. Liberman, there is an

8    entity called Liberman Group LLC.  Do you

9    recall that entity?

10         A.    Yes.

11         Q.    Are you a member of that

12   entity?

13         A.    Yes.

14         Q.    Are you a manager of that

15   entity?

16         A.    I don't believe so.

17         Q.    Who caused the formation of

18   Liberman Group LLC?

19         A.    That was done with Neil

20   Parsoff.

21         Q.    And who was Mr. Parsoff's

22   client when he formed Liberman Group LLC?

23         A.    The Liberman family.

24         Q.    And that -- and who spoke to

25   Mr. Parsoff on behalf of the Liberman

1                    B. Liberman

2    family?

3          A.    My wife, myself, and from time

4    to time, I'm not certain, one of my

5    daughters.  I'm not sure which one.

6          Q.    And what does the Liberman

7    Group LLC own?

8          A.    Uh, it owns interest in various

9    entities, partnerships, corporations, LLCs.

10         Q.    Do you recall which entities it

11   owns?

12         A.    I would have to check the list.

13         Q.    Where would you have that list

14   that you are going to check?

15         A.    Uh, I might have it on my desk.

16         Q.    Why don't you look for it.

17         A.    I was looking for it yesterday.

18   Hold on.

19               (Whereupon, a short recess was

20          taken.)

21         Q.    Mr. Liberman, were you able to

22   find that paper with the list?

23         A.    I am checking right now.

24               It is the victim of a spilled

25   cup of coffee at some point.  Let me see if

                     B. Liberman

1   I can read it.

3        Q.    So, could you tell me now that

4   you have that list what Liberman Group LLC

5   owns?

6        A.    A portion of At Home Israel

7   LLC, The Gym Holdings Group LLC, Casino

8   Coolage LLC, Hudson Leroy LLC --

9              THE WITNESS:  Excuse me.  I got

10        to take this.  Hold on.

11             (Whereupon, a short recess was

12        taken.)

13             THE WITNESS:  Thank you.  Thank

14        you.

15        A.    -- SA Land Partners III, LLC,

16   SA Land Partners -- Roman numeral -- VI,

17   LLC, Tru Fresh LLC, Tri Ventures II --

18   Roman numeral II -- Fund LP.

19             Right.

20        Q.    Okay.

21             Let's start with the first

22   item.  What was the first item on the list

23   that you had?

24        A.    At Home Israel LLC.

25        Q.    Does that entity now have any

```
 1                    B. Liberman
 2   assets?
 3        A.     No.
 4        Q.     Thin Holding Group LLC, does it
 5   have any assets?
 6        A.     Apparently no.
 7        Q.     When did it stop having assets?
 8        A.     Three or four years ago.
 9        Q.     And what kind -- I assume from
10   the name that it had something to do with
11   the gyms.
12        A.     It had an interest in the
13   fitness clubs, rented fitness clubs in a
14   number of towns in Connecticut and in New
15   York.
16        Q.     And were you a manager of that
17   entity?
18        A.     No.
19        Q.     Okay.
20               Who was?
21        A.     Seth Herschel and Stefan
22   Melter.
23        Q.     With regard to Hudson Leroy,
24   does that entity have any assets?
25        A.     Hudson Leroy has a lease and
```

1                    B. Liberman

2    sublease to Printing House Fitness, PH,

3    Printing House Fitness.

4              I'm not certain, but there is

5    an entity between Hudson Leroy and Equinox

6    Printing House.  But it has a triple net

7    lease.  The proceeds come to Hudson Leroy.

8         Q.    When was the last time Hudson

9    Leroy received any monies from these

10   leases?

11        A.    March of 2020, I believe.  Or

12   they did pay an electrical bill, uh,

13   recently, but that did not come to Hudson

14   Leroy.

15        Q.    Okay.

16        A.    I'm not sure.  I'm not sure.

17   They did pay, uh, an electrical bill

18   recently.  And I think they paid a partial

19   rent payment recently.

20        Q.    So, your recollection is that

21   Hudson -- that the tenant -- sorry, I guess

22   subtenant, actually, paid some rent in the

23   last year?

24        A.    I believe they have.

25        Q.    Has the lease been terminated?

```
 1                    B. Liberman
 2      A.    (No response.)
 3      Q.    Let me -- Mr. Liberman, that
 4  question was not clear even to me.
 5            Was the sublease between the
 6  tenant -- between Hudson Leroy and the
 7  tenant terminated?
 8      A.    Hudson Leroy.  In the
 9  interim -- no, I don't think so.
10      Q.    Has the lease between Hudson
11  Leroy and the owner of the property been
12  terminated?
13      A.    Um, I don't think so.
14      Q.    Has Hudson Leroy paid any rent
15  to the owner of the property since March of
16  2020?
17      A.    No.
18      Q.    And has Hudson Leroy paid any
19  money to the Liberman Group since March of
20  2020?
21      A.    No.
22      Q.    The next entity you mentioned
23  was SA Land Partners III LLC.  What did
24  that own?
25      A.    That owns an interest in a
```

1              B. Liberman

2    development assembled parcel south of San

3    Antonio.

4        Q.    And what's the status of that

5    investment?

6        A.    There is a -- they had sold, I

7    guess in '19.  In 2019 they sold some of

8    the acreage.

9        Q.    Since 2019 has that company

10   paid any money to the Liberman Group?

11       A.    No.

12       Q.    Do you have any idea what the

13   value of that investment is worth at this

14   time?

15       A.    No.  The general partner has

16   not returned calls for about eight months.

17       Q.    With regard to SA Land Partners

18   VI LLC, does Liberman Group still have an

19   interest in that entity?

20       A.    Yes.

21       Q.    Has the Liberman Group received

22   any payments from that entity since March

23   of 2020?

24       A.    No.

25       Q.    Do you have any idea what the

```
 1                  B.  Liberman
 2   value of that investment is?
 3        A.    No.
 4        Q.    The next item I heard was Two
 5   Fresh?
 6        A.    Tru, T-R-U.
 7        Q.    T-R-U Fresh --
 8        A.    Right.
 9        Q.    -- LLC?
10        A.    Yes.
11        Q.    What kind of business is that
12   in?
13        A.    That was in the business of
14   purchasing, arranging for a patented
15   process, a number of patented processes,
16   that I own to be used for freezing protein.
17             Basically it was salmon out of
18   Norway.  And then distributing, having it
19   shipped by ship and distributed in this
20   country.
21             (Whereupon, the witness
22        received a phone call and a recess
23        was taken.)
24        Q.    Is Tru Fresh still in business?
25        A.    No.
```

```
 1                      B. Liberman
 2        Q.    The next thing I have on the
 3   list is something that ended in Fund LL --
 4   Fund LP.  What's the full name again?
 5        A.    Tri Ventures II.
 6        Q.    And what business is that
 7   company in?
 8        A.    That company is in the business
 9   of -- it's an incubator company.  And they
10   invest in pharmaceutical, and medical
11   instruments, uh, surgical tools, things
12   like that.  Uh, and portfolio companies.
13   And then they, uh, sell them off.
14        Q.    Is that entity still in
15   business?
16        A.    Yes.
17        Q.    And what percentage of it does
18   the Liberman Group own?
19        A.    .8333 percent, less than one
20   percent.
21        Q.    Okay.
22              Have you received any
23   distribution?  Has the Liberman Group
24   received any distributions from that fund?
25        A.    Yes.
```

1                    B. Liberman

2        Q.     And when was that?

3        A.     I think it was in 2020.  Yes,

4    in 2020.

5        Q.     And what was the amount of the

6    distribution?

7        A.     I can't recall at this point.

8        Q.     If you don't know the exact

9    amount, was it $1000?  Was it 10,000?  Was

10   it 100,000?

11       A.     It was -- I think, it was in

12   the range of 20 to $30,000.

13       Q.     And that came in, you said, in

14   the past year?

15       A.     2020.

16       Q.     Does the Liberman Group have ts

17   own bank account?

18       A.     Yes.

19       Q.     At what bank?

20       A.     Currently it's Bethpage

21   Federal, uh, what do they call it, Federal

22   Credit Union.

23       Q.     Okay.

24              Do you have -- by any chance do

25   you have a statement for that account on

```
 1                    B. Liberman
 2    your desk?
 3         A.    No.  I have a letter from them.
 4    They are the same people who are
 5    foreclosing on -- they have a mortgage on
 6    305 Second Avenue.
 7         Q.    Who are the signatories on the
 8    bank account of the Liberman Group at
 9    Bethpage Federal Credit Union?
10         A.    I believe it is myself and my
11    wife.
12         Q.    Anyone else?
13         A.    Perhaps my assistant.
14         Q.    The next entity you mentioned
15    in your schedules was Hudson 805 LLC.  Do
16    you recall what that entity is?
17         A.    Wait a minute.  Wait a minute.
18    I didn't mention that.
19         Q.    It says you had a 12 and a half
20    per interest, and the value was zero.
21         A.    Wait a minute.  Not -- in the
22    list I just read to you?
23         Q.    No, not in the list.
24         A.    Oh, oh, oh.
25         Q.    In your bankruptcy schedules.
```

1                    B. Liberman

2          A.    Okay.  Sorry.  Sorry.  I was

3    just checking on the list.

4          Q.    In the bankruptcy schedules you

5    said you have a 12 and a half percent

6    interest in Hudson 805 LLC?

7          A.    Yes.

8          Q.    Could you tell me what that

9    entity owns?

10         A.    I believe it owns apartment

11   805, uh, at 421 Hudson Street.

12         Q.    Is it the sole owner of that

13   entity -- of that apartment?

14         A.    I don't know what you mean by

15   sole.

16         Q.    In other words, I am trying to

17   understand whether Hudson 805 LLC is the

18   only owner of that -- of apartment 805.

19              Is it that you're not

20   individually a co-owner, your wife is not a

21   co-owner of the apartment, of the real

22   estate?

23         A.    No.  Hudson 805 is the owner.

24         Q.    Okay.

25              How about the unit where your

```
 1                    B. Liberman
 2    office is in the basement of the building?
 3         A.    Yes.
 4         Q.    Is that also owned by Hudson
 5    805?
 6         A.    No, no.
 7         Q.    What entity owns the condo unit
 8    in the basement, the one where your office
 9    is?
10         A.    Mountbatten Equities.
11         Q.    How did you determine the value
12    of Hudson 805 LLC?
13         A.    Well, I generously took the
14    value at about nine million six, which was
15    a 20 percent discount off the value at the
16    top of the market when it was appraised at
17    12,000,000.
18               And then from that I subtracted
19    the obligations that are senior to the
20    equity interest.
21         Q.    Other than the mortgage to Mr.
22    Rosenberg, what other liens are on that
23    property?
24         A.    Um, approximately $6,000,000
25    plus default interest for about a year and
```

1                    B. Liberman

2   a half, which I have not calculated, to

3   Axos Bank for a first mortgage.

4            Then there is the second

5   mortgage that Mr. Rosenberg has.

6            Then there is the -- I don't

7   know which is senior.  I suppose senior to

8   all of that is the real estate taxes, which

9   at this point are somewhat in excess of a

10  million two.

11           And then beyond that there is

12  the real estate taxes, the mortgage.  And

13  then there is a common charges due.  And I

14  believe that's close to $1,000,000 as well.

15           So, I think that adds up to

16  well in excess of the nine six.  So that's

17  pretty generous.

18           The nine six is what I

19  estimated to be the market value, you know,

20  coming off the $12,000,000 appraisal

21  adjusted for the collapse of the market of

22  20 percent.

23           Is that helpful?

24       Q.    You answered the question.  So,

25  yes, it is helpful.

1              B. Liberman

2              I have a -- going back to the

3    Liberman Group.  Does it also own an

4    interest in an entity called Winter Lab

5    LTD?

6         A.    No.  The Winter Lab -- let me

7    see.  I have the coffee spills on it.  Hold

8    on a second.

9              The corporation, the interest

10   of the corporation are not owned by the

11   LLC.  The interest of the corporations are

12   owned directly by the trusts for the

13   individual children.  That's the way the

14   estate attorney set it up.

15             Hold on.  I have it here, I

16   think.  Hold on.

17             Winter Lab is owned by the

18   individual trust.

19        Q.    And do you own any percentage

20   in that?

21        A.    Yes.  Yes.  Here it is.  Winter

22   Lab -- uh -- uh, actually, no, I don't.

23   That's all -- oh, wait.

24             Sorry.  What's the question

25   again?

1                      B. Liberman

2        Q.    Do you own any interest in

3    Winter Lab LTD?

4        A.    Uh, according to this, no.

5        Q.    Who were the owners of Winter

6    Lab LTD?

7        A.    Aaron trust, Ava trust, Leah

8    trust, Stella trust and Zoe trust.

9              (Whereupon, the Reporter asked

10         for clarification.)

11        A.    Aaron trust, Ava trust, Leah

12    trust, L-E-A-H, Zoe, Z-O-E, and Stella,

13    S-T-E-L-L-A.

14        Q.    And who is the manager of that

15    company?

16        A.    I'm not certain.  It says here

17    Phyllis, but I believe I am as well.

18        Q.    And do you and/or Phyllis own

19    any percentage in that company as the

20    managers?

21              MR. ROSEN:  Lenard, could you

22         repeat that?

23              THE WITNESS:  Could you repeat

24         your question, Mr. Schwartzer.

25        Q.    Do you or Phyllis own -- you

1                    B. Liberman

2   believe, you said, that you and Phyllis are

3   the managers of that entity.  I was asking

4   whether you or Phyllis own any percentage

5   interest in that company.

6        A.    I'm not sure from the

7   information I have here.

8        Q.    At any time did you have an

9   interest in that company?

10       A.    Oh, back before 2014, yes.

11       Q.    And did you transfer your

12   interest to the children's trusts at that

13   time?

14       A.    In 2013 and '14, yes.

15       Q.    Did you receive anything, any

16   consideration back from the children for

17   those transfers?

18       A.    No.

19            MR. ROSEN:  Excuse me.  Hold

20        it.

21            Lenard, can you hear?

22            MR. SCHWARTZER:  Barely, about

23        every other word.

24            MR. ROSEN:  Hold on a minute.

25            Can you hear me now?

1              B. Liberman

2         MR. SCHWARTZER:  Yes.

3         MR. ROSEN:  I'm objecting to

4     the question.

5         MR. SCHWARTZER:  Okay.

6     Q.    Mr. Liberman, you still have to

7  answer the question.  Did you receive any

8  consideration from the children's trusts?

9     A.    No, I did not receive any

10  consideration.  Thank you.  Kiss on the

11  cheek.  That's it.

12     Q.    There is another -- obviously

13  there is another entity listed on your

14  bankruptcy schedules, Mountbatten Equities,

15  which is a limited partnership.

16            Do you still own an interest in

17  that?

18     A.    It's part of this entire

19  transaction with Rosenberg.  And I know I

20  no longer am manager.  And I think I still

21  have one percent of Mountbatten Equities.

22     Q.    Well, your schedules actually

23  says you own 42.33 percent.

24     A.    I did own that.  It's confusing

25  to me as to what stage this is.  I probably

1                    B. Liberman
2  still own it.  It is contracted to be sold.
3           Right.  That's what I would
4  own, 43 -- right.  My 40 percent, plus what
5  my father left me.  And -- that would be
6  it, yeah.
7       Q.    How did you -- well, let's say
8  -- what does Mountbatten Equities still
9  own?
10      A.    Mountbatten Equities still owns
11 the basement, first floor, ninth floor and
12 tenth floors of 421 Hudson Street, along
13 with apartment -- an interest in apartment
14 525, a 20 percent -- a 38 percent interest,
15 I believe, in apartment 525.
16      Q.    In the past two years has
17 Mountbatten Equities sold any properties?
18      A.    In the past two years?
19      Q.    And when I say sold, I mean
20 transferred, gave up, any kind of
21 transaction?
22      A.    I understand.  Uh, I don't
23 think so.
24      Q.    Okay.
25           Other than the real estate at

1                   B. Liberman

2    421 Hudson Street, does Mountbatten

3    Equities own anything else?

4         A.    No.

5         Q.    How did you value your interest

6    in Mountbatten Equities?

7         A.    It depends on what date.  On

8    what day?

9         Q.    As of the date of the petition

10   you said your 42 percent interest was worth

11   $65,000.  That sort of indicates to me that

12   the value of the property is about --

13   everything owned by Mountbatten Equities,

14   the net value is about 150,000.

15        A.    No, about a million something.

16   Oh, 150.  Yeah, 150.  Okay.  How that comes

17   about is it was not receiving any income.

18   It is unlikely receiving any income from

19   the fitness center, which was $300,000 a

20   year.

21             Actually, no.  It was $70,000 a

22   year.  And the only value it had was in the

23   basement, which is actually liability.

24             But it did own 38 percent of --

25   38 percent of apartment 525, which is

```
 1                    B. Liberman
 2   probably -- 525.  It might have been a
 3   million dollar apartment.
 4              I don't know if there is any
 5   financing at the moment.  I don't think so.
 6       Q.    Well, that's what is troubling
 7   to me.  If that's a million dollar
 8   apartment, and if there's no financing
 9   against it, how could your 42 percent be
10   worth only 65,000 and not something --
11       A.    Because it is 42 percent of 38
12   percent.  Sorry, It's a little complicated.
13       Q.    Okay.
14              How did you value the ninth
15   floor of 421 Hudson?
16       A.    The first floor, ninth floor
17   and tenth floors is the Equinox Fitness
18   Center.
19              If you capitalize the value of
20   that...
21              (Whereupon, the Reporter asked
22          for clarification.)
23       A.    Equinox Fitness Center pays
24   rent to the interim company, which pays it
25   to Hudson Leroy.  And Hudson Leroy pays
```

 1                    B. Liberman

 2    $70,000 a year to Mountbatten Equities.

 3    But since Hudson Leroy was not getting any

 4    money from -- eventually from Equinox, uh,

 5    it didn't pay the $70,000 a year to

 6    Mountbatten.

 7              So, the value is probably

 8    limited, some speculative value as to what

 9    that rent might be.

10              We know what the rent would be.

11    Well, it's speculative as to when it would

12    be paid, and if it would be paid in full.

13              So, the only thing that has

14    value that can be determined is that

15    apartment 525.

16              The rest of the property that

17    owns the basement runs at a loss.  Between

18    the common charges and the taxes, that

19    loses money.  I don't think I considered

20    that in the calculation.

21        Q.    Is there a tenant in the

22    basement?

23        A.    No.

24        Q.    Has there ever been a tenant in

25    the basement?

                         B. Liberman

1

2       A.      There was a tenant in the

3    basement.  It was a music studio.  It was

4    moved out in 2020.

5       Q.      Has Mountbatten Equities

6    received any payments from any of its

7    sources in the last year?

8       A.      No.

9       Q.      Have you received any payments

10   from Mountbatten Equities in the last year?

11      A.      Not to my knowledge.

12      Q.      There is an entity called 305

13   Second Avenue Association LLP of which you

14   are a limited partner at this time,

15   according to your schedules.

16              Do you know what that entity

17   is?

18      A.      Yes.

19      Q.      At one time were you the

20   general partner of that entity?

21      A.      Yes.

22      Q.      And when did you cease being

23   the general partner of that entity?

24      A.      October of 2020.

25      Q.      And was that part of the

1                    B. Liberman

2     transaction you made with Mr. Rosenberg's

3     company?

4          A.    Yes.

5          Q.    What does 305 Second Avenue

6     Association own?

7          A.    Three or four apartments at 305

8     Second Avenue, uh, the commercial space at

9     305 Second Avenue, which is currently

10    leased to New York University Langone

11    Hospital.

12               Uh, and it owns property in Las

13    Vegas.  I think it is 310 to 330 East

14    Charleston Boulevard in Las Vegas.

15         Q.    Did 302 Second Avenue

16    Associations own -- sell any of its

17    property in the last couple of years?

18         A.    It's 305 Second Avenue

19    Associates.

20         Q.    Associates, yes.

21         A.    It's 305, not 302.

22         Q.    Did it sell any of its

23    apartment units in the last two years?

24         A.    In the last two years?

25         Q.    Two years.

```
 1                    B. Liberman
 2       A.    Sorry?  How many?
 3       Q.    Two.  Two years.
 4       A.    Two?
 5       Q.    Last two years.
 6       A.    Yes.
 7       Q.    And what apartments did it
 8  sell?
 9       A.    Oh, gosh.  Uh --
10       Q.    I don't need the apartment
11  numbers.  I mean, did it sell one unit?
12  Did it sell seven?
13       A.    One, two -- I think it sold
14  three units.  So, I believe it sold three
15  units in the last two years.
16       Q.    Did it receive any money from
17  the sale of those units?
18       A.    Yes.
19       Q.    And at that time of the sale of
20  the units, were you one of the general
21  partners of 305 Second Avenue Associates?
22       A.    Yes.
23       Q.    What happened to those -- well,
24  how much did 305 Second Avenue Associates
25  receive from the sale?
```

1                    B. Liberman

2        A.    I'm not certain.

3        Q.    Could you give me a range?  Was

4    it $10,000 or a million?

5        A.    Probably close to 1,000,000.

6        Q.    Okay.

7              And where was the -- where did

8    that million dollars go?

9        A.    The million dollars went to the

10   Pennybacker loan requirements, which

11   required reserve be maintained, and we were

12   using the funds from that financing to

13   renovate other apartments for sale.  So, it

14   effectively went back into the building.

15       Q.    Did you receive any funds from

16   305 Second Avenue Associates in the last

17   two years?

18       A.    In the last two years?  Not

19   that I recall.

20       Q.    How did you value your

21   interest, your 33 percent interest in 305

22   Second Avenue Associates?

23       A.    I estimated the value of the

24   apartments that were not sold.  I estimated

25   the cost of completing the work requirement

1                    B. Liberman

2    in those apartments to get a certificate of

3    occupancy so they could be sold.

4              Uh, I estimated the value of

5    the commercial lease, and the likelihood of

6    it being refinanced when that mortgage was

7    close to being due.

8              I think it was due last

9    October, if I recall, or this past

10   February.  I'm not certain.  But you know,

11   that's how I valued it.

12        Q.    Do you have any appraisals for

13   any of these properties?

14        A.    There may be an appraisal in

15   connection with the refinancing and the

16   construction loan from two or three years

17   ago.  Yeah.

18        Q.    For which property?

19        A.    305 Second Avenue.

20        Q.    Okay.

21        A.    Oh, and there may be an

22   appraisal on -- there may be -- there is --

23   I know the Meadows Bank did an appraisal on

24   the property in Las Vegas.

25        Q.    Okay.

1                    B. Liberman

2              Do you have those appraisals?

3        A.    Not easily.  I am without any

4    assistance.  So, I'm sure that's somewhere

5    in this office.

6              Although it would take me

7    awhile.  You might get it from the Meadows

8    Bank for that one.

9        Q.    Okay.

10       A.    I guess I could ask the broker

11   if there was an appraisal done on the --

12       Q.    In the settlement agreement it

13   mentions a November 20th -- in the

14   settlement agreement -- in the settlement

15   motion, the motion to approve the deal with

16   three zero -- three five -- whatever it is,

17   305-421 Inc., in that motion it mentions

18   that there was a November 20th, 2020 loan,

19   $80,000 from 3-4 Lender secured by your

20   interest in 305 Second Avenue.

21             Do you recall that?

22       A.    Yes.

23       Q.    Who are the principals of 3-4

24   Lender?

25       A.    I'm not certain.

```
 1                    B. Liberman
 2       Q.    Who did you deal with with
 3   regard to 3-4 Lender?
 4       A.    I dealt with my attorney,
 5   Mr. Bitsky.
 6       Q.    Okay.
 7             Your attorney wasn't the
 8   lender.  Do you know who the lender was?
 9       A.    It's not in the --
10             MR. ROSEN:  Objection.
11       A.    It's not in the documents?
12       Q.    Well, I know that three -- 3-4
13   Lender LLC was formed by the firm of
14   Rosenberg & Estis, okay?  And then somebody
15   loaned you $80,000; is that correct?
16       A.    If that's what it says.  Yeah,
17   if that is what it says.
18       Q.    But can you tell me the person
19   who provided the funds for you, the
20   $80,000?
21       A.    It's --
22             MR. ROSEN:  He answered.
23       A.    It's not clear to me.
24             MR. ROSEN:  Len, can you hear
25       me?
```

1                  B. Liberman

2          A.     It was not clear to me who it

3     was.

4          Q.     Huh?

5          A.     It was not clear to me who it

6     was.

7          Q.     Who did you speak to about

8     getting the loan?

9          A.     Um, my counsel.

10         Q.     Well, before you went to your

11    counsel's saying I am getting this $80,000

12    loan, didn't you know that somebody was

13    going to loan you $80,000?

14         A.     It was someone with Rosenberg &

15    Estis.  They would be the company that did

16    that.  You can ask them.

17         Q.     Okay.

18                I understand Rosenberg & Estis

19    represents the lending company, but who did

20    you speak to about getting an $80,000 loan

21    that you -- and you signed -- eventually

22    got the $80,000 loan in November of 2020?

23                You had to speak to someone,

24    didn't you?

25         A.     Yeah, I remember speaking to my

1                      B. Liberman

2    attorney, who was speaking to Rosenberg &

3    Estis.  I spoke to my attorney about the

4    terms, and, uh, he spoke to whoever it was

5    at Rosenberg & Estis.

6         Q.    I understand that.

7              But how did you -- when you

8    went to speak to your attorney about the

9    terms of the loan, who told you that they

10   were even going to make a loan?

11        A.    It was part of the entire, uh,

12   program of the motion, uh, and the -- what

13   they call the DIP.

14        Q.    This is before the bankruptcy.

15   So, I'm asking you, was there someone who

16   said to you they would make that $80,000

17   loan, and who was that person?  Or what

18   person --

19        A.    I believe it was either -- um,

20   I'm not certain.  I'm not certain who it

21   was.

22        Q.    Okay.

23              Now, you mentioned a program.

24   When you said, oh, this was part of the

25   program, what program was that part of?

1                    B. Liberman

2        A.      The bankruptcy and the ability

3    to have, uh, 421-305 Corporation get an

4    early agreement from the court that the

5    property could be sold to it before the

6    value decreased further because of the

7    various defaults on all of the loans that

8    were outstanding.

9        Q.      Who came to you with the

10   program?

11       A.      Oh, I discussed that with Gary

12   Rosenberg.

13       Q.      So, was this $80,000 loan part

14   of that program?

15       A.      I believe so.  I'm not certain

16   of that details, but I believe so.

17       Q.      With regard to the program that

18   Mr. Rosenberg has presented to you, who was

19   representing you?

20       A.      Mr. Bitsky.

21       Q.      And what firm is Mr. Bitsky

22   with?

23       A.      Uh, Bensinger, or McGrail &

24   Bensinger, or Bensinger & McGrail.

25       Q.      And are they located in

1                    B. Liberman

2    Manhattan?

3         A.    I believe they have a Manhattan

4    address.

5         Q.    Do you know who the principals

6    of 3-4 Lender are?

7         A.    I believe it's the Rosenbergs.

8         Q.    When you say the Rosenbergs,

9    that's a plural?

10        A.    Yes.

11        Q.    Is it someone other than Gary

12   Rosenberg?

13        A.    His son Adam.

14        Q.    Part of the agreement says that

15   305-421 LLC has access to, and I quote,

16   $4,000,000 immediately available funds.

17             Have you seen documentation of

18   that?

19        A.    No.

20        Q.    In the agreement it says that

21   you have to obtain -- uh, actually, the

22   whole transaction is subject to obtaining

23   recognition agreements from the ground

24   lessors and the condominium boards.

25             Have those recognition

1                        B. Liberman

2     agreements been obtained?

3          A.    I'm sorry, which boards?

4          Q.    It says from the ground lessors

5     and condominium boards.  It doesn't

6     identify them in the document.

7          A.    I'm sorry, I did not understand

8     the first one.  I understand condominium

9     board, but preceding that, what does it

10    say?

11         Q.    It says that the deal is -- the

12    program is conditioned upon receiving

13    recognition agreements from ground lessors

14    and condominium boards.

15         A.    Ground lessor?

16         Q.    Yes.

17         A.    Okay.

18         Q.    Have those agreements been

19    obtained?

20         A.    This is for 305 Second Avenue?

21         Q.    It's for the settlement -- the

22    agreement you made with 305-421 for all the

23    different properties.

24         A.    I'm not certain.  I'm not

25    certain.

1                    B. Liberman

2        Q.    Have you seen any releases of

3   your guarantees?

4        A.    Have I seen any release of my

5   guarantees?

6        Q.    Yes.

7        A.    No.

8        Q.    Do you have an understanding of

9   when those releases are supposed to be

10  obtained as part of your program with Mr.

11  Rosenberg?

12       A.    I'm not clear on that detail.

13       Q.    Has the final version of the

14  profit participation agreement with Mr.

15  Rosenberg's entities been negotiated?

16       A.    Waterfall of the funds?

17       Q.    Yes.

18       A.    Yes, yes, that's negotiated,

19  yes.

20       Q.    Is that the final agreement

21  attached to the motion, to your knowledge?

22       A.    I'm not certain without looking

23  at it.  I presume it is.

24       Q.    Who did you discuss the terms

25  of the waterfall agreement with?

```
 1                    B. Liberman
 2         A.    My attorney, Mr. Bitsky, Jason
 3   Bitsky.
 4         Q.    Did you ever discuss it with
 5   Mr. Rosenberg?
 6         A.    There was one issue I discussed
 7   with Mr. Rosenberg.
 8         Q.    Well, who came up with the idea
 9   of a profit participation agreement?
10         A.    Mr. Rosenberg's firm.  I'm not
11   sure who.
12         Q.    Other than the monies you
13   received -- other than the monies you
14   received under the profit participation
15   agreement, are you receiving any other
16   money from this transaction?
17         A.    Well, there is a proposed DIP
18   in which I would receive some money.
19         Q.    Well, actually, you would be
20   loaned that money; isn't that correct?
21         A.    Yes.  I would be loaned that
22   money.  I would be paid out of the proceeds
23   of the liquidation, the waterfall.
24         Q.    Okay.
25               In the settlement agreement it
```

1                    B. Liberman

2    says that Mr. Rosenberg's entities have

3    been in negotiations with a number of

4    lenders.  What do you know about those

5    negotiations?

6         A.    I think he has completed his

7    negotiations and closed the Pennybacker.

8                   There was another entity called

9    G4, which sold its interest to some other

10   third party.  And I believe he successfully

11   negotiated that.

12                   I think he is in conversations

13   with Bethpage Federal Credit, whatever it

14   is, and he is in conversation with Meadows

15   Bank.  I know he got an extension from

16   Meadows Bank.

17                   He is in conversations with

18   Argentse -- A-R-G-E-N-T-S-E -- who has the

19   $19,000,000 loan on the Equinox Fitness

20   Center.  Uh, that's all I recall at the

21   moment.

22        Q.    There's another entity that you

23   used to own called or may still Orb

24   Management.

25                   Do you know what that is?

1                    B. Liberman

2        A.      Yes.

3        Q.      And what did it do?

4        A.      It managed 421 Hudson Street

5    and the 305 Second Avenue.

6        Q.      When you say managed, those are

7    condominium buildings, aren't they?

8        A.      Yes.

9        Q.      So, what did Orb Management do

10   with regard to managing those buildings?

11       A.      Uh, hired and fired all

12   employees, arranged to comply with all

13   regulations.  Uh, hired and supervised all

14   contractors.

15               Uh, took care of the collection

16   and disbursements of the common charges.

17   Uh, they generally managed the property.

18       Q.      And does Orb Management still

19   manage those properties?

20       A.      No.

21       Q.      When did its management cease?

22       A.      Uh, I think it ceased at the

23   end of -- I believe it was the end of

24   January 2021.

25       Q.      Who took over the management?

1                    B. Liberman

2        A.    Uh, I forgot what they are

3    called.   RMG Management.

4        Q.    And do you know who the owners

5    of RMG Management are?

6        A.    Uh, no.

7        Q.    Do you have an idea?

8        A.    I have the name in a proposal

9    somewhere, but I don't know offhand.

10        Q.    Does Mr. Gary M. Rosenberg own

11    that entity, or control that entity, or

12    have a relationship to that entity, to your

13    knowledge?

14        A.    No.

15        Q.    Since Orb Management no longer

16    manages those properties, does it have any

17    other business?

18        A.    No.

19        Q.    In the last year has Orb

20    Management provided you any money?

21        A.    Not that I recall.

22        Q.    Well, in the schedules it

23    mentions a $250,000 loan from Orb

24    Management to you in the past year.

25                    So, would that help you?

1                    B. Liberman

2        A.    I think it was -- it might have

3    been in 2020.

4        Q.    Right.

5        A.    Not in 2021.

6        Q.    And where would you -- when Orb

7    Management -- let me ask.

8             With regard to Orb Management,

9    who signed the bank -- the checks for Orb

10   Management?

11       A.    Uh, my associate and owner for

12   50 years, Winthrop Chamberlain.

13       Q.    Okay.

14       A.    On occasion.  On occasion.  I

15   had the right to sign checks, but it was

16   not the standard practice.

17       Q.    When you got the $250,000 from

18   Orb Management, was that a distribution or

19   a loan?

20       A.    It certainly was not a

21   distribution.  It was most likely a loan.

22       Q.    And did Mr. Chamberlain get a

23   loan at the same time?

24       A.    I don't know.

25       Q.    Well, who would know?

                    B. Liberman

1

2        A.      The town, the bookkeeper.

3        Q.      Well, who handles the books and

4    records of Orb Management?

5        A.      Right now I believe there is a

6    new accountant that has it.  The accountant

7    that we had for more many years died

8    December 24th of 2019.

9        Q.      What is the name of the new

10   accountant for Orb Management?

11       A.      I don't know.

12       Q.      So, if I wanted -- if you were

13   going to ask for the books and records of

14   the company of which you are a part owner,

15   who would you go to?

16       A.      Mabel Gomez.

17       Q.      And who is Mabel Gomez?

18       A.      Former bookkeeper.

19       Q.      And is she still employed by

20   you?

21       A.      No.

22       Q.      Is she employed indirectly by

23   you by one of your companies?

24       A.      No.

25       Q.      And how would you contact her?

1                    B. Liberman

2        A.     By telephone.

3        Q.     Okay.

4               I'm not going to ask you to put

5    her telephone number on the record, because

6    we want it -- that could be private.

7               But can you provide her address

8    and telephone number to your attorney so he

9    could provide it to me?

10       A.     Sure.

11       Q.     Thank you.

12              With regard to the apartment

13   still owned by 305, who is actually

14   collecting the rent?

15       A.     The new management company.

16       Q.     Okay.

17              And when they collect the rent,

18   do they then send some statement or

19   something to 305 so 305 knows what it is

20   supposed to receive?

21       A.     Let me -- if I may correct

22   something.  They don't work for 305.  They

23   work for Rutherford Condominium.  The new

24   managing agents work for the condominium,

25   not for the partnerships within which I

1                      B. Liberman

2    have interest.

3          Q.    And how do you know the rent is

4    collected or not collected?

5          A.    Whatever rents are collected

6    are insufficient to meet the current

7    obligations.  To meet the current

8    obligations I would have no idea what the

9    net amount -- because they are negative.

10   The net amounts are negative.

11         Q.    So, that's the rent on

12   apartment 525.  You're saying the total

13   rent collected is less than the obligations

14   owed?

15         A.    Not 525.  You asked me on 305.

16   Second Avenue Associates.  525 is the 421

17   Hudson Street.

18         Q.    Okay.

19               So, you have an interest in a

20   company that owned 38 percent of apartment

21   525; is that correct?

22         A.    Yes.

23         Q.    Who collects the rent?

24         A.    Angelo Gordon.

25         Q.    And what happens with the rent

1                          B. Liberman

2      after it is collected?

3           A.      You know, I don't know.  They

4      keep that account.  Angelo Gordon is the

5      big partnership that bought the 120 or so

6      apartments, and then sold them off.

7           Q.      Okay.

8                   And how do you know you're

9      getting the right amount of money from

10     apartment 525?

11          A.      We get an annual report.

12          Q.      And how much money did they

13     provide you in the last year?  Well, how

14     much did you receive from the rent of

15     apartment 525 in the last year?

16          A.      Zero.

17          Q.      And why is that?

18          A.      Because the common charges and

19     the taxes exceed the rent.  It's a rent

20     stabilized unit.

21          Q.      Currently are you -- currently,

22     are you at least living temporarily in

23     apartment 805?

24          A.      Yes.  Until my heat and hot

25     water is fixed, repaired in East Hampton

```
 1                    B. Liberman
 2  where I would like to be.
 3        Q.    Who else is currently residing
 4  in apartment 805?
 5        A.    Currently, as of today?  Just
 6  my wife and I.
 7        Q.    Mr. Liberman, does Leah
 8  Liberman live at 332 90th Street in
 9  Brooklyn?
10        A.    I don't think so.  I think --
11  uh, actually, I have some excellent news,
12  Leah gave birth yesterday to a 7 pound 9
13  ounces daughter, who I'm going to visit
14  later this afternoon for the first time.
15              So, she is currently in the
16  hospital.  But I believe she lives -- she
17  moved.  Because she has a baby.  She moved.
18        Q.    Okay.
19              Do you know the -- do you know
20  her current address?
21        A.    My wife has that.  I do not.
22        Q.    Again, I don't particularly
23  want to put that on a public record of a
24  deposition.
25              Will you provide that to your
```

1                      B. Liberman

2    attorney so he will provide it to me?

3         A.    Sure.  I can do that.

4         Q.    Thank you.

5         A.    Now, you understand that Monday

6    and Tuesday are Shavuot.

7         Q.    Oh, I'm not going to do

8    anything in the next --

9         A.    Okay.

10        Q.    -- before the 24th.  Don't

11   worry about that.

12        A.    Okay.

13        Q.    I mean, we're not doing

14   anything before the 24th.  Okay?  And I

15   certainly would not want to -- I certainly

16   would like to give a new mother as much

17   time as she needs.  Because she is going to

18   be tired and overworked no matter what I

19   do.

20        A.    She doesn't have to, my wife

21   will.

22        Q.    And your wife will probably be

23   tired too from helping.  That being said,

24   let's go back and get through some of these

25   other questions quickly.

1                    B. Liberman

2              Does Ava still live at the

3    address on Stuyvesant Oval?

4         A.     Yeah.   That's like -- yes.

5         Q.     Does Stella still live on

6    Eastern Parkway?

7         A.     Yes, but she recently moved

8    apartments as well.

9         Q.     What is the apartment number?

10   If it is the same building, just give me

11   the apartment number.

12        A.     I don't know.

13        Q.     Okay.

14              Could you provide Stella's new

15   address to your attorney so he could

16   provide it to me privately?

17        A.     Yes.

18        Q.     Does Zoe Liberman still live on

19   Rugby Road?

20        A.     That address I have.   406.

21   Yes.

22        Q.     Do you think it is 406 Rugby

23   Road, not 400?

24        A.     Maybe I'm wrong.   I'll check.

25        Q.     Please check and get back to

                        B. Liberman

1                       B. Liberman

2  your attorney.

3       A.    I mostly communicate by e-mail

4  with the kids, so.....

5       Q.    I understand.  I understand.

6             And do you know where Aaron is

7  residing?

8       A.    Aaron is now in Queens.

9       Q.    Okay.

10            Could you give his address to

11  your attorney?

12      A.    Uh, yes.

13      Q.    And my guess, Mr. Liberman, you

14  may have to consult Phyllis to get the

15  exact numbers?

16      A.    Yes, exactly.  She sends the

17  birthday cards.  Right.

18      Q.    There are a number of trusts

19  for your children -- oh, sorry.  There are

20  a number of trusts for your children.

21            Who prepared those trusts?

22      A.    Neil Parsoff.

23      Q.    And do you recall what year

24  that was done?

25      A.    I think it was 2012 or 2013.

1                    B. Liberman

2       Q.      Okay.

3               And do you -- why were they

4    prepared?

5       A.      They were prepared because I

6    was organizing -- I thought I was very

7    wealthy at the time, and I was.

8               And I was organizing my estate

9    for children and grandchildren at that

10   time.  Of course there were exemptions,

11   which I was able to organize things to fit

12   within the limits that were set by the

13   government, the value of transfers.

14      Q.      Who are the trustees of those

15   children's trusts?

16      A.      I'd have to check.  My wife,

17   and not sure who else.

18      Q.      Have you borrowed money from

19   those children's trusts?

20      A.      From the trusts?

21      Q.      Yes.

22              MR. ROSEN:  Lenard, can you

23        hear?

24              MR. SCHWARTZER:  Yes.

25              MR. ROSEN:  I am objecting.

1                    B. Liberman

2          And I don't understand how this is

3          relevant to the motions that are

4          before the court.

5                MR. SCHWARTZER:  Okay.  I'll go

6          back to the other issues.  That's

7          fine.  I'm not going to disagree with

8          you.

9      Q.     Currently, do you have any

10  income other than Social Security?

11     A.     Unemployment.

12     Q.     And other than unemployment and

13  Social Security, do you have any other

14  income?

15     A.     Sadly not.

16     Q.     Is anyone making the payments

17  for you with regard to your house in East

18  Hampton?

19     A.     No.

20     Q.     When is the last time you made

21  a mortgage payment on the house in East

22  Hampton?

23     A.     Perhaps May of 2020.  I'm not

24  certain.  May of -- April or May of 2020.

25                Does that sound right?  Maybe

```
 1                    B. Liberman
 2   earlier than that.  Maybe December of 2019.
 3        Q.    When is the last time you made
 4   a real estate tax payment on the house in
 5   East Hampton?
 6        A.    Um, I don't.  Not since -- it
 7   is a -- it's a proprietary lease.  The
 8   co-op pays the real estate tax.
 9        Q.    All right.
10              Who is paying the utilities on
11   the house in East Hampton?
12        A.    I am.
13        Q.    Who is paying the utilities on
14   the apartment, apartment 805?
15        A.    Uh, I and my wife.  She gets
16   Social Security as well.
17        Q.    In your motion for the DIP loan
18   you said you needed $47,000 a month for the
19   apartment 805 payment; is that correct?
20        A.    Uh, that's the agreed to sum,
21   yes.
22        Q.    Okay.
23              And what is that -- what amount
24   -- what is that going to pay?
25        A.    It's going to pay the
```

1                     B. Liberman

2    mortgages, the common charges, and the

3    taxes.

4         Q.    And what percentage of

5    apartment 805 do you have a direct interest

6    in?

7         A.    Twelve and a half.

8         Q.    Okay.

9               Why aren't the other 88 and a

10   half percent -- 87 and a half percent of

11   the owners making these payments?

12        A.    I suppose they don't have the

13   money.  I'm not paying the rent.  They

14   don't have the money.

15        Q.    Aren't the other -- isn't 75

16   percent of it owned by your children's

17   trusts?

18        A.    Yes.

19        Q.    And are you saying that the

20   children's trusts don't have any money?

21        A.    Pretty much.

22        Q.    I noticed in the schedules that

23   you have substantial debts to your children

24   that are listed.

25               Did the children provide you

```
1                    B. Liberman
2   with that money, or did it come directly
3   from the children, or from some other
4   source?
5        A.    The children gave me that
6   money.
7        Q.    Now, they gave you that money
8   out of their bank accounts?
9        A.    Yes.
10       Q.    Okay.
11             Did you receive any money from
12  the children's trusts?
13       A.    Not that I recall.
14       Q.    And over what period of time
15  have the children been loaning you that
16  money?
17       A.    More than ten years, I expect.
18       Q.    Now, you also listed a
19  substantial amount of personal loans over
20  the last ten years.
21             Why were you borrowing so much
22  money?
23       A.    I was developing a major
24  project of 189 apartment units in
25  Westchester County.
```

1                    B. Liberman

2              I was supporting that property,

3    and its mortgage payments, and the taxes,

4    and all of the costs of developing the

5    property, which included the professional

6    costs, the consultants costs, engineers,

7    uh, legal.

8              And then I fought off a

9    mortgage foreclosure on that property, all

10   of which required -- there's no income on

11   that property.  It's vacant land.

12             So all of this required cash be

13   put in.  And sadly that amounted to, I

14   believe, a little over $18,000,000 over the

15   past 12 years or so.

16             Uh, and it's still a very

17   worthy project.  Unfortunately the second

18   mortgage foreclosed.  I gave them a deed in

19   lieu.

20             I had an option for a while to

21   purchase it back, but all of that expired

22   in October of '20.

23             October of '20 was the last

24   time I had any ability to continue that

25   project.

1                    B.  Liberman

2              And that was after about 18 --

3     $18,000,700.  I'll know when my accountant

4     finishes the autopsy.  No, it's dead.

5              The biggest problem is all the

6     funds who were funneled into trying to keep

7     that alive.

8        Q.    Have you prepared and filed

9     your 2019 federal income tax return?

10       A.    Almost.

11       Q.    Have you prepared and filed

12    your 2020 federal income tax return?

13       A.    Not for a number of months.

14       Q.    Wouldn't your 2019 tax return

15    be past due now?

16       A.    Yes.

17       Q.    Have you made any arraignments

18    with the IRS regarding your income tax

19    liabilities for the years 2012 through '14?

20       A.    Have I made any arrangement

21    with the IRS?

22       Q.    Yes.

23       A.    No.  I tried to for a number of

24    years.  I had entered into a payment

25    schedule.  I couldn't keep up.

Page 89

1                    B. Liberman

2              I had a conversation with them

3    yesterday.  They now assigned someone else.

4    When it goes into bankruptcy, they assign a

5    special person.  She called me yesterday.

6         Q.    How did you determine the value

7    of the property at 10 Palomino Court?

8         A.    There are three units that are

9    identical that are connected.  It is -- the

10   whole development is 48 units.

11        Q.    And with regard to the tax

12   return, who is preparing those tax returns

13   for you?

14        A.    H, Bradford Miller.

15        Q.    And where is he located?

16        A.    Maybe it is Westchester County,

17   Orange County.  I'm not sure.

18        Q.    Can you provide his contact

19   information to your attorney so he can

20   provide it to me?

21        A.    Certainly.

22        Q.    Thank you.  The property in --

23   that's being leased to the gym, is that the

24   Equinox Gym?

25        A.    Yes.

1                    B. Liberman

2        Q.     And are they currently open?

3        A.     They are currently open with

4    the capacity limited.  I don't know what

5    the regulations are today, but they are

6    currently open and operating.  Yeah,

7    operating.

8        Q.     And are they paying rent?

9        A.     I'm not certain of the amount

10   of rent they are paying.

11       Q.     And who would be certain of

12   that?

13       A.     They did pay the electrical

14   charge.  I know that.

15       Q.     Who?  Mr. Liberman, you have to

16   look up when you talk, otherwise --

17       A.     They did pay the electrical

18   charge.  I'm certain of that.

19       Q.     Okay.

20              Who would know what rents are

21   being paid by Equinox, if it is not you?

22       A.     Mabel Gomez.

23       Q.     Now, in what bank account would

24   the rent be deposited in?

25       A.     Uh, I think that rent is

1                    B. Liberman

2   deposited directly in an Argentic account,

3   according to that mortgage.

4                They pay directly to lockbox or

5   an account that Argentic has.  And I think

6   it is in M & T Bank.  That's where they

7   keep the special account.

8        Q.    And do you get statements for

9   that special account?

10       A.    I believe so.  I mean, I don't,

11  Mabel does.

12       Q.    Okay.

13             When you say Mabel -- where do

14  they -- how do they send the bank

15  statements to Mabel?

16       A.    I don't know.  I'm assuming

17  they send her a hardcopy.  I assume she has

18  access to it.

19       Q.    Well, before you -- before the

20  last six months, where did Mabel Gomez

21  work?

22       A.    Orb Management, in the office

23  at 421 Hudson Street.

24       Q.    Okay.

25             And were the statements mailed

1                      B. Liberman

2    to 421?

3         A.    I believe so.

4         Q.    And where are you located right

5    now?

6         A.    Right now I'm in the basement

7    of 421 Hudson Street.

8         Q.    Is that the office where Mabel

9    works?

10        A.    No.  She works, uh, 75 or 100

11   feet south of here.  75 or 100 feet south

12   of where I am, she works.

13        Q.    Seventy-five feet?

14        A.    Yes.  So, 100 feet, yeah.

15   Between 75 and 100 feet.

16        Q.    So, it is within the same

17   building?

18        A.    Yes.

19        Q.    And who pays the rent for that

20   office?

21        A.    Orb Management.

22        Q.    Okay.

23              And who owns Orb Management?

24        A.    Uh, Winthrop Chamberlain and

25   Barnet Liberman.

1                    B. Liberman

2        Q.    So, don't you have access to

3    that unit as well?

4        A.    Yes, I do.  I don't have access

5    to her office.  It is locked.

6        Q.    Okay.

7              But do you have the ability to

8    get the bank statements?

9        A.    Not unless I broke the lock.

10   But you -- you know, I suppose you can get

11   them from the bank.

12       Q.    Well, doesn't Ms. Gomez work

13   for you?

14       A.    Not anymore.

15       Q.    So, why is she even looking at

16   the -- why would she still receive the bank

17   statements for the company?

18       A.    Because she is working through

19   the transition with all of the new

20   management company, and she is in charge of

21   the transition and all of the financial

22   transactions.

23       Q.    Is anyone paying her a salary?

24       A.    I'm not certain.

25       Q.    Is anybody giving her money to

1                       B. Liberman

2    do the transition work?

3         A.    I have no specific knowledge,

4    but I presume they are.  I presume she is

5    getting money.  I have no specific

6    knowledge.

7         Q.    Who would she be getting the

8    money from?

9         A.    The Rutherford Place

10   Condominium.  Uh, 305-421 corporation,

11   whatever it is called.  The new management

12   company.  Those are the people who are

13   benefitting from her work.

14        Q.    Okay.

15              And who has the records of Orb

16   Management at this time?

17        A.    Mabel and Win Chamberlain.

18        Q.    And do you have access to those

19   records?

20        A.    No.

21        Q.    Do you think if you asked Ms.

22   Gomez to give you the records she would do

23   so?

24        A.    I'm not sure.

25        Q.    The property in Las Vegas on

1                    B. Liberman

2    East Charleston Boulevard, is it listed for

3    sale?

4         A.    It was.  Uh, I think the

5    listing may have expired.  Certainly I no

6    longer have anything to do with it.

7               So, I had a listing agreement

8    with John Tippins and Glenda Shaw.

9         Q.    And what was -- was there a

10   price on the listing, an asking price on

11   the listing?

12        A.    When I listed it, I told them I

13   wanted $30,000,000.

14        Q.    And subsequent to the original

15   listing, has there been any reduction --

16        A.    Yes.

17        Q.    -- in the price?

18        A.    Oh, yeah.  There is -- any

19   offer considered -- the impression that

20   they are giving in the market place is make

21   an offer and we will -- I think, I'm not in

22   charge of that, and I have no input in it.

23        Q.    Are you aware of any offers to

24   purchase the property?

25        A.    Prior to COVID I believe it was

1                    B. Liberman
2      like an $8,000,000 offer, $7,000,000 offer
3      at the beginning of -- at the end of '19.
4           Q.    Since then have you received
5      any offers or been informed of any offers
6      by these realtors?
7           A.    No.  I speak to Glenda Shaw
8      from time to time, and she tells me the
9      market is getting hotter, there are people
10     coming to see it.  But there have been no
11     offers.
12          Q.    Has there been any -- if there
13     have been no offers, have there been any
14     discussions with her about what the price
15     the buyers are thinking in terms of?
16          A.    Not with me.
17          Q.    Your communication with the
18     realtor, have they been by telephone, by
19     letter, or by e-mail?
20          A.    Mostly by telephone.  I think
21     exclusively by telephone.  Or something
22     like -- I might have been to John's, said
23     give me a call, something like that.  But
24     any conversations have been by telephone.
25                    And I'm going to take another

1                    B. Liberman

2   gentleman's break, if I may.

3            MR. SCHWARTZER:  Please do.  Go

4       ahead.

5            (Whereupon, a short recess was

6       taken.)

7       Q.    Mr. Liberman, just a few more

8   questions for you.  We said we would try to

9   do this in four hours.  So, just a few more

10  questions.

11      A.    Okay.

12      Q.    Can you tell me what will

13  happen if you don't get the DIP loan?

14      A.    I'm probably gonna stay at

15  Hudson Street for a couple of months until

16  I get the heat fixed.  Then I'll move out

17  there.

18            And if I can't afford that, uh,

19  I'll probably move to my sister's, uh,

20  basement in Massachusetts.

21      Q.    Other than the use of the

22  money, the DIP loan money for paying the

23  rent at the apartment, how else would the

24  DIP loan money help maintain or protect the

25  assets of this bankruptcy estate?

1                    B. Liberman

2        A.    I'm not sure I understand.

3    First of all, the apartment --

4        Q.    You have to be closer to the

5    computer again.

6        A.    The apartment is not being paid

7    for in the DIP loa.  The only thing in the

8    DIP loan is the electricity, uh, you know,

9    the utilities for the apartment, until I

10   get the other one back together.  Then I

11   won't have those expenses here.

12              The apartment's, you know,

13   under foreclosure as well.  So, it will

14   take them awhile.

15              So, there was -- but I

16   certainly will have it all fixed up in East

17   Hampton if I get the DIP loan.  Because I

18   need some of those funds to finish the

19   repairs.

20       Q.    Well, you're feeling me --

21   didn't you just tell me that the apartment

22   805 has no equity?

23       A.    Right.  It's being --

24       Q.    So, how does it -- how would

25   spending money on apartment 805 benefit

```
 1                    B. Liberman
 2   creditors?
 3        A.    It doesn't.
 4        Q.    Or the bankruptcy estate?
 5        A.    It doesn't.
 6        Q.    I'll repeat the question.
 7              Mr. Liberman, if apartment 805
 8   has no equity, how would spending money on
 9   apartment 805 benefit the bankruptcy estate
10   or the creditors?
11        A.    I don't believe it would.  And
12   I don't expect to spend money on apartment
13   805.  The repairs I was talking about was
14   for the house in East Hampton.
15        Q.    Okay.
16              How would spending money on the
17   house in East Hampton benefit the
18   bankruptcy estate or the -- or your
19   creditors?
20        A.    I'm not sure I have an answer
21   for that.
22        Q.    How would any of the funds that
23   you are requesting for the DIP loan benefit
24   the bankruptcy estate or your creditors?
25        A.    Well, provide me shelter while
```

```
 1                  B. Liberman
 2    I assist in the -- presuming that the
 3    motion is accepted, I will be able to
 4    assist in the maximization of the value
 5    with the Rosenbergs, because of my special
 6    and complete knowledge of the mechanics and
 7    operations of the properties.
 8              So, basically it's -- my
 9    intellect and knowledge would benefit the
10    estate.  And I have a place to park my
11    intellect and knowledge.
12         Q.    Other than signing the final
13    assignment documents, what other
14    obligations do you have under the agreement
15    with Mr. Rosenberg?
16         A.    I'm not certain.
17         Q.    Do you have any agreement to be
18    employed by Mr. Rosenberg or any of these
19    entities after the transaction is
20    completed?
21         A.    No.
22         Q.    So, for what reason would you
23    be working on these issues?
24         A.    Because it's the right thing to
25    do to maximize the values for all of these
```

1                    B. Liberman

2    creditors.

3         Q.    Does Mr. Chamberlain have the

4    same knowledge you have --

5         A.    No.

6         Q.    -- of these properties?

7         A.    No.  No.

8         Q.    Has Mr. Chamberlain been

9    operating 305 Second Avenue?

10        A.    No.

11        Q.    Does Ms. Gomez have the

12   information that you would have about the

13   properties?

14        A.    Different information.

15        Q.    Is there any other assistance

16   that you have been using to manage the

17   property?

18        A.    Uh, there's no one that has

19   unique and complete knowledge that I have.

20        Q.    Under the agreement, do you

21   have any obligation to provide that

22   information to Mr. Rosenberg?

23        A.    Not that I know of.

24        Q.    Under the agreement with Mr.

25   Rosenberg it looks like the only thing that

1                    B. Liberman

2    the bankruptcy estate will receive is the

3    profit participation agreement; is that

4    correct?

5         A.    I believe so.

6         Q.    And that money will go to the

7    bankruptcy estate, correct?

8         A.    Yes.

9         Q.    Okay.

10             Would you be receiving any

11   money from this?

12        A.    If I get anything, it goes to

13   the bankruptcy estate.

14        Q.    So, how are you going to live

15   after this deal is done?

16        A.    My wife has asked the same

17   question.  I don't know.  I have an awkward

18   -- my screen comes up here from time to

19   time with some job offers.  You know, I'll

20   get a job.

21        Q.    Okay.

22             You know what, I think we are

23   done.  I think you should go visit your

24   grandchild.

25        A.    Thank you very much.  Boy,

```
                       B. Liberman
 1
 2   that's great timing.  I really appreciate
 3   it.  Thank you.
 4        Q.    All right.  I can't think of
 5   anything more important for you to do
 6   today.
 7              Certainly it is more important
 8   to go and enjoy that new baby and your
 9   daughter's joy in having a new baby, and I
10   wish them the best.
11        A.    Thank you.
12              MR. SCHWARTZER:  I was just
13         going to say that, Ms. Black, if she
14         wants to ask questions, she would
15         have the right to do so.
16              MS. BLACK:  I don't want to ask
17         any questions at this point in time.
18         Thank you very much, Mr. Schwartzer.
19              MR. SCHWARTZER:  I do have --
20         I'm sorry.  I did have one question
21         that I wasn't sure of.
22        Q.    How many apartments did 305
23   Second Avenue own about a year or two ago?
24        A.    A year ago, uh, it owned -- it
25   owned around -- probably around ten.
```

1                    B. Liberman

2        Q.     And what happened to the ones

3    that it doesn't own any more?

4        A.     Uh, a number of them were given

5    to -- back to Pennybacker, uh, along -- I

6    believe Mr. Rosenberg gave them the

7    apartments and a million and a half dollars

8    to relieve all the obligations of the loan.

9              And then a number of them -- I

10   think three; it is hard to tell.  It is

11   either three or four, but there was a new

12   configuration which divided up some lots.

13             So, it is probably three and a

14   half units stayed.  And those have to be

15   completed and sold.

16       Q.     Okay.

17             I thought -- but I'm talking

18   about the ones that were sold.  You said

19   about ten were sold, and only some of them

20   went to Pennybacker.

21             They were sold to third

22   parties, correct?

23       A.     There were -- yeah, about three

24   were sold to third parties, right.

25       Q.     And how much were those sold

1                    B. Liberman

2    for?

3         A.    Over two years ago.  They were

4    sold for, I don't know, maybe maybe six or

5    $7,000,000.  It is a number that I can get

6    if you need it.

7         Q.    Okay.

8               And where did that six or

9    $7,000,000 go?

10        A.    It went into the work to

11   renovate them, the payment of that

12   mortgage, and the work to renovate some of

13   the apartments that were not sold.

14        Q.    And where would the net

15   proceeds have been deposited?

16        A.    The net proceeds stayed, uh,

17   in -- they were used to reduce the

18   outstanding mortgage.

19              And whatever was not used to

20   pay the outstanding mortgage amount

21   Pennybacker, as was required by the loan

22   documents, since it was taking longer, they

23   required more funds to be placed in reserve

24   accounts.

25              So, there was very little, if

```
1                   B. Liberman
2    any, uh, payout to the partnership of those
3    funds in the past three years.
4         Q.    And who would have the records
5    of those transactions?
6         A.    Um, Mabel would have those
7    records.
8         Q.    Mabel Gomez?
9         A.    Yes.
10        Q.    Whose office is 75 feet away?
11        A.    Yes.  Yes.
12        Q.    Okay.
13              And do you have access to those
14   records?
15        A.    Uh, I could also find them from
16   the broker who sold them.  You want to know
17   the amount that they sold for?  What is it
18   that you really need to know?
19        Q.    I would like to follow the
20   money trail.
21        A.    I can tell you the money went
22   to the bank to pay down the mortgages.  She
23   will have those records.
24        Q.    Ms. Gomez would have those
25   records?
```

                    B. Liberman

1

2     A.    Yes, yes.

3     Q.    Okay.

4           And do you have access to those

5  records, if I ask you to produce them?

6     A.    I wouldn't know where to look,

7  quite frankly.

8     Q.    Thank you, Mr. Liberman.  I

9  didn't want to hold you any longer.

10    A.    Oh, no.  I have ten more

11  minutes.  You got it if you want.

12    Q.    You mean I can't be nice?

13    A.    I do appreciate it.  I'll go

14  home and, you know, I help.

15          MR. SCHWARTZER:  Ms. Lynch, I

16       am done asking questions.  We could

17       go off record.

18          (Whereupon, at 4:23 P.M., the

19       Examination of this witness was

20       concluded.)

21

22          °        °        °        °

23

24

25

1                    B. Liberman

2                D E C L A R A T I O N

3

4        I hereby certify that having been

5    first duly sworn to testify to the truth, I

6    gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9    transcript is a true and correct transcript

10   of the testimony given by me at the time

11   and place specified hereinbefore.

12

13

14

                        _____

15                        BARNET LOUIS LIBERMAN

16

17

18   Subscribed and sworn to before me

19   this _____ day of _____ 20___.

20

21

     _____

22       NOTARY PUBLIC

23

24

25

Page 109

1              B. Liberman

2            E X H I B I T S

3

4   EXHIBIT    EXHIBIT                    PAGE

5            DESCRIPTION

6   (None)

7

8              I N D E X

9

10  EXAMINATION BY                       PAGE

11  MR. SCHWARTZER                       6

12

13

14    INFORMATION AND/OR DOCUMENTS REQUESTED

15  INFORMATION AND/OR DOCUMENTS      PAGE

16  Request address and telephone number. 75

17  Request address.                     78

18  Request address.                     80

19  Check address.                       80

20  Request address.                     81

21  Request contact information.         89

22

23       QUESTIONS MARKED FOR RULINGS

24  PAGE LINE QUESTION

25  (None)

Page 110

                        B. Liberman

1                    C E R T I F I C A T E

2

3

4  STATE OF NEW YORK        )
                           :  SS.:
5  COUNTY OF SUFFOLK        )

6

7         I, NATALIE LYNCH, a Notary Public for

8  and within the State of New York, do hereby

9  certify:

10        That the witness whose examination is

11  hereinbefore set forth was duly sworn and

12  that such examination is a true record of

13  the testimony given by that witness.

14        I further certify that I am not

15  related to any of the parties to this

16  action by blood or by marriage and that I

17  am in no way interested in the outcome of

18  this matter.

19        IN WITNESS WHEREOF, I have hereunto

20  set my hand this 19th day of May 2021.

21

22

23       _____

                NATALIE LYNCH

24

25

ERRATA SHEET

VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Barnet Louis Liberman
DATE OF DEPOSITION: 5/14/2021
WITNESSES' NAME: Barnet Louis Liberman

PAGE   LINE (S)        CHANGE              REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

_____
Barnet Louis Liberman

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.

_____          _____
(NOTARY PUBLIC)                   MY COMMISSION EXPIRES:

| & |
| --- |
| **&**  2:4,18 3:4 4:17 10:20 24:11,15,20 62:14 63:14,18 64:2,5 65:23,24 91:6 |

| 0 |
| --- |
| **01223**  3:19 |

| 1 |
| --- |
| **1**  2:5 4:17 5:14 6:12 |
| **1,000,000**  47:14 59:5 |
| **10**  6:24 89:7 |
| **10,000**  43:9 59:4 |
| **100**  92:10,11,14,15 |
| **100,000**  43:10 |
| **1000**  43:9 |
| **10017**  3:6 |
| **10017-2803**  2:20 |
| **10022**  2:15 |
| **11**  1:4 13:14,19 |
| **11556-0926**  2:10 |
| **11722**  3:14 |
| **11791**  3:11 |
| **11937**  6:25 |
| **12**  44:19 45:5 87:15 |
| **12,000,000**  32:12 46:17 47:20 |
| **120**  77:5 |
| **13**  6:4 |
| **14**  1:8 15:10,14 16:5 50:14 88:19 |
| **14th**  5:14 |
| **150**  53:16,16 |
| **150,000**  53:14 |
| **17**  17:16 |
| **18**  88:2 |

**18,000,000**  87:14
**18,000,700**  88:3
**189**  86:24
**19**  40:7 96:3
**19,000,000**  70:19
**1985**  9:7
**19th**  110:20
**1:17**  1:9
**1:30**  6:5
**1:37**  6:11

| 2 |
| --- |
| **2,000,000**  12:12 16:20 |
| **20**  43:12 46:15 47:22 52:14 87:22 87:23 108:19 111:22 |
| **2000**  13:8 |
| **2004**  7:10 |
| **2009**  12:15 15:23 16:20 |
| **2012**  81:25 88:19 |
| **2013**  50:14 81:25 |
| **2014**  50:10 |
| **2017**  9:18 |
| **2019**  15:24 16:21 16:25 17:16 18:10 20:19 30:23 40:7 40:9 74:8 84:2 88:9,14 |
| **2020**  38:11 39:16 39:20 40:23 43:3 43:4,15 56:4,24 61:18 63:22 73:3 83:23,24 88:12 |
| **2021**  1:8 71:24 73:5 110:20 |
| **20th**  61:13,18 |
| **230**  3:10 |
| **24491**  110:22 |

**24th**  5:23 74:8 79:10,14
**250,000**  72:23 73:17
**2850**  2:5

| 3 |
| --- |
| **3-4**  3:5 61:19,23 62:3,12 66:6 |
| **30**  4:16 |
| **30,000**  43:12 |
| **30,000,000**  95:13 |
| **300,000**  53:19 |
| **302**  57:15,21 |
| **305**  44:6 56:12 57:5,7,9,18,21 58:21,24 59:16,21 60:19 61:20 67:20 71:5 75:13,19,19 75:22 76:15 101:9 103:22 |
| **305-421**  3:4 61:17 66:15 67:22 94:10 |
| **310**  57:13 |
| **323**  3:18 |
| **33**  59:21 |
| **330**  57:13 |
| **332**  78:8 |
| **38**  52:14 53:24,25 54:11 76:20 |

| 4 |
| --- |
| **4,000,000**  66:16 |
| **40**  52:4 |
| **400**  80:23 |
| **406**  80:20,22 |
| **42**  53:10 54:9,11 |
| **42.33**  51:23 |
| **421**  17:7 19:15 45:11 52:12 53:2 54:15 71:4 76:16 91:23 92:2,7 |

**421-305**  65:3
**43**  52:4
**445**  2:15
**47,000**  84:18
**48**  89:10
**4:23**  107:18

| 5 |
| --- |
| **5/14/2021**  111:3 |
| **50**  73:12 |
| **525**  52:14,15 53:25 54:2 55:15 76:12 76:15,16,21 77:10 77:15 |
| **560**  3:14 |

| 6 |
| --- |
| **6**  109:11 |
| **6,000,000**  46:24 |
| **65,000**  53:11 54:10 |
| **6901**  3:10 |

| 7 |
| --- |
| **7**  78:12 |
| **7,000,000**  96:2 105:5,9 |
| **70,000**  53:21 55:2 55:5 |
| **733**  3:5 |
| **747**  2:20 |
| **75**  85:15 92:10,11 92:15 106:10 109:16 |
| **78**  109:17 |
| **7801-1**  2:11 |

| 8 |
| --- |
| **8,000,000**  96:2 |
| **8-21-70611**  1:3 |
| **80**  109:18,19 |
| **80,000**  61:19 62:15 62:20 63:11,13,20 63:22 64:16 65:13 |

**805** 17:6 18:8,8
19:6,10,15 20:14
21:24 22:7,8,18
31:2,17,21,22 32:5
33:15,19 44:15
45:6,11,17,18,23
46:5,12 77:23
78:4 84:14,19
85:5 98:22,25
99:7,9,13
**806** 31:22
**81** 109:20
**820** 31:9,15,16
**8333** 42:19
**84** 9:7
**87** 85:10
**88** 85:9
**89** 109:21
**89146-5308** 2:6

**9**

**9** 78:12
**90th** 78:8
**926** 2:10
**9th** 2:15

**a**

**aaron** 49:7,11 81:6
81:8
**ability** 7:21 65:2
87:24 93:7
**able** 7:16 28:3
35:21 82:11 100:3
**accepted** 100:3
**access** 66:15 91:18
93:2,4 94:18
106:13 107:4
**account** 43:17,25
44:8 77:4 90:23
91:2,5,7,9
**accountant** 74:6,6
74:10 88:3

**accounts** 86:8
105:24
**acreage** 40:8
**action** 110:16
**actual** 14:23
**adam** 66:13
**add** 16:19
**additional** 18:23
23:12,14
**address** 6:22 66:4
75:7 78:20 80:3
80:15,20 81:10
109:16,17,18,19
109:20
**adds** 47:15
**adjusted** 47:21
**administer** 4:11
**afford** 97:18
**afternoon** 78:14
**age** 8:3
**agents** 75:24
**ago** 22:14 23:2
32:7,9 37:8 60:17
103:23,24 105:3
**agreed** 4:5,20 5:16
84:20
**agreement** 5:15
61:12,14 65:4
66:14,20 67:22
68:14,20,25 69:9
69:15,25 95:7
100:14,17 101:20
101:24 102:3
**agreements** 66:23
67:2,13,18
**ahead** 23:7,9
33:25 97:4
**alive** 88:7
**allowed** 10:11
**amount** 43:5,9
76:9 77:9 84:23

86:19 90:9 105:20
106:17
**amounted** 87:13
**amounts** 76:10
**angelo** 76:24 77:4
**annual** 77:11
**annum** 15:11
**answer** 7:17 11:6
11:17 13:3 16:13
17:22 18:20 22:12
25:12,16 51:7
99:20
**answered** 47:24
62:22
**answering** 7:20
**antonio** 40:3
**anybody** 30:15
93:25
**anymore** 93:14
**apartment** 17:6
18:8,8 19:14 22:8
22:18 31:2,9,17,20
32:5,20 45:10,13
45:18,21 52:13,13
52:15 53:25 54:3
54:8 55:15 57:23
58:10 75:12 76:12
76:20 77:10,15,23
78:4 80:9,11
84:14,14,19 85:5
86:24 97:23 98:3
98:6,9,21,25 99:7
99:9,12
**apartment's** 98:12
**apartments** 31:6
57:7 58:7 59:13
59:24 60:2 77:6
80:8 103:22 104:7
105:13
**apparent** 26:19

**apparently** 37:6
**appearances** 2:24
**appears** 17:17
22:5
**appraisal** 32:9,15
47:20 60:14,22,23
61:11
**appraisals** 60:12
61:2
**appraised** 32:5,11
46:16
**appreciate** 103:2
107:13
**approve** 61:15
**approximately**
31:18 46:24
**approximation**
12:13
**april** 83:24
**argentic** 91:2,5
**argentse** 70:18
**arraignments**
88:17
**arrange** 20:17
**arranged** 19:20
20:22 22:5,6
71:12
**arrangement**
88:20
**arranging** 41:14
**asked** 22:14 23:3
24:3 27:23 28:8
30:4,8 49:9 54:21
76:15 94:21
102:16
**asking** 9:23 16:15
17:23 18:5,16
24:12,13,14 25:8
25:14 26:6,13
27:20 50:3 64:15
95:10 107:16

**assembled** 40:2

**assets** 33:19 37:2,5 37:7,24 97:25

**assign** 89:4

**assigned** 89:3

**assignment** 100:13

**assist** 100:2,4

**assistance** 61:4 101:15

**assistant** 44:13

**associate** 73:11

**associates** 2:18 6:6 57:19,20 58:21,24 59:16,22 76:16

**association** 56:13 57:6

**associations** 57:16

**assume** 14:19 15:4 37:9 91:17

**assuming** 91:16

**assumptions** 17:24

**attached** 68:21

**attorney** 3:9 5:10 5:25 14:20 18:3 20:17 21:8 24:8,9 26:3,7,9 27:11 48:14 62:4,7 64:2 64:3,8 69:2 75:8 79:2 80:15 81:2 81:11 89:19

**attorneys** 3:4

**authorized** 4:11

**autopsy** 88:4

**ava** 49:7,11 80:2

**available** 66:16

**avenue** 2:15,20 3:5 44:6 56:13 57:5,8 57:9,15,18 58:21 58:24 59:16,22 60:19 61:20 67:20 71:5 76:16 101:9

103:23

**aware** 5:19 33:21 95:23

**awhile** 61:7 98:14

**awkward** 102:17

**axos** 47:3

**b**

**b** 5:1,2,2 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1

108:1 109:1,2 110:1

**baby** 24:25 78:17 103:8,9

**back** 16:20 34:3 48:2 50:10,16 59:14 79:24 80:25 83:6 87:21 98:10 104:5

**bank** 43:17,19 44:8 47:3 60:23 61:8 70:15,16 73:9 86:8 90:23 91:6,14 93:8,11,16 106:22

**bankruptcy** 1:2 3:18 7:4,4,9 44:25 45:4 51:14 64:14 65:2 89:4 97:25 99:4,9,18,24 102:2 102:7,13

**barely** 50:22

**barnet** 1:4,13 2:18 3:9 6:21 9:24 13:3 17:22 18:20 22:12 23:7 28:23 92:25 108:15 111:2,3,21

**basement** 46:2,8 52:11 53:23 55:17 55:22,25 56:3 92:6 97:20

**basically** 41:17 100:8

**beckett** 3:19

**beginning** 96:3

**behalf** 34:25

**believe** 5:14 7:18 12:14 17:13 34:16 38:11,24 44:10 45:10 47:14 49:17 50:2 52:15 58:14

64:19 65:15,16 66:3,7 70:10 71:23 74:5 78:16 87:14 91:10 92:3 95:25 99:11 102:5 104:6

**ben** 3:22

**benefit** 17:5 18:9 98:25 99:9,17,23 100:9

**benefitting** 94:13

**bensinger** 65:23 65:24,24

**best** 7:21 12:19,23 15:19 16:4,15 27:9 30:20 33:8 103:10

**bethpage** 43:20 44:9 70:13

**beyond** 47:11

**big** 77:5

**biggest** 88:5

**bill** 38:12,17

**birth** 78:12

**birthday** 81:17

**bitsky** 62:5 65:20 65:21 69:2,3

**black** 3:15 103:13 103:16

**blood** 110:16

**board** 9:12 67:9

**boards** 66:24 67:3 67:5,14

**bookkeeper** 16:2 74:2,18

**books** 74:3,13

**borrowed** 82:18

**borrowing** 86:21

**bought** 77:5

**boulevard** 2:5 57:14 95:2

**box** 3:18
**boy** 102:25
**bradford** 89:14
**breach** 26:3
**break** 34:2 97:2
**bridge** 9:19
**broke** 93:9
**broker** 61:10
106:16
**brooklyn** 78:9
**building** 46:2
59:14 80:10 92:17
**buildings** 71:7,10
**business** 41:11,13
41:24 42:6,8,15
72:17
**buyers** 96:15

**c**

**c** 2:2 3:2 108:2
110:2,2
**calculated** 47:2
**calculation** 55:20
**call** 11:23 41:22
43:21 64:13 96:23
**called** 5:3 34:8
48:4 56:12 70:8
70:23 72:3 89:5
94:11
**calls** 40:16
**candee** 2:13,16
**capacity** 90:4
**capitalize** 54:19
**cards** 81:17
**care** 71:15
**case** 1:3 7:5 16:18
111:2
**cash** 87:12
**casino** 36:7
**caused** 34:17
**cease** 56:22 71:21

**ceased** 71:22
**center** 53:19 54:18
54:23 70:20
**central** 3:14
**certain** 9:17 11:25
12:17 29:25 32:25
35:4 38:4 49:16
59:2 60:10 61:25
64:20,20 65:15
67:24,25 68:22
83:24 90:9,11,18
93:24 100:16
**certainly** 29:5
73:20 79:15,15
89:21 95:5 98:16
103:7
**certificate** 60:2
**certification** 4:8
**certify** 108:4,8
110:9,14
**chamberlain**
73:12,22 92:24
94:17 101:3,8
**chance** 43:24
**change** 111:5
**changes** 32:14,21
**chapter** 1:4
**charge** 90:14,18
93:20 95:22
**charges** 47:13
55:18 71:16 77:18
85:2
**charleston** 57:14
95:2
**check** 15:25 17:3
35:12,14 80:24,25
82:16 109:19
**checking** 35:23
45:3
**checks** 73:9,15

**cheek** 51:11
**children** 21:13
48:13 50:16 81:19
81:20 82:9 85:23
85:25 86:3,5,15
**children's** 50:12
51:8 82:15,19
85:16,20 86:12
**christine** 3:15
**circumstances**
18:13
**civil** 1:15
**clarification** 23:4
24:4 27:24 49:10
54:22
**clear** 26:24 39:4
62:23 63:2,5
68:12
**clearly** 12:21 28:5
**client** 24:8,9 26:3
26:9 27:2 34:22
**close** 47:14 59:5
60:7
**closed** 70:7
**closer** 12:22 98:4
**closing** 9:18
**clubs** 37:13,13
**coffee** 35:25 48:7
**cohen** 3:17,19
**collapse** 47:21
**collect** 75:17
**collected** 76:4,4,5
76:13 77:2
**collecting** 75:14
**collection** 71:15
**collects** 76:23
**come** 18:16 22:24
29:20 30:7 34:3
38:7,13 86:2
**comes** 53:16
102:18

**coming** 47:20
96:10
**commercial** 57:8
60:5
**commission**
111:25
**committee** 3:9
**common** 47:13
55:18 71:16 77:18
85:2
**communicate** 81:3
**communication**
96:17
**companies** 42:12
74:23
**company** 11:22
12:3 19:17 20:22
20:25 40:9 42:7,8
42:9 49:15,19
50:5,9 54:24 57:3
63:15,19 74:14
75:15 76:20 93:17
93:20 94:12
**complete** 100:6
101:19
**completed** 70:6
100:20 104:15
**completing** 59:25
**complicated** 54:12
**comply** 71:12
**compromised** 7:23
**computer** 98:5
**concierge** 3:22
**concluded** 107:20
**condition** 7:19
**conditioned** 67:12
**condo** 46:7
**condominium**
66:24 67:5,8,14
71:7 75:23,24
94:10

conference  6:15
configuration
  104:12
confirm  30:24
confirming  18:2
confusing  51:24
connected  89:9
connecticut  37:14
connecting  32:19
connection  12:8
  13:6 60:15
consideration
  18:21 50:16 51:8
  51:10
considered  55:19
  95:19
consisting  31:21
construction
  60:16
consult  81:14
consultants  87:6
contact  74:25
  89:18 109:21
contents  29:12
contested  7:3 10:4
  10:6
continue  87:24
continued  2:24
contracted  52:2
contractors  71:14
control  72:11
controlling  22:7
conversation  29:3
  29:13 70:14 89:2
conversations
  70:12,17 96:24
coolage  36:8
copies  13:19 14:13
  14:15,20,22,25
  15:6,8

copy  4:14,17
  14:18 17:15
corporation  48:9
  48:10 65:3 94:10
corporations  35:9
  48:11
correct  12:12,16
  21:8 24:22 62:15
  69:20 75:21 76:21
  84:19 102:4,7
  104:22 108:9
cost  59:25
costs  87:4,6,6
counsel  2:4,9,14
  2:18 4:6,17 5:17
  5:19 10:18 13:13
  14:6 63:9
counsel's  63:11
country  41:20
county  17:16
  86:25 89:16,17
  110:5
couple  34:2 57:17
  97:15
course  82:10
court  1:2 4:13
  6:24 7:4,9 10:16
  14:6 16:18 27:5
  28:2,12 65:4 83:4
  89:7
covered  26:8
covid  95:25
credit  43:22 44:9
  70:13
creditor  3:18,21
creditors  2:5,9,14
  3:9 99:2,10,19,24
  101:2
cup  35:25
current  76:6,7
  78:20

currently  43:20
  57:9 77:21,21
  78:3,5,15 83:9
  90:2,3,6

**d**

d  3:6 4:2 108:2
  109:8
date  1:8 16:20
  53:7,9 111:3
dated  12:15 15:23
daughter  78:13
daughter's  103:9
daughters  35:5
david  24:25 27:13
day  53:8 108:19
  110:20 111:22
days  4:16
dead  88:4
deal  23:19 61:15
  62:2 67:11 102:15
dealt  23:16 62:4
debt  30:9
debtor  1:5,13 2:19
  2:19
debts  85:23
december  16:25
  17:16 18:9 30:22
  74:8 84:2
decide  25:19
decisions  12:3
decreased  65:6
deed  87:18
default  46:25
defaults  65:7
definitive  16:13
delaying  26:18
depends  53:7
deposited  90:24
  91:2 105:15
deposition  1:12
  4:8,9,14 5:12,13

5:21,25 6:7,12 7:2
  8:21 10:12 28:15
  78:24 111:3
depositions  27:5
description  109:5
desk  35:15 44:2
detail  68:12
details  29:18
  65:16
determine  46:11
  89:6
determined  55:14
developing  86:23
  87:4
development  40:2
  89:10
dialed  8:23
died  74:7
difference  8:3
different  31:23
  67:23 101:14
difficult  31:4
difficulties  23:5
  24:5 27:25
dip  64:13 69:17
  84:17 97:13,22,24
  98:7,8,17 99:23
direct  85:5
directly  48:12
  86:2 91:2,4
disagree  83:7
disbursements
  71:16
discount  46:15
discovery  14:7
  16:17
discuss  29:9 30:14
  68:24 69:4
discussed  65:11
  69:6

**discussions** 22:16
96:14
**distributed** 41:19
**distributing** 41:18
**distribution** 42:23
43:6 73:18,21
**distributions**
42:24
**district** 1:2
**divided** 104:12
**document** 17:5,19
67:6
**documentation**
66:17
**documents** 14:21
14:23 30:13 62:11
100:13 105:22
109:14,15
**doing** 13:7 17:8
79:13
**dollar** 54:3,7
**dollars** 59:8,9
104:7
**drink** 8:8
**due** 6:13 47:13
60:7,8 88:15
**duly** 5:3 108:5
110:11

**e**

**e** 2:2,2,6 3:2,2 4:2
4:2 5:2,2 49:12,12
49:13 70:18,18
81:3 96:19 108:2
109:2,8 110:2,2
**earlier** 84:2
**early** 65:4
**easily** 61:3
**east** 6:24 57:13
77:25 83:17,21
84:5,11 95:2
98:16 99:14,17

**eastern** 1:2 80:6
**effect** 4:12,15
**effectively** 59:14
**eight** 40:16
**either** 25:15 30:24
64:19 104:11
**electrical** 38:12,17
90:13,17
**electricity** 98:8
**employed** 74:19
74:22 100:18
**employees** 71:12
**encumbering** 17:6
**ended** 42:3
**engineers** 87:6
**enjoy** 103:8
**entered** 88:24
**entire** 51:18 64:11
**entities** 9:25 19:5
35:9,10 68:15
70:2 100:19
**entity** 11:20 20:5
22:7 34:8,9,12,15
36:25 37:17,24
38:5 39:22 40:19
40:22 42:14 44:14
44:16 45:9,13
46:7 48:4 50:3
51:13 56:12,16,20
56:23 70:8,22
72:11,11,12
**equinox** 38:5
54:17,23 55:4
70:19 89:24 90:21
**equities** 10:21
46:10 51:14,21
52:8,10,17 53:3,6
53:13 55:2 56:5
56:10
**equity** 46:20 98:22
99:8

**errata** 111:1
**esq** 2:6,11,16,21
3:6,11,15,17,19
**established** 26:11
**estate** 3:9,18 45:22
47:8,12 48:14
52:25 82:8 84:4,8
97:25 99:4,9,18,24
100:10 102:2,7,13
**estimated** 47:19
59:23,24 60:4
**estis** 3:4 10:20
24:11,15,20 62:14
63:15,18 64:3,5
**eventually** 55:4
63:21
**evidence** 7:14
**exact** 18:13 43:8
81:15
**exactly** 18:12
81:16
**exam** 7:10
**examination** 6:17
107:19 109:10
110:10,12
**examined** 5:5
**exceed** 77:19
**excellent** 78:11
**excess** 47:9,16
**exclusively** 23:18
96:21
**excuse** 36:9 50:19
**execute** 17:11
**executed** 13:20
14:16 17:2,3,4,20
19:2
**executing** 18:7
**exemptions** 82:10
**exercise** 33:23
**exhibit** 109:4,4

**expect** 86:17 99:12
**expenses** 98:11
**expired** 87:21 95:5
**expires** 111:25
**explain** 25:4
**explained** 22:25
**extension** 70:15

**f**

**f** 4:2 110:2
**family** 12:7 34:23
35:2
**far** 8:3
**father** 52:5
**favor** 27:17
**february** 60:10
**federal** 1:15 3:14
27:5 43:21,21
44:9 70:13 88:9
88:12
**feeling** 98:20
**feet** 92:11,11,13
92:14,15 106:10
**fella** 24:24
**file** 2:11 10:7,9
**filed** 88:8,11
**filing** 4:7
**final** 30:18 68:13
68:20 100:12
**financial** 93:21
**financing** 54:5,8
59:12
**find** 21:5 35:22
106:15
**finding** 21:3
**fine** 8:6 25:10,17
26:25 33:25 83:7
**finish** 98:18
**finishes** 88:4
**fired** 71:11
**firm** 2:4 9:11,13
9:16 10:19,23

24:11,15 29:24
62:13 65:21 69:10
**first**  5:3 10:18
12:14,19,24 36:21
36:22 47:3 52:11
54:16 67:8 78:14
98:3 108:5
**fit**  82:11
**fitness**  37:13,13
38:2,3 53:19
54:17,23 70:19
**fits**  20:11
**five**  61:16 92:13
**fixed**  77:25 97:16
98:16
**floor**  2:15 52:11
52:11 54:15,16,16
**floors**  52:12 54:17
**follow**  106:19
**follows**  5:6
**force**  4:15
**foreclosed**  87:18
**foreclosing**  44:5
**foreclosure**  87:9
98:13
**foregoing**  108:8
**forgot**  72:2
**form**  4:21 9:22
10:13 11:16
**formation**  20:22
34:17
**formed**  21:21,25
34:22 62:13
**former**  74:18
**forming**  20:25
**forth**  110:11
**forward**  5:24
**fought**  87:8
**four**  32:6,9 37:8
57:7 97:9 104:11

**frankly**  107:7
**fred**  3:11
**freeze**  24:25,25
25:4,9 27:13,14,18
29:3,4,17,25
**freezing**  41:16
**fresh**  36:17 41:5,7
41:24
**friday**  5:14
**front**  16:12
**full**  42:4 55:12
**fund**  36:18 42:3,4
42:24
**funds**  18:23 59:12
59:15 62:19 66:16
68:16 88:6 98:18
99:22 105:23
106:3
**funneled**  88:6
**further**  4:20 65:6
108:8 110:14

**g**

**g**  70:18
**g4**  70:9
**gary**  9:4 12:8,25
17:5 29:7 65:11
66:11 72:10
**general**  7:9 11:19
40:15 56:20,23
58:20
**generally**  71:17
**generous**  47:17
**generously**  46:13
**gentleman's**  97:2
**getting**  24:7 26:18
55:3 63:8,11,20
77:9 94:5,7 96:9
**giampolo**  3:6 8:19
8:22 9:21 10:3
**give**  16:13 59:3
79:16 80:10 81:10

94:22 96:23
**given**  104:4
108:10 110:13
**giving**  8:7 13:24
14:4 18:21,22
93:25 95:20
**glass**  32:18
**glenda**  95:8 96:7
**go**  5:24 21:3 23:7
23:9 28:9 30:17
33:25 59:8 74:15
79:24 83:5 97:3
102:6,23 103:8
105:9 107:13,17
**goes**  89:4 102:12
**going**  7:12 9:21
18:15 23:14 25:2
25:7 26:2 33:22
35:14 48:2 63:13
64:10 74:13 75:4
78:13 79:7,17
83:7 84:24,25
96:25 102:14
103:13
**gomez**  74:16,17
90:22 91:20 93:12
94:22 101:11
106:8,24
**gonna**  97:14
**good**  8:25 26:23
**gordon**  2:11 76:24
77:4
**gosh**  58:9
**government**  82:13
**grandchild**  102:24
**grandchildren**
82:9
**great**  103:2
**ground**  66:23 67:4
67:13,15

**group**  3:8 14:4
34:8,18,22 35:7
36:4,7 37:4 39:19
40:10,18,21 42:18
42:23 43:16 44:8
48:3
**guarantees**  68:3,5
**guess**  29:24 38:21
40:7 61:10 81:13
**gym**  36:7 89:23,24
**gyms**  37:11

**h**

**h**  49:12 89:14
109:2
**half**  31:13,14,16
44:19 45:5 47:2
85:7,10,10 104:7
104:14
**hampton**  6:25
77:25 83:18,22
84:5,11 98:17
99:14,17
**hand**  110:20
**handles**  74:3
**happen**  97:13
**happened**  20:16
58:23 104:2
**happens**  76:25
**hard**  17:25 31:3
104:10
**hardcopy**  91:17
**hear**  8:14,15 12:21
14:2 28:6,13,22,25
50:21,25 62:24
82:23
**heard**  41:4
**hearing**  5:22
28:16
**heat**  77:24 97:16
**held**  11:14

**heller** 3:22
**help** 72:25 97:24
  107:14
**helpful** 47:23,25
**helping** 79:23
**hereinbefore**
  108:11 110:11
**hereunto** 110:19
**herschel** 37:21
**hint** 10:17
**hired** 71:11,13
**hold** 23:21,22
  35:18 36:10 48:7
  48:15,16 50:19,24
  107:9
**holding** 37:4
**holdings** 10:24
  36:7
**home** 36:6,24
  107:14
**hospital** 57:11
  78:16
**hot** 77:24
**hotter** 96:9
**hours** 97:9
**house** 38:2,3,6
  83:17,21 84:4,11
  99:14,17
**hudson** 17:7 19:6
  19:10,15 20:6,9,13
  20:13,18 21:20,24
  21:25 22:6,7
  32:24 33:4,14,15
  33:18,19 36:8
  37:23,25 38:5,7,8
  38:13,21 39:6,8,10
  39:14,18 44:15
  45:6,11,17,23 46:4
  46:12 52:12 53:2
  54:15,25,25 55:3
  71:4 76:17 91:23

**92**:7 97:15
**huh** 63:4

### i

**idea** 40:12,25 69:8
  72:7 76:8
**identical** 89:9
**identify** 67:6
**ii** 36:17,18 42:5
**iii** 36:15 39:23
**immediately** 66:16
**important** 103:5,7
**impression** 95:19
**inability** 6:14
**inappropriate**
  26:2
**included** 87:5
**income** 53:17,18
  83:10,14 87:10
  88:9,12,18
**incubator** 42:9
**indicates** 53:11
**indirectly** 74:22
**individual** 48:13
  48:18
**individually** 9:24
  45:20
**information** 7:13
  50:7 89:19 101:12
  101:14,22 109:14
  109:15,21
**informed** 96:5
**input** 95:22
**instance** 10:19,22
**instruct** 25:16
**instructing** 25:11
**instruments** 42:11
**insufficient** 76:6
**intellect** 100:9,11
**interest** 15:9,16,21
  16:6,6 30:4 33:13
  33:19 35:8 37:12

**39**:25 40:19 44:20
  45:6 46:20,25
  48:4,9,11 49:2
  50:5,9,12 51:16
  52:13,14 53:5,10
  59:21,21 61:20
  70:9 76:2,19 85:5
**interested** 110:17
**interim** 39:9 54:24
**interrupting** 25:24
  26:17,21
**introduce** 10:15
**invest** 42:10
**investment** 40:5
  40:13 41:2
**involved** 11:21
**involving** 7:4
**irs** 88:18,21
**islip** 3:14
**israel** 36:6,24
**issue** 69:6
**issues** 83:6 100:23
**item** 36:22,22 41:4
**iv** 2:13

### j

**j** 2:13,16
**january** 71:24
**jason** 69:2
**jericho** 3:10
**job** 102:19,20
**john** 3:6 8:19
  13:13 14:5 95:8
**john's** 96:22
**jones** 2:5
**joy** 103:9
**judge** 4:13
**judgement** 2:5,9
  2:14

### k

**kantrow** 3:8,11
**keep** 28:3 77:4
  88:6,25 91:7
**kids** 81:4
**kind** 37:9 41:11
  52:20
**kiss** 51:10
**know** 8:2,4,18 9:4
  9:9 16:13 17:9,14
  19:4,6,9,10,19,22
  19:23 20:5,8
  28:19 33:17 43:8
  45:14 47:7,19
  51:19 54:4 55:10
  56:16 60:10,23
  62:8,12 63:12
  66:5 70:4,15,25
  72:4,9 73:24,25
  74:11 76:3 77:3,3
  77:8 78:19,19
  80:12 81:6 88:3
  90:4,14,20 91:16
  93:10 98:8,12
  101:23 102:17,19
  102:22 105:4
  106:16,18 107:6
  107:14
**knowledge** 12:20
  12:23 30:20 56:11
  68:21 72:13 94:3
  94:6 100:6,9,11
  101:4,19
**known** 9:6
**knows** 75:19

### l

**l** 4:2,2 5:2,2 49:12
  49:13,13 108:2
**lab** 48:4,6,17,22
  49:3,6

**land** 10:24 36:15 36:16 39:23 40:17 87:11
**langone** 57:10
**las** 2:6 57:12,14 60:24 94:25
**lasix** 7:24
**law** 2:4 3:8 9:13 29:24
**layout** 31:24
**lead** 7:14
**leah** 49:7,11 78:7 78:12
**lease** 37:25 38:7 38:25 39:10 60:5 84:7
**leased** 57:10 89:23
**leases** 38:10
**leaving** 7:24
**left** 8:12 52:5
**legal** 87:7
**len** 62:24
**lenard** 2:6 5:9 13:5 27:16,21 49:21 50:21 82:22
**lender** 3:5 9:19 61:19,24 62:3,8,8 62:13 66:6
**lenders** 70:4
**lending** 63:19
**leroy** 36:8 37:23 37:25 38:5,7,9,14 39:6,8,11,14,18 54:25,25 55:3
**lessor** 67:15
**lessors** 66:24 67:4 67:13
**letter** 44:3 96:19
**liabilities** 88:19
**liability** 53:23
**liberman** 1:4,13 2:19 3:10 5:1 6:1 6:21 7:1,2 8:1 9:1 9:3,24 10:1 11:1 12:1 13:1,15,21 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1,8 27:1,9 28:1 29:1,2 30:1,17 31:1 32:1 33:1 34:1,7,8,18,22,23 34:25 35:1,6,21 36:1,4 37:1 38:1 39:1,3,19 40:1,10 40:18,21 41:1 42:1,18,23 43:1,16 44:1,8 45:1 46:1 47:1 48:1,3 49:1 50:1 51:1,6 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1,7,8 79:1 80:1,18 81:1,13 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1,15 91:1 92:1,25 93:1 94:1 95:1 96:1 97:1,7 98:1 99:1,7 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,8 108:1,15 109:1
**liberman** 5:8
**liens** 46:22
**lieu** 87:19
**likelihood** 60:5
**limited** 51:15 55:8 56:14 90:4
**limits** 82:12
**line** 28:18 109:24 111:5
**link** 8:20
**liquidation** 69:23
**list** 35:12,13,22 36:4,22 42:3 44:22,23 45:3
**listed** 31:6,10 51:13 85:24 86:18 95:2,12
**listing** 95:5,7,10 95:11,15
**little** 54:12 87:14 105:25
**live** 78:8 80:2,5,18 102:14
**lives** 78:16
**living** 77:22
**llc** 2:5,9,14 3:4,5 3:23 19:6,10,14 20:6,9,13,14,18 21:20,24 32:24 33:5,15,16,18,20 34:8,18,22 35:7 36:4,7,7,8,8,15,17 36:17,24 37:4 39:23 40:18 41:9 44:15 45:6,17 46:12 48:11 62:13 66:15 111:1
**llcs** 35:9
**llp** 2:8 56:13
**loa** 98:7
**loan** 12:19,24 13:10 59:10 60:16 61:18 63:8,12,13 63:20,22 64:9,10 64:17 65:13 70:19 72:23 73:19,21,23 84:17 97:13,22,24 98:8,17 99:23 104:8 105:21
**loaned** 12:11 62:15 69:20,21
**loaning** 86:15
**loans** 65:7 86:19
**located** 65:25 89:15 92:4
**location** 31:7
**lock** 93:9
**lockbox** 91:4
**locked** 93:5
**long** 9:6
**longer** 51:20 72:15 95:6 105:22 107:9
**look** 35:16 90:16 107:6
**looking** 17:24 35:17 68:22 93:15
**looks** 101:25
**loses** 55:19
**loss** 55:17
**lot** 23:13
**lots** 104:12
**louis** 1:4,13 2:18 3:10 6:21 108:15 111:2,3,21
**lp** 36:18 42:4
**lynch** 1:16 107:15 110:7,23

| m | | | |
|---|---|---|---|

**m**

**m**  5:2 9:4 12:8,25
17:5 72:10 91:6
**mabel**  74:16,17
90:22 91:11,13,15
91:20 92:8 94:17
106:6,8
**mail**  81:3 96:19
**mailed**  91:25
**maintain**  97:24
**maintained**  59:11
**major**  32:21 86:23
**making**  83:16
85:11
**man**  33:23
**manage**  71:19
101:16
**managed**  71:4,6
71:17
**management**
70:24 71:9,18,21
71:25 72:3,5,15,20
72:24 73:7,8,10,18
74:4,10 75:15
91:22 92:21,23
93:20 94:11,16
**manager**  33:3,4,6
33:11,14 34:14
37:16 49:14 51:20
**managers**  20:8
21:24 49:20 50:3
**manages**  72:16
**managing**  11:24
19:16 20:13 32:24
71:10 75:24
**manhattan**  66:2,3
**march**  38:11
39:15,19 40:22
**marked**  109:23
**market**  31:4 46:16
47:19,21 95:20

96:9
**marriage**  110:16
**massachusetts**
3:19 97:20
**matter**  7:3 10:4,6
79:18 110:18
**matters**  7:10 9:14
**mature**  30:9
**maximization**
100:4
**maximize**  100:25
**mcgrail**  65:23,24
**mcpherson**  2:4
**meadows**  60:23
61:7 70:14,16
**mean**  14:18 28:20
45:14 52:19 58:11
79:13 91:10
107:12
**means**  28:20
**mechanics**  100:6
**medical**  7:19
42:10
**meet**  76:6,7
**melter**  12:6 37:22
**member**  11:23,24
20:13 34:11
**members**  19:17
32:24
**mention**  44:18
**mentioned**  39:22
44:14 64:23
**mentions**  61:13,17
72:23
**miller**  89:14
**million**  46:14
47:10 53:15 54:3
54:7 59:4,8,9
104:7
**minute**  23:22 34:2
44:17,17,21 50:24

**minutes**  6:4
107:11
**moment**  23:2
29:18 54:5 70:21
**moments**  22:14
**monday**  79:5
**money**  23:12,13
23:14 39:19 40:10
55:4,19 58:16
69:16,18,20,22
72:20 77:9,12
82:18 85:13,14,20
86:2,6,7,11,16,22
93:25 94:5,8
97:22,22,24 98:25
99:8,12,16 102:6
102:11 106:20,21
**monies**  38:9 69:12
69:13
**month**  84:18
**months**  40:16
88:13 91:20 97:15
**mooshie**  13:13,25
14:5,15,21 15:22
17:14
**mortgage**  9:18
17:4,15,18 18:7,18
18:22 19:2,7,21,24
22:18,21,22 23:15
24:21 25:5 27:15
29:10,20 30:15,19
30:22 33:2,3 44:5
46:21 47:3,5,12
60:6 83:21 87:3,9
87:18 91:3 105:12
105:18,20
**mortgages**  85:2
106:22
**mother**  79:16
**motion**  10:7,8,10
61:15,15,17 64:12

68:21 84:17 100:3
**motions**  7:8,11,13
7:15 83:3
**mountbatten**
10:20,21 11:2,3,4
11:14 46:10 51:14
51:21 52:8,10,17
53:2,6,13 55:2,6
56:5,10
**move**  97:16,19
**moved**  56:4 78:17
78:17 80:7
**music**  56:3
**muted**  28:21

**n**

**n**  2:2 3:2 4:2 5:2,2
70:18 108:2 109:8
**name**  5:9 6:19
27:10 37:10 42:4
72:8 74:9 111:2,3
**named**  24:24
**natalie**  1:16 110:7
110:23
**need**  8:2,4,9 10:7
58:10 98:18 105:6
106:18
**needed**  18:23
84:18
**needs**  79:17
**negative**  76:9,10
**negotiated**  68:15
68:18 70:11
**negotiations**  70:3
70:5,7
**neil**  20:23 21:6,7
24:23 30:16 34:19
81:22
**net**  38:6 53:14
76:9,10 105:14,16
**nevada**  2:6

**new** 1:2,17 2:10,15 2:15,20,20 3:6,6 3:11,14 5:5 6:13 6:25 9:12 17:16 37:14 57:10 74:6 74:9 75:15,23 79:16 80:14 93:19 94:11 103:8,9 104:11 110:4,8 111:1
**news** 78:11
**nice** 107:12
**nine** 46:14 47:16 47:18
**ninth** 52:11 54:14 54:16
**norway** 41:18
**notary** 1:16 5:4 108:22 110:7 111:25
**note** 12:14 15:2,3 15:14 30:8
**notes** 12:12 13:14 13:19,25 14:5,11 14:14 15:5,10,17 15:21 16:6,7,10,11 16:14,16,22 18:17
**notice** 1:14
**noticed** 5:13 85:22
**novak** 3:22
**november** 61:13 61:18 63:22
**number** 13:23,24 37:14 41:15 70:3 75:5,8 80:9,11 81:18,20 88:13,23 104:4,9 105:5 109:16
**numbers** 58:11 81:15

**numeral** 36:16,18
**nype** 2:4,9,14 3:21 5:11
**nype's** 13:13 14:6

**o**

**o** 4:2 5:2 49:12 108:2
**oath** 4:12
**object** 9:22 10:12 10:13 25:8
**objecting** 11:9,13 11:15 51:3 82:25
**objection** 11:5 13:2 17:21 18:19 22:11 23:6 25:17 25:21 62:10
**objections** 4:21 25:20 27:6,7
**obligation** 101:21
**obligations** 46:19 76:7,8,13 100:14 104:8
**obtain** 66:21
**obtained** 67:2,19 68:10
**obtaining** 66:22
**obviously** 51:12
**occasion** 73:14,14
**occupancy** 60:3
**october** 56:24 60:9 87:22,23
**offer** 95:19,21 96:2,2
**offers** 95:23 96:5,5 96:11,13 102:19
**offhand** 72:9
**office** 3:13 23:17 23:20 29:16,24 46:2,8 61:5 91:22 92:8,20 93:5 106:10

**official** 3:9
**oh** 22:2,23 23:10 44:24,24,24 48:23 50:10 53:16 58:9 60:21 64:24 65:11 79:7 81:19 95:18 107:10
**okay** 6:3 8:5,17 9:2 10:25 11:12 13:9 14:9 15:6 16:24 20:4 21:18 22:4 29:8 31:19 31:25 36:20 37:19 38:15 42:21 43:23 45:2,24 51:5 52:24 53:16 54:13 59:6 60:20,25 61:9 62:6,14 63:17 64:22 67:17 69:24 73:13 75:3 75:16 76:18 77:7 78:18 79:9,12,14 80:13 81:9 82:2 83:5 84:22 85:8 86:10 90:19 91:12 91:24 92:22 93:6 94:14 97:11 99:15 102:9,21 104:16 105:7 106:12 107:3
**old** 33:23
**ones** 15:23 104:2 104:18
**op** 84:8
**open** 90:2,3,6
**operating** 90:6,7 101:9
**operations** 100:7
**opportunity** 8:7
**opposition** 10:10

**option** 87:20
**orange** 89:17
**orb** 70:23 71:9,18 72:15,19,23 73:6,8 73:9,18 74:4,10 91:22 92:21,23 94:15
**order** 5:21
**organize** 20:18 82:11
**organizing** 82:6,8
**original** 4:9,17 15:5 95:14
**ossining** 10:24 11:20
**ounces** 78:13
**outcome** 25:20 110:17
**outstanding** 65:8 105:18,20
**oval** 80:3
**overworked** 79:18
**owed** 76:14
**owned** 9:25 46:4 48:10,12,17 53:13 75:13 76:20 85:16 103:24,25
**owner** 39:11,15 45:12,18,20,21,23 73:11 74:14
**owners** 49:5 72:4 85:11
**owning** 33:13
**owns** 19:14 35:8 35:11 36:5 39:25 45:9,10 46:7 52:10 55:17 57:12 92:23

**p**

**p** 2:2,2,21 3:2,2 4:2

**p.m.** 1:9 5:14 6:11 6:13 107:18

**p.o.** 3:18

**page** 2:24 109:4,10 109:15,24 111:5

**paid** 15:16 16:9 38:18,22 39:14,18 40:10 55:12,12 69:22 90:21 98:6

**palomino** 6:24 89:7

**paper** 35:22

**parcel** 40:2

**park** 2:15 100:10

**parkway** 80:6

**parsoff** 20:23 21:7 24:23 25:3 27:12 30:16 34:20,25 81:22

**parsoff's** 29:15 34:21

**part** 14:3 51:18 56:25 64:11,24,25 65:13 66:14 68:10 74:14

**partial** 38:18

**participation** 68:14 69:9,14 102:3

**particularly** 78:22

**parties** 1:14 4:7 104:22,24 110:15

**partner** 11:19 40:15 56:14,20,23

**partners** 36:15,16 39:23 40:17 58:21

**partnership** 11:19 51:15 77:5 106:2

**partnerships** 35:9 75:25

**party** 10:3,5 70:10

**patented** 41:14,15

**pay** 30:5 38:12,17 55:5 84:24,25 90:13,17 91:4 105:20 106:22

**payee** 15:4

**paying** 15:20 16:5 16:21 84:10,13 85:13 90:8,10 93:23 97:22

**payment** 19:23 38:19 83:21 84:4 84:19 88:24 105:11

**payments** 18:25 19:7,20 30:21 40:22 56:6,9 83:16 85:11 87:3

**payout** 106:2

**pays** 54:23,24,25 84:8 92:19

**pc** 2:18 3:4

**pelta** 3:22

**pending** 7:8

**pennybacker** 59:10 70:7 104:5 104:20 105:21

**people** 44:4 94:12 96:9

**percent** 15:10,14 16:5 42:19,20 45:5 46:15 47:22 51:21,23 52:4,14 52:14 53:10,24,25 54:9,11,12 59:21 76:20 85:10,10,16

**percentage** 42:17 48:19 49:19 50:4

85:4

**perfectly** 33:25

**perform** 33:16

**period** 7:25 8:11 86:14

**person** 12:2 20:21 24:10,19 26:11 62:18 64:17,18 89:5

**personal** 86:19

**personality** 30:2

**petition** 53:9

**ph** 38:2

**pharmaceutical** 42:10

**phone** 5:20 8:19 24:24 27:11 28:15 29:15,16 41:22

**phyllis** 13:15,20 19:18 49:17,18,25 50:2,4 81:14

**physical** 32:14

**place** 94:9 95:20 100:10 108:11

**placed** 105:23

**plaza** 2:10 3:14

**please** 6:19,22 27:21 33:25 80:25 97:3

**pllc** 3:8

**plural** 66:9

**plus** 2:5,9,14 5:11 46:25 52:4

**point** 21:19 22:20 22:21 30:3 35:25 43:7 47:9 103:17

**pointing** 28:11

**portfolio** 42:12

**portion** 36:6

**position** 11:3,14 11:18,22

**possession** 2:19

**pound** 78:12

**practice** 73:16

**preceding** 67:9

**prepared** 81:21 82:4,5 88:8,11

**preparing** 89:12

**present** 3:21

**presented** 29:21 29:22,23 65:18

**presume** 68:23 94:4,4

**presuming** 100:2

**pretty** 15:2 47:17 85:21

**prevent** 7:20

**price** 95:10,10,17 96:14

**principals** 61:23 66:5

**printing** 38:2,3,6

**prior** 95:25

**private** 75:6

**privately** 80:16

**privilege** 24:9 26:4 26:9 33:23

**pro** 3:17

**probably** 20:10 51:25 54:2 55:7 59:5 79:22 97:14 97:19 103:25 104:13

**problem** 8:7 23:23 24:7 88:5

**procedure** 1:16

**proceeds** 38:7 69:22 105:15,16

**process** 41:15

**processes** 41:15

**produce** 107:5

**product** 24:8
**professional** 87:5
**profit** 68:14 69:9
69:14 102:3
**program** 64:12,23
64:25,25 65:10,14
65:17 67:12 68:10
**project** 13:7 86:24
87:17,25
**promissory** 12:11
13:14,19,25 14:5
14:14 15:10,17,21
16:16 18:17
**properties** 52:17
60:13 67:23 71:19
72:16 100:7 101:6
101:13
**property** 9:20
39:11,15 46:23
53:12 55:16 57:12
57:17 60:18,24
65:5 71:17 87:2,5
87:9,11 89:7,22
94:25 95:24
101:17
**proposal** 72:8
**proposed** 2:18
69:17
**proprietary** 84:7
**protect** 97:24
**protein** 41:16
**provide** 75:7,9
77:13 78:25 79:2
80:14,16 85:25
89:18,20 99:25
101:21
**provided** 14:14,20
15:9,22 16:17
17:12,15 18:3,3,18
62:19 72:20

**providing** 13:12
13:18
**public** 1:17 5:4
78:23 108:22
110:7 111:25
**purchase** 87:21
95:24
**purchasing** 41:14
**purpose** 20:24
25:5 26:17 33:15
**pursuant** 1:14 7:7
**put** 23:14 75:4
78:23 87:13

**q**

**queens** 81:8
**question** 11:16
13:17 22:15 27:3
30:18 39:4 47:24
48:24 49:24 51:4
51:7 99:6 102:17
103:20 109:24
**questioned** 14:10
**questions** 7:17,21
8:11 10:14 26:2
26:13,21,22,23,24
79:25 97:8,10
103:14,17 107:16
109:23
**quickly** 79:25
**quite** 107:7
**quote** 66:15

**r**

**r** 2:2 3:2 4:2 5:2,2
41:6,7 70:18
108:2 110:2
**radler** 2:8
**range** 43:12 59:3
**rate** 15:9
**read** 36:2 44:22

**real** 45:21 47:8,12
52:25 84:4,8
**really** 7:6 20:7
103:2 106:18
**realtor** 96:18
**realtors** 96:6
**reason** 5:18 21:4
21:20 100:22
111:5
**recall** 13:12,22,24
14:10 15:12,13,18
15:20 16:8,21,23
17:8 20:12,15
21:2 22:9 29:11
30:6,12 32:8
33:10,12 34:9
35:10 43:7 44:16
59:19 60:9 61:21
70:20 72:21 81:23
86:13
**receive** 50:15 51:7
51:9 58:16,25
59:15 69:18 75:20
77:14 86:11 93:16
102:2
**received** 38:9
40:21 41:22 42:22
42:24 56:6,9
69:13,14 96:4
**receiving** 53:17,18
67:12 69:15
102:10
**recess** 6:8 34:5
35:19 36:11 41:22
97:5
**recognition** 66:23
66:25 67:13
**recollect** 18:12,13
**recollection** 15:20
16:4,16 17:10
18:6 27:10 38:20

**record** 6:20,23
25:18 27:8 28:4,5
28:9,11 75:5
78:23 107:17
110:12
**recorded** 17:15
**records** 14:24
16:12 74:4,13
94:15,19,22 106:4
106:7,14,23,25
107:5
**red** 28:18
**reduce** 105:17
**reduction** 95:15
**refinanced** 60:6
**refinancing** 60:15
**reflect** 28:6
**reg** 1:3
**regard** 11:2 24:20
25:4 37:23 40:17
62:3 65:17 71:10
73:8 75:12 83:17
89:11
**regarding** 88:18
**regulations** 71:13
90:5
**related** 7:7 110:15
**relates** 7:13
**relating** 7:10,14
**relationship** 72:12
**relatively** 5:20
**relax** 25:22
**release** 68:4
**releases** 68:2,9
**relevant** 83:3
**relieve** 8:8 104:8
**rely** 18:4
**remember** 13:18
14:4 18:7 20:11
29:14,14,17 63:25

removed   32:20
renovate   59:13
  105:11,12
rent   9:12 38:19,22
  39:14 54:24 55:9
  55:10 75:14,17
  76:3,11,13,23,25
  77:14,19,19 85:13
  90:8,10,24,25
  92:19 97:23
rented   37:13
rents   76:5 90:20
repaid   13:10
repaired   77:25
repairs   98:19
  99:13
repeat   13:16 49:22
  49:23 99:6
report   77:11
reporter   23:3 24:3
  27:23 28:3,8,12
  49:9 54:21
reporting   111:1
represent   10:5
  21:10,15
representation
  11:21
represented   9:10
  9:11,14,16,17
  10:19,20,23
representing   5:10
  9:23 24:17 29:4,6
  65:19
represents   21:11
  21:11,12,13 63:19
request   109:16,17
  109:18,20,21
requested   109:14
requesting   99:23
required   23:11
  59:11 87:10,12

105:21,23
requirement
  59:25
requirements
  59:10
reserve   59:11
  105:23
reserved   4:22 27:6
residing   78:3 81:7
resigned   33:11
resigning   33:12
respective   1:14
  4:6
response   39:2
rest   55:16
return   88:9,12,14
  89:12
returned   40:16
returns   89:12
revenue   2:5,9,14
  5:11
right   8:24 35:23
  36:19 41:8 52:3,4
  73:4,15 74:5 77:9
  81:17 83:25 84:9
  92:4,6 98:23
  100:24 103:4,15
  104:24
rivkin   2:8
rmg   72:3,5
road   80:19,23
robert   3:17,19
roman   36:16,18
rosen   2:18,21 6:5
  8:13,17,24 11:5,10
  11:15 13:2,5
  17:21 18:19 22:11
  23:6,9,21 24:2,6
  25:7,13,22,25
  26:10,14,16,20
  27:16,21 28:7,14

28:22 49:21 50:19
  50:24 51:3 62:10
  62:22,24 82:22,25
rosen's   6:14
rosenberg   3:4 9:4
  10:20 12:8,10,19
  12:25 13:15,20
  15:2 17:6 18:9,18
  19:8 22:17 23:12
  24:11,15,20 29:7
  33:3 46:22 47:5
  51:19 62:14 63:14
  63:18 64:2,5
  65:12,18 66:12
  68:11 69:5,7
  72:10 100:15,18
  101:22,25 104:6
rosenberg's   57:2
  68:15 69:10 70:2
rosenbergs   66:7,8
  100:5
rugby   80:19,22
rules   1:15 7:7
rulings   109:23
runs   55:17
russell   2:4,9,14
  3:21 5:11
rutherford   75:23
  94:9
rxr   2:10

s

s   2:2 3:2 4:2,2 5:2
  49:13 70:18 109:2
  111:5
sa   36:15,16 39:23
  40:17
sadly   83:15 87:13
salary   93:23
sale   31:6,10 58:17
  58:19,25 59:13
  95:3

salmon   41:17
san   40:2
sandy   8:13,16,22
  8:23 11:11 24:2
  28:17,21
sanford   2:21
saying   33:9 63:11
  76:12 85:19
says   44:19 49:16
  51:23 62:16,17
  66:14,20 67:4,11
  70:2
schedule   88:25
schedules   44:15
  44:25 45:4 51:14
  51:22 56:15 72:22
  85:22
schwartzer   2:4,6
  5:8,9 6:3,10,18
  8:15 9:2 10:2 11:8
  11:12 23:24 25:10
  25:15,23 26:5,12
  26:16,25 27:19
  28:2,10 33:24
  49:24 50:22 51:2
  51:5 82:24 83:5
  97:3 103:12,18,19
  107:15 109:11
screen   102:18
se   3:17
sealing   4:7
second   10:22 44:6
  47:4 48:8 56:13
  57:5,8,9,15,18
  58:21,24 59:16,22
  60:19 61:20 67:20
  71:5 76:16 87:17
  101:9 103:23
secured   23:15
  61:19

security 83:10,13
  84:16
see 6:5 35:25 48:7
  96:10
seeking 7:12
seen 66:17 68:2,4
sell 42:13 57:16,22
  58:8,11,12
send 75:18 91:14
  91:17
sends 81:16
senior 46:19 47:7
  47:7
series 13:14
service 4:16
services 3:23
set 5:16 6:12 48:14
  82:12 110:11,20
seth 37:21
settlement 61:12
  61:14,14 67:21
  69:25
seven 58:12
seventy 92:13
shavuot 79:6
shaw 95:8 96:7
sheet 111:1
shelter 99:25
ship 41:19
shipped 41:19
short 5:20 34:5
  35:19 36:11 97:5
show 15:9
side 26:6,7
sign 18:14 73:15
signatories 44:7
signature 17:17
  110:22
signed 4:10,12,15
  14:16 20:2 33:2,4
  63:21 73:9

signing 100:12
similar 31:5,11,12
sister's 97:19
sitting 18:12
six 46:14 47:16,18
  91:20 105:4,8
size 31:13,14,16
  32:2
social 83:10,13
  84:16
sold 40:6,7 52:2,17
  52:19 58:13,14
  59:24 60:3 65:5
  70:9 77:6 104:15
  104:18,19,21,24
  104:25 105:4,13
  106:16,17
sole 45:12,15
somebody 62:14
  63:12
somewhat 7:23
  47:9
son 66:13
sorely 18:23
sorry 8:25 13:16
  21:17 23:8 38:21
  45:2,2 48:24
  54:12 58:2 67:3,7
  81:19 103:20
sort 53:11
sound 83:25
source 86:4
sources 56:7
south 2:5 40:2
  92:11,11
space 57:8
speak 63:7,20,23
  64:8 96:7
speaker 28:18
speaking 23:25
  63:25 64:2

special 89:5 91:7,9
  100:5
specific 13:22
  17:10 22:19 94:3
  94:5
specifically 14:12
specified 108:11
specify 9:22
speculative 55:8
  55:11
spend 99:12
spending 98:25
  99:8,16
spilled 35:24
spills 48:7
spiral 32:19
spoke 10:23 24:10
  34:24 64:3,4
ss 110:4
stabilization 9:12
stabilized 77:20
stage 51:25
stainless 32:18
staircases 32:19
standard 73:16
start 36:21
state 1:17 5:4 6:19
  6:22 14:6 16:17
  28:12 110:4,8
statement 43:25
  75:18
statements 28:4
  91:8,15,25 93:8,17
states 1:2 3:13
status 40:4
stay 97:14
stayed 104:14
  105:16
steel 32:18
stefan 12:6 37:21

stella 49:8,12 80:5
stella's 80:14
stipulated 4:5,20
stop 25:23 37:7
street 17:7 19:15
  45:11 52:12 53:2
  71:4 76:17 78:8
  91:23 92:7 97:15
stuart 2:11
studio 56:3
stuyvesant 80:3
subject 66:22
sublease 38:2 39:5
subscribed 108:18
  111:22
subsequent 95:14
substantial 32:13
  85:23 86:19
subtenant 38:22
subtracted 46:18
successfully 70:10
suffolk 110:5
suite 2:5 3:10
sum 84:20
supervised 71:13
support 10:8
supporting 87:2
suppose 47:7
  85:12 93:10
supposed 68:9
  75:20
sure 14:17 15:2,14
  18:11,14 20:16
  31:9 35:5 38:16
  38:16 50:6 61:4
  69:11 75:10 79:3
  82:17 89:17 94:24
  98:2 99:20 103:21
surgical 42:11
sworn 4:10 5:4
  108:5,18 110:11

111:22
syosset 3:11

**t**

t 4:2,2 5:2 20:12
41:6,7 49:13
70:18 91:6 108:2
109:2 110:2,2
table 7:24
take 5:21 10:17
34:2 36:10 61:6
96:25 98:14
taken 1:13 6:9 7:3
34:6 35:20 36:12
41:23 97:6
talk 90:16
talking 24:20,23
99:13 104:17
talks 28:14
tax 84:4,8 88:9,12
88:14,18 89:11,12
taxes 47:8,12
55:18 77:19 85:3
87:3
tech 3:22
technical 23:5
24:5 27:25
telephone 6:16
75:2,5,8 96:18,20
96:21,24 109:16
tell 16:4 21:20,23
23:24 27:17 31:3
33:8 36:3 45:8
62:18 97:12 98:21
104:10 106:21
telling 11:13 26:5
tells 96:8
temporarily 77:22
ten 18:16 86:17,20
103:25 104:19
107:10

tenant 38:21 39:6
39:7 55:21,24
56:2
tenth 52:12 54:17
terminated 38:25
39:7,12
terms 29:10,19
30:14 64:4,9
68:24 96:15
terraces 32:19
terrible 26:22
testified 5:5
testify 108:5
testimony 108:6
108:10 110:13
thank 8:25 34:4
36:13,13 51:10
75:11 79:4 89:22
102:25 103:3,11
103:18 107:8
thin 37:4
thing 42:2 55:13
98:7 100:24
101:25
things 10:14 42:11
82:11
think 11:23 13:4
21:13 28:20 32:6
38:18 39:9,13
43:3,11 47:15
48:16 51:20 52:23
54:5 55:19 57:13
58:13 60:8 70:6
70:12 71:22 73:2
78:10,10 80:22
81:25 90:25 91:5
94:21 95:4,21
96:20 102:22,23
103:4 104:10
thinking 96:15

third 2:20 3:5
70:10 104:21,24
thought 22:25
82:6 104:17
three 37:8 57:7
58:14,14 60:16
61:16,16 62:12
89:8 104:10,11,13
104:23 106:3
time 1:9 4:22 5:15
5:16,21 6:13 8:11
10:15 11:19 12:15
13:7 18:24 21:19
23:11 27:18 30:3
30:7 32:4 33:7
35:3,4 38:8 40:14
50:8,13 56:14,19
58:19 73:23 78:14
79:17 82:7,10
83:20 84:3 86:14
87:24 94:16 96:8
96:8 102:18,19
103:17 108:10
times 7:25 28:13
timing 103:2
tippins 95:8
tired 79:18,23
tlg 20:5,9,12,18
21:20,24 22:6
32:24 33:4,15,18
today 7:17,22 78:5
90:5 103:6
told 22:13 64:9
95:12
tools 42:11
top 46:16
total 76:12
totally 31:23
town 74:2
towns 37:14

trail 106:20
transaction 24:18
24:21 51:19 52:21
57:2 66:22 69:16
100:19
transactions 93:22
106:5
transcript 10:16
108:9,9
transfer 50:11
transferred 52:20
transfers 50:17
82:13
transition 93:19
93:21 94:2
tri 36:17 42:5
trial 3:22 4:22
tried 88:23
triple 38:6
trouble 8:18
troubling 54:6
tru 36:17 41:6,24
true 14:15,18
108:9 110:12
trust 48:18 49:7,7
49:8,8,8,11,11,12
trustee 3:13
trustees 82:14
trusts 21:12 48:12
50:12 51:8 81:18
81:20,21 82:15,19
82:20 85:17,20
86:12
truth 108:5
try 97:8
trying 8:20 17:10
21:5 45:16 88:6
ts 43:16
tuesday 79:6
turnpike 3:10

**twelve** 85:7
**twice** 32:2
**two** 7:8,11 31:21
32:18 41:4 47:10
52:16,18 57:23,24
57:25 58:3,4,5
58:13,15 59:17,18
60:16 103:23
105:3

**u**

**u** 4:2 5:2 41:6,7
**uh** 9:10,18,18
12:10 15:25 17:7
17:7 18:4 30:16
35:8,15 38:12,17
42:11,12,13 43:21
45:11 48:22,22
49:4 52:22 55:4
57:8,12 58:9 60:4
64:4,11,12 65:3,23
66:21 70:20 71:11
71:13,15,17,22
72:2,6 73:11
78:11 81:12 84:15
84:20 87:7,16
90:25 92:10,24
94:10 95:4 97:18
97:19 98:8 101:18
103:24 104:4,5
105:16 106:2,15
**um** 39:13 46:24
63:9 64:19 84:6
106:6
**unable** 28:6
**understand** 6:11
14:17 16:3 26:12
27:3,4 29:4 45:17
52:22 63:18 64:6
67:7,8 79:5 81:5,5
83:2 98:2

**understanding**
68:8
**understands** 11:17
**unemployment**
83:11,12
**unfortunately**
87:17
**union** 43:22 44:9
**uniondale** 2:10
**unique** 101:19
**unit** 32:14 45:25
46:7 58:11 77:20
93:3
**united** 1:2 3:13
**units** 31:21 57:23
58:14,15,17,20
86:24 89:8,10
104:14
**university** 57:10
**unsecured** 18:17
**unsigned** 4:14
**use** 97:21
**utilities** 84:10,13
98:9

**v**

**vacant** 87:11
**value** 31:2 32:10
32:11 40:13 41:2
44:20 46:11,14,15
47:19 53:5,12,14
53:22 54:14,19
55:7,8,14 59:20,23
60:4 65:6 82:13
89:6 100:4
**valued** 60:11
**values** 100:25
**various** 35:8 65:7
**vegas** 2:6 57:13,14
60:24 94:25
**ventures** 36:17
42:5

**veritext** 111:1
**version** 68:13
**vi** 36:16 40:18
**victim** 35:24
**video** 6:15
**virtual** 1:12
**visit** 78:13 102:23

**w**

**wait** 6:4 34:3
44:17,17,21 48:23
**waived** 4:9
**want** 5:24 10:13
28:5 75:6 78:23
79:15 103:16
106:16 107:9,11
**wanted** 23:15
74:12 95:13
**wants** 103:14
**water** 77:25
**waterfall** 68:16,25
69:23
**way** 29:22 30:24
31:12 48:13
110:17
**wealthy** 82:7
**went** 59:9,14
63:10 64:8 104:20
105:10 106:21
**westchester** 86:25
89:16
**whereof** 110:19
**wife** 19:18,19
20:10 21:15 22:3
35:3 44:11 45:20
78:6,21 79:20,22
82:16 84:15
102:16
**william** 2:13,16
**willing** 30:5
**win** 94:17

**winter** 48:4,6,17
48:21 49:3,5
**winthrop** 73:12
92:24
**wish** 103:10
**witness** 4:10,16,18
5:3 6:2 11:7 23:8
23:10 27:20,22
28:17,24 33:22
34:4 36:9,13
41:21 49:23
107:19 110:10,13
110:19
**witnesses'** 111:3
**wondering** 18:6
**word** 28:16 50:23
**words** 45:16
**work** 24:8 59:25
75:22,23,24 91:21
93:12 94:2,13
105:10,12
**working** 93:18
100:23
**works** 92:9,10,12
**worry** 79:11
**worth** 40:13 53:10
54:10
**worthy** 87:17
**writing** 29:22
30:13
**wrong** 26:20 80:24

**x**

**x** 1:3,6 109:2,8

**y**

**yeah** 15:7 22:23
52:6 53:16 60:17
62:16 63:25 80:4
90:6 92:14 95:18
104:23

**year**   38:23 43:14
   46:25 53:20,22
   55:2,5 56:7,10
   72:19,24 77:13,15
   81:23 103:23,24
**years**   18:17 32:6,9
   37:8 52:16,18
   57:17,23,24,25
   58:3,5,15 59:17,18
   60:16 73:12 74:7
   86:17,20 87:15
   88:19,24 105:3
   106:3
**yesterday**   35:17
   78:12 89:3,5
**york**   1:2,17 2:10
   2:15,15,20,20 3:6
   3:6,11,14 5:5 6:13
   6:25 9:12 17:16
   37:15 57:10 110:4
   110:8 111:1

**z**

**z**   49:12
**zero**   44:20 61:16
   77:16
**zoe**   49:8,12 80:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.